**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

---

| | | |
|---|---|---|
| FORD MOTOR COMPANY, | ) | |
| | ) | Hon. Harold A. Ackerman |
| Plaintiff, | ) | |
| | ) | Civil Action No. 06-1278 |
| v. | ) | |
| | ) | *Consolidated with* |
| EDGEWOOD PROPERTIES, INC., | ) | |
| | ) | Civil Action No. 06-4266 |
| Defendant-Counterclaimant. | ) | |
| | ) | **SECOND AMENDED** |
| EDGEWOOD PROPERTIES, INC., | ) | **OPINION & ORDER**[*] |
| | ) | |
| Third-Party Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| FORD MOTOR LAND DEVELOPMENT, | ) | |
| CORPORATION, MIG/ALBERICI, LLC, and | ) | |
| and EQ NORTHEAST, INC. | ) | |
| | ) | |
| Third-Party Defendants. | ) | |
| | ) | |
| PREFERRED REAL ESTATE, | ) | |
| INVESTMENTS, INC. and 240 | ) | |
| PRINCETON AVENUE ASSOCIATES, L.P., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| EDGEWOOD PROPERTIES, INC., COLUMBIA | ) | |
| GROUP AT HAMILTON, LLC, FORD MOTOR | ) | |

---

[*] This Second Amended Opinion & Order corrects several references in the Court's
original Opinion.  In several places, the Court inadvertently omitted Ford Motor Land
Development Corporation as a defendant in the Trenton Action, and misstated the precise nature
of Edgewood's claims in the Trenton Action.  The Opinion has been revised for accuracy, and
the Order has been similarly corrected.

COMPANY, AND FORD MOTOR LAND )
DEVELOPMENT CORPORATION, )
                                 )
              Defendants. )
———————————————————————)
                                 )
EDGEWOOD PROPERTIES, INC., and )
COLUMBIA GROUP AT HAMILTON, LLC, )
                                 )
              Third-Party Plaintiffs, )
                                 )
       v. )
                                 )
MIG/ALBERICI, LLC, and )
EQ NORTHEAST, INC. )
                                 )
             Third-Party Defendants. )
———————————————————————)

John McGahren, Esq.
PATTON BOGGS LLP
One Riverfront Plaza, 6th Floor
Newark, New Jersey 07102
*Attorneys for Ford Motor Company and*
*Ford Motor Land Development Corporation*

James Stewart, Esq.
Khizar A. Sheikh, Esq.
LOWENSTEIN SANDLER PC
65 Livingson Avenue
Roseland, NJ 07068
*Attorneys for EQ Northeast, Inc.*

Martha N. Donovan, Esq.
NORRIS MCLAUGHLIN & MARCUS, PA
721 Route 202-206
Bridgewater, NJ 08807
*Attorneys for MIG/Alberici, LLC*

Steven G. Sanders, Esq.
David Fassett, Esq.
ARSENEAULT, FASSETT & MARINO
560 Main Street

2

Chatham, NJ 07928

Melvyn I. Weiss, Esq.
Ariana J. Tadler, Esq.
Jennifer L. Young, Esq.
MILBERG WEISS & BERSHAD LLP
One Pennsylvania Plaza
New York, New York 10119
*Attorneys for Edgewood Properties, Inc. & Columbia Group at Hamilton, LLC*

Anthony L. Gallia, Esq.
DUANE MORRIS, LLP
30 South 17th St.
Philadelphia, PA 19103-7396

John C. Barnoski, Esq.
Roxanne Elizabeth Jayne, Esq.
COZEN O'CONNOR
Liberty View
457 Haddonfield Road, Suite 300
Cherry Hill, NJ 08002
*Attorneys for 240 Princeton Avenue Associates, LP & Preferred Real Estate Investments, Inc.*


**ACKERMAN, Senior District Judge:**

　　This action arises from the demolition of a car manufacturing facility and the subsequent

attempt to reuse crushed concrete from that facility at other properties in New Jersey, where

some of the crushed concrete contained a quantity of a chemical in excess of statutory

environmental limits.  Before the Court are six motions to dismiss spanning two suits originally

commenced in Newark and Trenton and now consolidated before this Court (Civ. Nos. 06-1278

(the "Newark Action") & 06-4266 (the "Trenton Action")).  MIG Alberici ("Alberici") filed

motions to dismiss in the Trenton Action, as well as in the Newark Action (Trenton Docket No.

53, Newark Docket No. 30); EQ Northeast ("EQ") filed motions to dismiss in both cases

(Trenton Docket No. 54, Newark Docket No. 31); and Ford Motor Company ("Ford") & Ford

Motor Land Development Corporation ("Ford Land") filed motions to dismiss in both cases

(Trenton Docket No. 31, Newark Docket No. 32), all pursuant to Federal Rule of Civil Procedure

12(b)(6).[1]  For the following reasons, Alberici's motions to dismiss are granted in part and denied

in part; EQ's motions to dismiss are granted in part and denied in part; and Ford's and Ford

Land's motions to dismiss are granted in part and denied in part.

### *Background*

**I.     Newark Action, Docket No. 06-1278**

Ford operated an automobile assembly plant, located on U.S. Route 1 in Edison

Township, New Jersey (the "Edison Plant" or the "Plant").[2]  In February 2004, Ford closed the

Edison Plant, and began dismantling and decommissioning the structure.  As required by the

Industrial Site Recovery Act ("ISRA"), *see* N.J. Stat. Ann. § 13:1K-6, Ford entered into a

Remediation Agreement with the New Jersey Department of Environmental Protection

("NJDEP") to facilitate the lawful demolition of the building.

In February 2004, Ford contracted with Alberici to conduct the demolition of the Plant's

concrete floor slabs, which Alberici planned to reuse for on-site fill, road bed, and other similar

uses.  The contract required Alberici to dispose of the concrete from the demolition project by

---

[1] Each defendant's motion to dismiss in the Newark Action before this Court is essentially identical to that same party's motion to dismiss filed originally in the Trenton Action. For purposes of judicial economy, this Court will adjudicate each party's two motions in a unified analysis, except where the respective pairs of motions diverge in substance.

[2] Ford Motor Company is a corporation organized and existing under the law of the State of Delaware, with its principal place of business in Dearborn, Michigan.

following NJDEP regulations governing detections of polychlorinated biphenyls ("PCBs") in the concrete material.  Specifically, NJDEP regulations allow distribution of concrete material with a PCB detection level below 0.49 parts per million ("ppm") for use in residential zones, and distribution of concrete material with a detection level between 0.49 ppm and 2 ppm for use in commercial zones.  Concrete material that tests for PCB concentration above 2 ppm is prohibited by the NJDEP for reuse in any zone.  On November 9, 2004, NJDEP approved Alberici's request to reuse crushed concrete at the Edison Plant, provided that the crushed material did not contain unlawful detections of PCBs.  Accordingly, once the concrete was crushed, Alberici segregated the concrete material depending upon its concentration of PCB constituents.

On February 24, 2005, Ford and Edgewood Properties, Inc. ("Edgewood")[3] entered into a written agreement (the "First Contract").  Ford agreed to provide Edgewood with up to 50,000 cubic yards of crushed concrete from the Edison Plant containing PCB levels suitable for residential use, and in return Edgewood would transport the concrete material off-site for use as fill.  Pursuant to the First Contract, Edgewood received approximately 32,000 cubic yards of crushed concrete material from the Edison Plant, and transported the concrete to six New Jersey properties.[4]

On April 27, 2005, Edgewood contends that Golder Associates, Inc., Ford's environmental consultant, provided ELM, Inc., Edgewood's environmental consultant, with a

---

[3] Edgewood Properties, Inc. is a corporation organized under the laws of the State of New Jersey, with its principal place of business in Piscataway, New Jersey.

[4] Edgewood transported concrete from the Edison Site to the following six New Jersey properties: American Standard, Hamilton Township; Fulton Street, New Brunswick; Applegarth, Monroe Township; Laurelton Mobile Home Park, Brick Township; West Windsor Township Site, West Windsor; and Tingley, South Plainfield.

memorandum that stated that "only those stockpiles [of concrete] where the samples exhibited PCB concentrations [suitable for residential] use cleanup criteria are currently being staged for potential re-use at appropriate off-site locations," while "stockpiles where the samples exhibited PCB concentrations above the [residential] use criteria, . . . are segregated and properly disposed off-site."  (Edgewood's Counterclaims at ¶ 29.)[5]

On June 10, 2005, Edgewood entered into a Subcontract (the "Second Contract") with Third-Party Defendant, EQ Northeast ("EQ") to crush concrete from the Edison Plant.  Ford and Ford Land did not sign the Second Contract, but Edgewood claims that Edgewood entered into the Second Contract with EQ and Ford Land, Ford's wholly-owned subsidiary.  According to the Second Contract, Edgewood agreed to "remove all crushed material that has been proven to be free of contamination, or to have contamination levels [suitable for] commercial standards, for use at [Edgewood's] Applegarth site or other [Edgewood] commercial sites."  (Third-Party Compl., Ex. C (the "Second Contract"), Agreement at ¶ 3.)[6]  EQ was responsible for testing all crushed material for environmental contamination, and to handle all crushed material that had contamination levels above commercial zone regulations.  According to Edgewood, at no time under the First Contract with Ford or under the Second Contract with EQ did it ever select which piles of concrete it would take from the Plant, because only Ford, Ford Land, Alberici, and EQ knew which piles of concrete met the residential use criteria and which did not.

_____

[5] All citations to "Counterclaims" refer to Edgewood's Newark Action counterclaims.

[6] Under the Second Contract, Edgewood transported concrete to the following seven New Jersey properties (the "Properties"): American Standard, Hamilton Township; Fulton Street, New Brunswick; Applegarth, Monroe Township; Laurelton Mobile Home Park, Brick Township; West Windsor Township Site, West Windsor; Tingley, South Plainfield; and Brick 70, Brick.

In addition, the Second Contract provided that EQ and Ford Land would "indemnify [Edgewood] and hold [Edgewood] harmless against (1) any claims, penalties or fines arising from a determination that [Edgewood] is not permitted to use the processed material, and (2) any claims, damages or losses incurred because of [Edgewood's] handling of hazardous material at the Ford plant, Edison, New Jersey."  (*Id.*)

On or about June 23, 2005, Edgewood discovered that the concrete from the Edison Plant contained levels of PCBs in excess of the residential use criteria, and in some instances, in excess of commercial use criteria.  Beginning in September 2005, Ford responded to complaints from Edgewood and its counsel regarding the levels of PCBs in the concrete by "commencing excavation, removal and disposal of [concrete] from four of the sites." (Ford's Newark Br. at 3.) Further, in early 2006, Ford commenced excavation and removal from a fifth property, the American Standard property.  According to Edgewood, Ford's sampling results submitted to the NJDEP in connection with the remediation of the Properties confirmed that the concrete provided under the First and Second Contracts exceeded the residential use criteria for PCBs**.**

On March 8, 2006, the NJDEP issued an Order, *In the Matter of Ford Motor Company/Ford Motor Land Development Corporation, Edgewood Properties Inc. and MIG/Alberici, L.L.C., Respondents*, EA ID# PI V1166 (the "Administrative Order"), pursuant to the New Jersey Spill Compensation & Control Act ("Spill Act"), the Solid Waste Management Act, and the Solid Waste Utility Control Act.  The Administrative Order declared that "concrete materials contaminated with PCBs of various ranges have been located at the seven properties." (Compl. at ¶ 34.)[7]  The Administrative Order directs Ford, Edgewood and Alberici to submit a

---

[7]All citations to "Compl." refer to Ford's Newark Complaint (Newark Docket No. 1).

Response Plan to NJDEP "to complete the removal of all contaminated concrete waste material transported from Ford Motor Company's Plant Site in Edison New Jersey and brought to [seven of Edgewoods' sites.]"  (*Id.* at ¶ 36.)  In addition, the NJDEP ordered Edgewood to stop development of the Properties, which Edgewood contends resulted in millions of dollars in damages.

Pursuant to the Administrative Order, Ford has conducted investigations, remediation work, and other response actions at the Properties identified by the NJDEP.  In September 2005, Ford and EQ began, but did not complete, the removal of the concrete from several of Edgewood's sites.  Ford claims that it will continue to perform work pursuant to NJDEP-approved Response Plans, and that it has incurred costs and will continue to incur cleanup and removal costs in connection with these response actions.

## II.     Procedural History of Newark Action

On March 17, 2006, Ford filed a Complaint in this Court against Edgewood, Civ. No. 06-1278, for recovery of costs and declaratory relief under Section 58:10-23.11f(a)(2) of the Spill Act.  Ford alleges that pursuant to the Spill Act, "if it is liable for costs related to [the clean up of] the Seven Properties, then . . . Ford is entitled to contribution from [Edgewood], and all investigation and remediation costs which Ford has or will incur, or for which Ford is deemed liable, should be allocated among [Edgewood] and Ford, using such equitable factors as the Court deems appropriate, including [Edgewood's] express indemnification of Ford for all such costs under the [First Contract]."  (Compl. at ¶ 48.)  On December 7, 2006, Edgewood timely answered Ford's Complaint (Newark Docket No. 14), and asserted Counterclaims against Ford and third-party claims against Ford Land, Alberici and EQ.

8

### III.      Trenton Action, Docket No. 06-4266

On September 6, 2006, in a separate action, Plaintiff 240 Princeton Avenue Associates, L.P. ("240 Princeton") filed a Complaint against Edgewood and Columbia Group at Hamilton, LLC ("Columbia"), which was subsequently assigned to the Trenton vicinage.  The Trenton Action arises out of the redevelopment of the former American Standard site, a former porcelain toilet manufacturing facility located at 240 Princeton Avenue, Hamilton, New Jersey.  As noted above, the American Standard site is one of the Properties, and is addressed by the NJDEP's Administrative Order.  240 Princeton is the owner of Lot 10.02 of the American Standard Site, and Columbia Group is the owner of Lot 10.01 of the American Standard Site.

240 Princeton's initial Complaint alleges several claims unrelated to the issues raised in this Opinion.  On September 15, 2006, 240 Princeton amended its Complaint, adding Preferred Real Estate Investments, Inc. ("Preferred") as a Plaintiff, adding Ford and Ford Land as Defendants, and adding additional claims against Edgewood and Ford relating to Edgewood's use of crushed concrete from the Edison Plant as material in a roadbed on the American Standard site. On October 25, 2006, Edgewood and Columbia filed third-party claims against EQ and Alberici, as well as crossclaims against Ford and Ford Land.  (*See* Trenton Docket No. 16).  Edgewood's crossclaims and third-party claims relate to the concrete obtained from the Edison Plant and used at the Properties.[8]

On November 29, 2006, Ford and Ford Land filed a motion to stay or dismiss the

---

[8] Edgewood's crossclaims against Ford in *Preferred Real Estate v. Edgewood,* No. 06-4266, are essentially identical to Edgewood's counterclaims against Ford in *Ford v. Edgewood,* No. 06-1278.  Furthermore, Edgewood's third-party claims against Alberici and EQ in *Preferred Real Estate v. Edgewood,* No. 06-4266, are essentially identical to Edgewood's third-party claims against Alberici and EQ in *Ford v. Edgewood*, No. 06-1278.

9

crossclaims of Edgewood (*See* Trenton Docket No. 31).  On January 16, 2007, both Alberici and

EQ filed motions to dismiss Edgewood's Third-Party Complaint against them.  (*See* Trenton

Docket Nos. 53, 54.)

On February 28, 2007, by Opinion and Order, Magistrate Judge Salas consolidated *Ford*

*Motor Co. v. Edgewood Properties, Inc.*, Civil Action No. 06-1278 with the Trenton Action,

*Preferred Real Estate Investments v. Edgewood Properties, Inc.*, Civil Action No. 06-4266.

Hereinafter, all papers were filed under docket number 06-1278.

On July 25, 2007, 240 Princeton and Preferred entered a stipulation of dismissal with

prejudice of its claims against Edgewood and Columbia.  (*See* Trenton Docket No. 65.)

Edgewood's crossclaims against Defendants Ford and Ford Land, and Edgewood's third-party

claims against Alberici and EQ remain pending and are addressed by the Court in this Opinion.

## *Analysis*

Pursuant to Federal Rule of Civil Procedure 12(b)(6), a defendant may move to dismiss a

complaint or parts of a complaint before or after filing an answer.  A motion to dismiss will be

granted if a count or complaint fails to state a claim upon which relief can be granted.  In

evaluating a motion to dismiss pursuant to Rule 12(b)(6), the court must "accept as true all

allegations in the complaint and all reasonable inferences that can be drawn therefrom, and view

them in the light most favorable to the plaintiff."  *Kanter v. Barella*, 489 F.3d 170, 177 (3d Cir.

2007) (quoting *Evancho v. Fisher*, 423 F.3d 347, 350 (3d Cir. 2005)); *see also, e.g.*, *Labov v.*

*Lalley*, 809 F.2d 220, 221 (3d Cir. 1987).  A complaint must contain "enough facts to state a claim

to relief that is plausible on its face," and the "[f]actual allegations must be enough to raise a right

10

to relief above the speculative level on the assumption that all the allegations in the complaint are true." *Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955, 1965, 1974 (2007) (internal citations omitted). Yet, "[u]nder the liberal federal pleading rules, it is not necessary to plead evidence, and it is not necessary to plead all the facts that serve as a basis for the claim." *Foundation Credit Funds, LLC v. Branch Banking & Trust Co.*, No. 06-0893, 2006 WL 3780677, at *1 (D.N.J. Dec. 21, 2006).  A court need not accept "'unsupported conclusions and unwarranted inferences,'" *Baraka v. McGreevey*, 481 F.3d 187, 195 (3d Cir. 2007) (quoting *Schuylkill Energy Res., Inc. v. Pa. Power & Light Co.*, 113 F.3d 405, 417 (3d Cir. 1997)), and "[l]egal conclusions made in the guise of factual allegations . . . are given no presumption of truthfulness," *Wyeth v. Ranbaxy Labs., Ltd.*, 448 F. Supp. 2d 607, 609 (D.N.J. 2006) (citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986)); *see also Kanter*, 489 F.3d at 177 ("[A] court need not credit either 'bald assertions' or 'legal conclusions' in a complaint when deciding a motion to dismiss.") (quoting *Evancho*, 423 F.3d at 351).  Sitting in diversity, this Court applies the law of the state of New Jersey to test the sufficiency of Edgewood's claims.

Cutting through the morass of briefs, the Court will address these six motions in the following manner: In Part I, the Court will address Edgewood's claims against third-party defendant Alberici in the Newark Action.  In this analysis, the Court will first examine the substantive sufficiency of Edgewood's claims before briefly discussing whether Edgewood's claims satisfy the procedural requirements of a third-party action.  In Part II, the Court will address identical claims made by Edgewood against Alberici in the Trenton Action.

In Part III, the Court will examine Edgewood's claims against third-party defendant EQ in the Newark and Trenton Actions.  In this assessment, the Court will first determine whether

11

Edgewood alleges a proper third-party action against EQ before appraising whether Edgewood states claims upon which relief may be granted.

In Part IV, the Court will evaluate Edgewood's counterclaims against Plaintiff Ford and Edgewood's third-party claims against third-party defendant Ford Land.  While most of this discussion will address the substantive sufficiency of Edgewood's claims against Ford and Ford Land, the Court will also analyze the third-party procedural issues that arise in Edgewood's third-party suit against Ford Land.

In Part V, the Court will apply its findings in the Newark Action to Edgewood's claims against Ford and Ford Land in the Trenton Action, while addressing one additional argument made by Ford and Ford Land.  Finally, in the conclusion, the Court will offer a comprehensive summary of Edgewood's claims that survive, and those claims that merit dismissal.

**I.     Edgewood's Newark Action Claims Against Alberici (Newark Docket No. 30)**

In its Third-Party Complaint, Edgewood asserts two causes of action against Alberici: contribution and negligence.  Specifically, Edgewood alleges in Count V of its Third-Party Complaint that "[i]f Edgewood is liable for costs related to the Properties under the Spill Act, then pursuant to [that Act], Edgewood is entitled to contribution from Alberici."  (Third-Party Compl. at ¶ 51.)  In Count VI, Edgewood alleges that "[a]s a direct and proximate result of Alberici's breach of the duty of care owed to Edgewood, Edgewood suffered damages in an amount to be determined at trial."  (Third-Party Compl. at ¶ 55.)  Alberici argues that Edgewood fails to state a claim upon which relief may be granted, as well as that Edgewood fails to allege a proper third-party claim.  The Court will first address Edgewood's Spill Act and negligence claims before turning to Alberici's procedural argument regarding Edgewood's third-party claim.

### A.    Edgewood's Spill Act Claim Must Be Dismissed

The Spill Act states, in relevant part, that

> [w]henever one or more dischargers or persons cleans up and
> removes a discharge of a hazardous substance, *those dischargers
> and persons shall have a right of contribution against all other
> dischargers* and persons in any way responsible for a discharged
> hazardous substance or other persons who are liable for the cost of
> the cleanup and removal of that discharge of a hazardous substance.
> . . . *In resolving contribution claims, a court may allocate the costs
> of cleanup and removal among liable parties using such equitable
> factors as the court determines are appropriate*.

N.J.S.A. § 58:10-23:11f(a)(2)(a) (emphasis added).

The issue is whether the Spill Act permits Edgewood to seek contribution from a third-party defendant.  In its motion to dismiss, Alberici argues that "courts have uniformly interpreted this language to mean that a responsible party under the Spill Act can only be held accountable for its equitable share in the first instance and, therefore, cannot as a matter of law, seek contribution from other allegedly responsible parties."  (Alberici's Newark Br. at 7.)  To support its position, Alberici cites two cases from this District allegedly establishing that, despite the "contribution" language of the Spill Act, "private parties . . . can only recoup from Edgewood the latter's 'fair share' of the cleanup and removal costs."  (Alberici's Newark Reply Br. at 11.)  In contrast, Edgewood relies on the express language of the Spill Act, arguing that it permits contribution claims based on joint and several liability.  Two cases from this District shed persuasive light on this question.

In *SC Holdings, Inc. v. A.A.A. Realty Co.*, now-Chief Judge Brown dismissed a third-party action under the Spill Act for failure to state a claim.  No. 95-0947, 1996 U.S. Dist. LEXIS 12428, at *29 (D.N.J. Aug. 19, 1996).  There, the third-party plaintiff initiated an action under the

13

Spill Act against other allegedly liable parties.  Analyzing the face and scheme of the statute, together with its legislative history, Judge Brown observed that the relevant provisions of the Spill Act "read[ ] in a manner substantially similar to CERCLA," the Spill Act's federal cousin.  *Id.* at *28.  Under CERCLA, "liable parties [are] limited in their recovery only to such costs as are ascribed to third parties on a several liability basis." *Id.* at *29.  Judge Brown also discerned a discrepancy in the Spill Act: Whereas one provision of the Spill Act, section 58:10-23g(c)(1), describes joint and several liability, another provision, section 58:10-23f(a)(2), "reads much more closely to [ ] CERCLA, by providing a right of [several] contribution [by] authorizing the courts to equitably allocate the costs of cleanup and removal among the parties." *Id.* at *30. Accordingly, Judge Brown concluded "that the Spill Act can fairly be read only to allow . . . a right to seek contribution, not to maintain a cost recovery action" that would sound in joint liability. *Id.* at *32.  Thus, because the third-party plaintiff sought to maintain a cost recovery action, Judge Brown dismissed the third-party action for failure to state a claim.

In *Reichhold, Inc. v. United States Metals Refining Co.*, Judge Debevoise also dismissed a third-party action under the Spill Act for failure to state a claim.  No. 03-453, 2004 WL 3312831, at *7 (D.N.J. Oct. 27, 2004).  In that case, the third-party plaintiff alleged "that if found liable to [the plaintiff] or any other person for any of the relief sought in the Complaint, including liability for cleanup and removal costs, it will be entitled to contribution from Third-Party Defendants under the Spill Act." *Id.* at *6.  Judge Debevoise cited to the Third Circuit's opinion, *In re Reading Co.*, which stated that "when there is no question that joint liability is lacking, a necessary element to establish contribution cannot be proven.  The claim for contribution must then, as a matter of law fail[;] CERCLA contribution, like common law contribution requires

14

some form of joint liability." *Id.* at *7 (quoting 115 F.3d 1111, 1124 (3d Cir. 1997)).  Judge

Debevoise thus held that "[b]ecause rights of contribution in this case are analogous under

CERCLA and the Spill Act and because [the third-party plaintiff] will not be liable for an amount

in excess of its pro rata share of harm . . . it cannot seek contribution from Third-Party Defendants

under the Spill Act." *Reichhold*, 2004 WL 3312831, at *7.

      The above analyses from other judges in this District are compelling.  While the Spill Act

supports contribution for Ford against Edgewood, the Spill Act does not contemplate liability

against Edgewood beyond Edgewood's own fair share.  "[S]ince contribution has traditionally

existed on a several basis," *see SC Holdings*, 1996 U.S. Dist. LEXIS 12428, at *30, the Spill

Act's remedial focus on contribution indicates a provision for several, and not joint, liability.

Edgewood attributes no caselaw to the contrary.  Instead, it states that "[w]hether Edgewood has

in fact paid more than its pro rata share in remediating the properties is not an issue properly

raised at this early pleading stage."  (Edgewood's Newark Br./Alberici at 14.)[9]  This Court

disagrees.  As a matter of law, Edgewood cannot be found liable for more than its fair share.

Count V of Edgewood's Third-Party Complaint must be dismissed.

      **B.**    **Edgewood States a Claim for Negligence Upon Which Relief Can Be Granted**

      Alberici next argues that Edgewood fails to state a claim for negligence because Alberici

did not owe a legal duty of care to Edgewood.  Alberici anchors its argument in the absence of any

"relationship between Alberici and Edgewood, contractual or otherwise."  (Alberici's Newark Br.

---

     [9] Because Edgewood filed opposition briefs against Alberici, EQ, and Ford/Ford Land, the Court, in the interest of clarity, refers to Edgewood's respective opposition papers as "Edgewood's Newark Br./[Defendant] at [page]."

at 9.)

      Sitting in diversity, this Court is "reposed with responsibility for determining the scope of tort liability." *Kelly v. Gwinnell*, 96 N.J. 538, 552 (1984).  The "traditional negligence elements [are] duty, foreseeability, breach, and causation." *Consolidated Rail Corp v. Gottshall,* 512 U.S. 532, 566 (1994).   "The imposition of a duty to exercise care to avoid a risk of harm to another involves considerations of fairness and public policy implicating many factors." *Olivio v. Owens-Illinois, Inc.*, 186 N.J. 394, 401 (2006).  "The foreseeability of harm is a significant consideration in the determination of a duty to exercise reasonable care." *Carvalho v. Toll Bros. & Developers*, 143 N.J. 565, 572 (1996).  Additional factors to consider are "the relationship of the parties, the nature of the attendant risk, the opportunity and ability to exercise care, and the public interest in the proposed solution." *Hopkins v. Fox & Lazo Realtors*, 132 N.J. 426, 439 (1993).  Put differently, "the concept of foreseeability [subsumes] many of the concerns we acknowledge as relevant to the imposition of a duty: the relationship between the plaintiff and the tortfeasor, the nature of the risk, and the ability and opportunity to exercise care." *Carter Lincoln- Mercury, Inc. v. EMAR Group, Inc.*, 135 N.J. 182, 194 (1994).

      Alberici argues that "[t]here is nothing in New Jersey case law that even approaches attaching a legal duty of care in the case in which a company, which is not a landowner, is conducting operations at a site and the actual owner of the site and other third-parties enter into contractual arrangements for disposal of material away from the site, where the aforementioned company is not even a party to those contractual arrangements."  (Alberici's Newark Br. at 10.)  Thus, in large part, Alberici's argument hinges on contractual privity between Edgewood and Alberici.  Yet, "[p]rivity is . . . irrelevant to an action based on negligence." *Impex Agric.*

16

*Commod. Div. v. Leonard Parness Trucking Corp.*, 576 F. Supp. 587, 590 (D.N.J. 1983).

Moreover, Alberici's characterization of New Jersey law is unfounded.

In *Sun Pipeline Co. v. Conti Const. Co.*, the court found that "[o]ne who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking." No. 86-2011, 1989 U.S. Dist. LEXIS 6213, at *7-8 (D.N.J. June 1, 1989) (citation omitted).  The court then enumerated three scenarios that would give rise to imposing a legal duty of care on an independent contractor: if "[1] his failure to exercise reasonable care increases the risk of such harm; or [2] he has undertaken to perform a duty owed by the other to the third person, or [3] the harm is suffered because of reliance of the other or the third person upon the undertaking."  *Id.* at *8; s*ee also Diaz v. Johnson Matheny*, 869 F. Supp. 1155, 1167 (D.N.J. 1994) ("The New Jersey Supreme Court has held that a third party injured as a result of the negligent performance of an act by an independent contractor has a cause of action in tort even though that third party could not base his action in contract since he was not a party to the contract."); *Bacak v. Hoya*, 4 N.J. 417, 422 (1950) ("Thus it has been uniformly held that an independent contractor is liable to a third person injured as a result of the negligence of the independent contractor or his servants in the performance of his work for the contractee in an action based in tort, although such third person could not base his action upon the contract to which he was not a party.").

Here, Edgewood alleges that "Ford hired [Alberici] to serve as the general contractor responsible for decommissioning the Edison Plant."  (Counterclaims, Factual Allegations at ¶ 3.) Edgewood continues in its Third-Party Complaint: "In decommissioning the Edison Plant with

17

knowledge that Ford . . . or their agents would be transferring recycled concrete to third parties like Edgewood . . . [Alberici] fail[ed] to properly and adequately test the concrete; fail[ed] to notify federal, state, and local authorities that the concrete was contaminated; fail[ed] to request the proper permits to transfer the concrete to Edgewood; fail[ed] to track the concrete; fail[ed] to properly stockpile, categorize, and segregate the concrete; [and] fail[ed] to properly dispose of the concrete." (Third-Party Compl. at ¶¶ 53- 54.)  Thus, the Court infers that Edgewood alleges one or all of the scenarios outlined in *Sun Pipeline*: that Alberici's alleged acts "increase[d] the risk of [ ] harm" to Edgewood; or that Alberici undertook a duty owed by Ford to Edgewood; or that Edgewood suffered harm because it relied on Alberici's undertaking.  *Sun Pipeline*, 1989 U.S. Dist. LEXIS 6213, at *8.

Further, looking at the additional factors reflecting foreseeability,[10] the relationship between Edgewood and Alberici, though not contractual, was established through Ford, which was in contract with Edgewood.  At meetings at the Edison Plant, Edgewood alleges that "representatives and/or agents of Ford and [Alberici], including Mike Powell and Marty Huffman, knowingly misrepresented that they would provide Edgewood concrete containing contaminants not exceeding the [lawful] criteria with the intention that Edgewood would rely upon this representation."  (Counterclaims, Factual Allegations at ¶ 18.)  Edgewood alleges that the nature of the risk was understood, too, because "Ford and [Alberici] requested permission from the NJDEP to use clean crushed concrete and masonry brick as general backfill."  (*Id.* at ¶ 6.)  Finally, Edgewood enumerates at length the ability and opportunity of Alberici to exercise care, yet

---

[10] "[T]he relationship between the plaintiff and the tortfeasor, the nature of the risk, and the ability and opportunity to exercise care."  *Carter Lincoln- Mercury*, 135 N.J. at 194.

"[Alberici] did not apply for the proper permits" despite knowledge of the NJDEP regulations. (*Id.* at ¶ 9.)  Contrary to Alberici's argument, Edgewood's Third-Party Complaint surpasses imposing liability on Alberici for just "being in the wrong place at the wrong time."  (Alberici's Newark Br. at 10.)  Rather, Edgewood alleges in detail the ostensible acts and omissions committed by Alberici.

In a related argument, Alberici observes that Edgewood appears to have mistakenly or with knowing falsity identified Mike Powell and Marty Huffman as Alberici employees.  Alberici points to the absence of these two names in Edgewood's opposition brief, despite their prominent depiction in Edgewood's Third-Party Complaint, as proof that "these allegations against [Alberici] are totally baseless."  (Alberici's Newark Reply Br. at 5.)  Sparing all parties an unnecessary rehash of this dispute, Edgewood has sufficiently given Alberici *notice* of the claims against it.  Edgewood's allegation that "representatives and/or agents of Ford and Alberici, including Mike Powell and Marty Huffman" acted negligently may be broadly interepreted. (Third-Party Compl. at 11, ¶18.)  Moreso, Alberici's challenge to Edgewood to "produce even one document (which it claims to possess right now) to support its position," (*see* Alberici's Reply Br. at 5.), is inapt because at this stage "it is not necessary to plead evidence," *see Foundation Credit Funds*, 2006 WL 3780677, at *1.

Edgewood sufficiently alleges that Alberici owed Edgewood a legal duty of care.  There is no dispute as to Edgewood's allegations of the remaining elements of negligence.  Accordingly, Count VI states a claim upon which relief can be granted.

### C.   Edgewood Properly Asserts a Third-Party Claim

Alberici argues that Edgewood may not assert its third-party action because Edgewood's

claims do not abide by Federal Rules of Civil Procedure 14(a) and 18(a).  Edgewood counters that Alberici's "argument fails because Fed. R. Civ. P. 18(a) provides that once a party asserts a proper third-party claim ([Alberici] concedes that Edgewood's third-party claims in the Trenton Action are proper to the extent they are based upon the contamination of the American Standard site)," it may join as many direct claims as it elects.  (Edgewood's Newark Br./Alberici at 18.)  Rule 18(a) provides that "[a] party asserting a claim to relief as an original claim, counterclaim, cross-claim, or third-party claim, may join, either as independent or as alternate claims, as many claims . . . as the party has against an opposing party."  While the Court will examine the procedural logistics commanded by Rules 14(a) and 18(a) in greater depth in Section III of this Opinion, here, Edgewood's negligence claim is properly joined to what were, prior to consolidation, Edgewood's Trenton Action claims against Alberici.  Alberici's argument that Edgewood's negligence action is closer to a direct claim is irrelevant now that the Trenton and Newark Actions have been consolidated.  As to Alberici's argument against Edgewood's Spill Act claim, asserted under Rule 14(a),[11] this argument is moot because the Court has dismissed Edgewood's Spill Act claim.  The Court need not reach the parties' arguments regarding the entire controversy doctrine.

## II. Edgewood's Trenton Action Claims Against Alberici (Trenton Docket No. 53)

In its Trenton Action Amended Third-Party Complaint, Edgewood asserts two causes of action against Alberici that are identical to its Newark Action Third-Party Complaint.  Count I asserts a Spill Act contribution claim, and Count II asserts a negligence action.

---

[11] A claim may be brought under Rule 14(a) "[a]t any time after commencement of the action [by] a defending party, as a third-party plaintiff" when the third-party that is served is "the person not a party to the action who is or may be liable to the third-party plaintiff for all or part of the plaintiff's claim against the third-party plaintiff."  Fed. R. Civ. P. 14(a).

Alberici supplements its motion to dismiss by arguing that Edgewood cannot assert third-party claims for properties other than the single site that is the subject of the Trenton Action Amended Third-Party Complaint.  Edgewood responds that "the consolidation of the Newark Action and the Trenton Action should render [Alberici]'s argument moot. . . .  As the Trenton Action has been consolidated into the Newark Action, and the Newark Action indisputably involves all seven Development Sites, Alberici's argument in the Trenton Action regarding the propriety of Edgewood's third-party claims arising out of all seven Development Sites should now be academic."  (Edgewood's Newark Br./Alberici at 17.)  Edgewood is correct.  For the same reasons just stated, Count I (Spill Act) is dismissed while Count II (negligence) states a proper claim.  Thus, Alberici's motion to dismiss (Trenton Docket No. 53) is granted in part and denied in part.

### III.    EQ's Motion to Dismiss (Newark Docket No. 31)

In its Newark Action Third-Party Complaint, Edgewood asserts causes of action against EQ pursuant to the Spill Act, Count IX; contractual indemnification, Count X; breach of contract, Count VII; and negligence, Count VIII.  In order to plead a proper third-party action, a third-party plaintiff must pursue at least one claim under Federal Rules of Civil Procedure 14(a).  A proper Rule 14(a) claim is a claim that is *derivative* of the first-party claims between the original parties, which will be discussed in detail shortly.  A sufficient Rule 18(a) claim is a direct claim between the third-party plaintiff and the third-party defendant.  Once at least a single proper Rule 14(a) claim is alleged, a third-party plaintiff may join as many Rule 18(a) claims as it elects.

Here, Edgewood pursues Counts IX and X in accordance with Rule 14(a), and joins Counts VII and VIII in accordance with Rule 18(a).  Because direct claims can only be joined

under Rule 18(a) to a properly-alleged third-party claim under Rule 14(a), this Court first must

determine whether Edgewood's two Rule 14(a) claims are properly asserted.  *See McClendon v.*

*Cont'l Group, Inc.*, No. 83-1340, 1986 U.S. Dist. LEXIS 18878, at *5 (D.N.J. Oct. 21, 1986) ("If

[the third-party plaintiff] has pled one valid third-party claim, the other counts may be joined

under Federal Rule of Civil Procedure 18(a).").

### A.   Edgewood's Rule 14(a) Spill Act and Contractual Indemnification Claims

A claim may be asserted under Rule 14(a) "only when the third-party defendant's liability

is derivative or secondary."  *Chao v. New Jersey Licensed Beverage Ass'n, Inc.*, 461 F. Supp. 2d

303, 306 (D.N.J. 2006) (internal citation omitted).  Thus, a third-party complaint "must set forth a

claim of secondary liability such that, if the third-party plaintiff is found liable, the third-party

defendant will be liable to the defendant/third-party plaintiff under a theory of indemnification,

contribution, or some other theory of derivative liability."  *Nat'l Fire Ins. Co. v. Univ. Janitorial*

*Supply Corp.*, No. 05-5945, 2006 WL 892291, at *4 (D.N.J. Apr. 6, 2006) (internal citation

omitted).  Being procedural in nature, Rule 14 itself does not create a right of contribution or

indemnity; rather, a third-party plaintiff's right to relief must be cognizable under the substantive

law.  *Chao*, 461 F. Supp. 2d at 307.  Thus, this Court turns to the substance of Edgewood's Spill

Act and contractual indemnification claims to ascertain whether these claims sufficiently allege

secondary liability such that they may be brought in accordance with Rule 14(a).

Count IX of Edgewood's Third-Party Complaint against EQ alleges a Spill Act claim that

is identical to Edgewood's Spill Act claim against Alberici.  For the same reasons stated above

regarding Alberici's motion to dismiss, this Court dismisses Edgewood's third-party Spill Act

claim against EQ.

Count X of Edgewood's Third-Party Complaint against EQ alleges a contractual indemnification claim, citing a provision in the Second Contract between EQ and Edgewood.[12] This indemnification provision states that  "[EQ] and [Ford Land] shall indemnify [Edgewood] and hold [Edgewood] harmless against (1) any claims, penalties or fines arising from a determination that [Edgewood] is not permitted to use the processed material, and (2) any claims, damages, or losses incurred because of [Edgewood's] handling of hazardous material at the Ford plant, Edison, New Jersey."  (Second Contract, Agreement at ¶ 8.)  Thus, according to the terms of the Second Contract, EQ is secondarily liable to Edgewood on two grounds: (1) If Ford's direct claim against Edgewood arises from a determination that Edgewood is not permitted to use the concrete material; or (2) if Ford's direct claim against Edgewood pertains to damages incurred due to Edgewood's actions at the Ford plant.  This Court must determine whether Edgewood's indemnification claim against EQ *derives* from Ford's original claims against Edgewood.  That is, Edgewood's indemnification claim is properly asserted if Ford's claim against Edgewood gives rise to one of the two contractual indemnification grounds providing for liability against EQ in the Second Contract.  Therefore, this Court must now examine Ford's claims against Edgewood.

---

[12] Generally, a court may only adjudge a motion to dismiss on the face of the non-moving party's pleadings.  *Angelastro v. Prudential-Bache Sec., Inc.*, 764 F.2d 939, 944 (3d Cir. 1985). However, a "'document integral to or explicitly relied upon in the complaint' may be considered 'without converting the motion [to dismiss] into one for summary judgment.'" *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997) (emphasis in original) (quoting *Shaw v. Digital Equipment Corp.*, 82 F.3d 1194, 1220 (1st Cir. 1996)); *see also Pension Benefit Guar. Corp. v. White Consol. Indus.*, 998 F.2d 1192, 1196 (3d Cir. 1993) ("[A] court may consider an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document.").  Here, in deciding EQ's motion to dismiss, the Court considers the terms of the Second Contract referenced in Edgewood's Third-Party Complaint.

In its Complaint, Ford seeks remuneration for costs it has or will incur as a result of the NJDEP's Administrative Order declaring "that 'concrete materials contaminated with PCBs of various ranges have been located' at the Seven Properties."  (Compl. at ¶ 34 (quoting Administrative Order).)  Specifically, Ford alleges that it "is entitled to contribution from [Edgewood], and all investigation and remediation costs which Ford has or will incur, or for which Ford is deemed liable, [which] should be allocated among [Edgewood] and Ford, using such equitable factors as the Court deems appropriate[.]"  (*Id.*)  Ford adds that it "has conducted investigation and remediation work and other response actions at the Seven Properties identified by NJDEP . . . and has incurred costs and will continue to incur cleanup and removal costs in connection with these response actions."  (*Id.* at 37.)

Examining Ford's claims in light of the Second Contract's first indemnification ground,[13] Edgewood argues that its "contractual indemnification claim is at least partially derivative in that the indemnification provision can be triggered by, among other things, a finding that Edgewood is liable to Ford for some or all or Ford's costs in remediating the Development Sites.  Any such remediation would only be necessitated by NJDEP's 'determination that [Edgewood] is not permitted to use the concrete.'" (Edgewood's Newark Br./Alberici at 19 (quoting the Second Contract).)

The Court agrees with Edgewood.  In order for Edgewood to allege a derivative indemnification claim against EQ, Edgewood must argue that *if it is liable to Ford* under the Spill

---

[13] "[EQ] and [Ford Land] shall indemnify [Edgewood] and hold [Edgewood] harmless against *(1) any claims, penalties or fines arising from a determination that [Edgewood] is not permitted to use the processed material*."  (Second Contract, Agreement at ¶ 8 (emphasis added).)

Act for damages on the Properties, *then EQ is liable* in part or in whole to Edgewood because the

Second Contract provides for EQ's liability to Edgewood due to Edgewood's inability to use the

concrete.  The Court accepts this argument because Ford's direct claim against Edgewood "*arises*

*from* a determination that [Edgewood] is not permitted to use the processed material."  (Second

Contract, Agreement at ¶ 8 (emphasis added).)  The terms of the indemnification provision are

broad, and Edgewood alleges in its Third-Party Complaint that "[a]s a result of the NJDEP's

determination that Edgewood is not permitted to use the concrete, Edgewood faces actual and

potential liability, including without limitation the claims asserted against Edgewood [by Ford]."

(Third-Party Compl. at ¶ 79.)  Viewing Edgewood's allegations in a light most favorable to it, *see*

*Kanter*, 489 F.3d at 177, the Court infers that the Administrative Order gave rise to Ford's

subsequent suit against Edgewood, and thus, that absent the NJDEP findings, Ford would not

pursue a claim against Edgewood.  Accordingly, Edgewood's indemnification claim *derives* from

Ford's direct claim, and is a proper basis for its Rule 14(a) third-party claim against EQ.[14]

EQ advances one final argument: that a *second* indemnification provision in the Second

Contract absolves EQ of third-party liability.  This provision in the Second Contract states that

"[Edgewood] agrees to indemnify and hold [EQ], its officers, agents and employees, harmless

from any loss, cost, expense, damage, claim, demand, liability, or cause of action of whatever kind

. . . caused by [Edgewood]."  (Second Contract at 2.)  If given weight, this second

---

[14] The second ground of the Second Contract's indemnification clause expressly allows indemnification for damages incurred "at the *Ford plant, Edison, New Jersey*."  (Second Contract, Agreement at ¶ 8 (emphasis added).)  However, Ford's direct claim against Edgewood pertains explicitly to the Properties, a point noted by Ford no less than seven times in its Complaint.  (*See* Compl. at ¶¶ 30, 35, 36, 45, 46, 47, 48, (1), (2).)  Thus, Edgewood's only proper basis for pursuing a third-party contractual indemnification claim is the first prong of the indemnification provision in the Second Contract.

indemnification provision would appear to prevent Edgewood from seeking indemnification from EQ.

Addressing the two separate indemnification provisions, Edgewood explains that the first indemnification provision upon which it relies and that supports its position, was "negotiated by the parties [and] supercedes the standard form indemnification provision that EQ cites.  Moreover, that provision would only require Edgewood to indemnify EQ for property damage 'caused by' Edgewood."  (Edgewood's Newark Br./EQ at 21 n.6.)  EQ counters that "[t]he Court should reject this attempt to divert its attention from the plain language of the [second] indemnification provision, which clearly indicates that Edgewood has no contractual right to indemnification from EQ."  (EQ's Newark Reply Br. at 6.)

"In the interpretation of a contract the intention of the parties is to be gathered from the language used in the instrument as a whole." *Great Atl. & Pac. Tea Co., Inc. v. Checchio*, 335 N.J. Super. 495, 501 (App. Div. 2000).  "[W]here the terms of the contract are contradictory[,] the meaning put upon the instrument by the parties themselves is strong evidence of the correct interpretation of the instrument and will be enforced by the courts."  *Eggleston v. Dudley*, 257 F.2d 398, 400 (3d Cir. 1958).  "[I]n the process of interpretation and construction of the integrated agreement all relevant evidence pointing to meaning is admissible."  *Garden State Plaza Corp. v. S. S. Kresge Co.*, 78 N.J. Super. 485, 496 (App. Div. 1963); *see also Odatalla v. Odatalla*, 355 N.J. Super. 305, 313 (Super. Ct. Ch. Div. 2002) ("[P]arol evidence can be introduced to interpret the meaning of the written words of the contract.") (internal quotation omitted).

Here, the Second Contract's two indemnification provisions, read together, are ambiguous.  Each party cites the provision more likely to support its own position, and each party

argues that the other provision does not apply in the instant circumstances.  The indemnification provision supporting Edgewood allows, as the Court has found, EQ to indemnify Edgewood from claims arising under circumstances such as Ford suing Edgewood.  The indemnification provision supporting EQ requires Edgewood to indemnify EQ for a claim "of whatever kind of nature" against EQ, which may potentially include a third-party claim such as that initiated by Edgewood. Edgewood argues that this second provision is inapplicable here because Edgewood did not "cause" the damage.  (Edgewood's Newark Br./EQ at 21 n.6.)  That determination, however, is not made at this early pleading stage, and is a fact question at issue in this suit.

Further, Edgewood argues that the first indemnification provision was "negotiated" as opposed to the "standard form" of the second provision, (*see* Edgewood's Newark Br./EQ at 21 n.6.), and EQ disagrees.  At this stage, it is not within this Court's province to divine the parties' intent.  Edgewood has given EQ proper notice of the claims against it, and Edgewood is entitled to proceed to discovery to prove the contracting parties' intent.  *See Great Atl. & Pac. Tea Co., Inc.*, 335 N.J. Super. at 501 ("[I]f the intention of the parties is not to be gleaned from a reading of the instrument as a whole, the plaintiff should have had the opportunity of presenting evidence of the facts and circumstances surrounding the execution of the [contract].").

Because Rule 14(a) provides a proper, independent procedural basis for Edgewood to pursue its third-party action against EQ, the Court need not reach the parties' arguments on the entire controversy doctrine.

## B.      Edgewood's Rule 18(a) Joinder Claims

Federal Rule of Civil Procedure 18(a) provides that "a party asserting a claim to relief as a . . . third-party claim, may join, either as independent or as alternate claims, as many claims,

legal, equitable, or maritime, as the party has against an opposing party."  *See Schwab v. Erie L. R. Co.*, 438 F.2d 62, 71 (3d Cir. 1971) ("[W]e conclude that Rule 14 must be read in conjunction with Rule 18(a), as amended, and read together, these two rules give the third-party plaintiff a proper procedural route for asserting his affirmative claim for damages.").  Because Edgewood has asserted a proper third-party claim for contractual indemnification, Edgewood may pursue its breach of contract and negligence counts as joined to the indemnification count if Edgewood states a claim upon which relief may be granted.  For its Rule 18(a) joinder counts, Edgewood need not allege derivative claims.

### 1.    Edgewood States a Claim for Breach of Contract

In Count VII, Edgewood alleges that "[u]nder the Second Contract, EQ was obligated to, among other things, test the concrete at the Edison Site for contaminants; provide the results of such tests to Edgewood; stockpile the concrete; properly handle and dispose of concrete exceeding the [residential zone] and/or [commercial zone] criteria; and obtain the necessary permits to lawfully crush, handle, dispose, and transfer the concrete. . . .  EQ breached the Second Contract by failing to properly test the concrete at the Edison Site for contaminants; failing to provide the results of such tests to Edgewood; failing to properly handle and dispose of concrete exceeding the [residential zone] and/or [commercial zone] criteria; and failing to obtain the necessary permits to lawfully crush, handle, dispose, and transfer the concrete."  (Third-Party Compl. at ¶¶ 58-59.)

EQ argues that "the language of the Counts and relief sought in the Third-Party Complaint show that Edgewood is attempting to establish a claim for its own independent damages."  (EQ's Newark Br. at 15.)  Even were that true, EQ's argument is moot because the

Court has found that Edgewood has properly asserted a Third-Party claim to which Edgewood may join any number of direct claims against EQ pursuant to Rule 18(a).

EQ proffers additional arguments against Edgewood's breach of contract claim rooted in a purported inconsistency between two of Edgewood's allegations with the terms of the Second Contract.  However, the Court does not find that those arguments warrant dismissal of Edgewood's entire breach of contract claim.  Edgewood sufficiently alleges breach of contract, and the Court denies EQ's motion to dismiss this claim.

## 2. EQ's Motion to Dismiss Edgewood's Negligence Claim, Count VIII, is Denied

Edgewood brings a negligence claim against EQ, alleging that EQ negligently performed its decommissioning work at the Edison Plant.  (Third-Party Compl. at ¶ 62.)  Because Edgewood's factual allegations against EQ cover both the period before Edgewood entered into the Second Contract with EQ, and the period after the Second Contract took effect, the Court infers that Edgewood's negligence claim covers both periods.  (*See* Third-Party Compl. at ¶¶ 22-24, 36-38.)

Again, the "traditional negligence elements [are] duty, foreseeability, breach, and causation." *Consolidated Rail Corp*, 512 U.S. at 566.  "The imposition of a duty to exercise care to avoid a risk of harm to another involves considerations of fairness and public policy implicating many factors." *Olivio v. Owens-Illinois, Inc.*, 186 N.J. 394, 401 (2006).  "The foreseeability of harm is a significant consideration in the determination of a duty to exercise reasonable care." *Carvalho*, 143 N.J. at 572.  Additional factors are "the relationship of the parties, the nature of the attendant risk, the opportunity and ability to exercise care, and the public

29

interest in the proposed solution." *Hopkins v. Fox & Lazo Realtors*, 132 N.J. 426, 439 (1993).

At the same time, the Supreme Court of the United States has observed that the application of tort principles to matters of contract dispute creates the risk that "contract law would drown in a sea of tort." *E. River Steamship Corp. v. Transam. Delaval*, 476 U.S. 858, 866 (1986). "[R]emedies in tort relating to a breach of contract may not be maintained in addition to those established under the contract itself in the absence of any independent duty owed by the breaching party to the plaintiff." *F.D.I.C. v. Bathgate*, 27 F.3d 850, 876 (3d Cir. 1994). "Moreover, Plaintiffs cannot seek relief pursuant to a tort claim where Plaintiffs' claims are governed by a contract." *Pinnacle Choice, Inc. v. Silverstein*, No. 07-1379, 2007 WL 2212861, at *4 (D.N.J. July 31, 2007). "This legal duty must spring from circumstances extraneous to, and not constituting elements of, the contract, although it may be connected with and dependent upon the contract." *Shapiro v. Barnea*, No. 06-811, 2006 WL 3780647, at *3 (D.N.J. Dec. 21, 2006). For instance, in *Sunset Financial Resources, Inc. v. Redevelopment Group V, LLC, et al*, the court found that the defendant owed the plaintiff an independent duty of care beyond the governance of their contract "because . . . [the defendant] was an appraiser who owed a duty to Plaintiff imposed by law." Nos. 05-2914/15, 2006 WL 3675384, at *6 (D.N.J. Dec. 12, 2006). Thus, in the instant matter, the Court must determine whether EQ owed a duty of care to Edgewood independent from the Second Contract.

EQ argues that "any duty regarding EQ's obligation for testing derives from the contract." (EQ's Newark Br. at 13.) However, Edgewood alleges that EQ acted negligently *before* the Second Contract was signed. In the pre-Second Contract period, covering roughly February 23, 2005 to June 10, 2005, Edgewood alleges that "Ford and/or [Alberici] hired EQ [ ] to test the

concrete at the Edison Site for contaminants and to stockpile, handle, test, and dispose of certain concrete. . . .  EQ knew that Edgewood intended to use the concrete as fill on its property development sites. . . .  EQ selected piles of concrete to be loaded onto Edgewood's trucks and loaded the concrete onto Edgewood's trucks."  (Third-Party Compl. at ¶¶ 22-24.)

For the same reasons that the Court found that Alberici owed a duty of reasonable care to Edgewood, the Court finds that EQ owed a duty to Edgewood during the pre-Second Contract period.  Edgewood alleges that, similar to Alberici, EQ was hired to "perform[ ] decommissioning work at the Edison Plant with knowledge" that the concrete would be transferred to third parties like Edgewood, and that EQ loaded the concrete onto Edgewood's trucks.  (Third-Party Compl. at ¶ 62.)  Thus, based on the pre-contractual relationship between EQ and Edgewood, the attendant risk of improper concrete decommissioning, and EQ's alleged failures to properly test the concrete, EQ's alleged harm to Edgewood during the pre-Second Contract period was foreseeable, and thus, EQ owed a duty of care to Edgewood as a matter of law.  The Court finds that Edgewood sufficiently alleges breach, causation, and damages.

With regard to the post-Second Contract period, EQ already owed a duty of care to Edgewood "imposed by law" prior to entering into the Second Contract.  *Sunset Fin. Res.*, 2006 WL 3675384, at *6; *see also Sun Pipeline Co.*, 1989 U.S. Dist. LEXIS 6213, at *7-8 (imposing legal duty of care on independent contractor).  While EQ persuasively draws equivalence between Edgewood's negligence and breach of contract allegations, the Court finds that EQ's duty of care "spr[ung] from circumstances extraneous to" the Second Contract because EQ owed a duty to Edgewood as an independent contractor prior to the period that it owed Edgewood a first-party contractual duty.  *See Highlands Ins. Co. v. Hobbs Group, LLC.*, 373 F.3d 347, 356 (3d Cir. 2004)

31

("[T]he duty [Defendant] owed [Plaintiff] is wholly independent of any contractual obligations it might have had to [Plaintiff] as a function of [Defendants'] status as an agent of [the contracting party]."); *Portland Gen. Elec. Co. v. Westinghouse Elec. Corp.*, 842 F.Supp. 161, 165 (W.D. Pa. 1993) ("[T]ort claims aris[e] out of a contract if the defendant assumes a position, relationship or status upon which the law predicates a duty independent of the contract.") (internal citation omitted).

Count VIII of Edgewood's Third-Party Complaint states a valid claim.  For the same reasons, EQ's motion to dismiss in the Trenton Action will be granted in part and denied in part.

### IV.   Ford's and Ford Land's Motion to Dismiss (Newark Docket No. 32)

In the Newark Action, Edgewood alleges six counterclaims against Ford, as well as four third-party claims against Ford Land.  Ford challenges Edgewood's claim for breach of express warranty (Count I); unjust enrichment (Count III); the New Jersey Consumer Fraud Act (Count IV); and contractual indemnification (Count V).  Ford does not challenge counterclaims II and VI (fraud in the inducement and the Spill Act).  Against Ford Land, Edgewood pursues near-identical third-party claims for breach of express warranty (Count I); unjust enrichment (Count II), contractual indemnification (Count III), and the Spill Act (Count IV).  In its motion to dismiss, Ford Land seeks dismissal of Edgewood's Third-Party Complaint, Counts I, II, and III.

### A.   Edgewood's Breach of Express Warranty and Contractual Indemnification Claims Against Ford and Ford Land

Edgewood's counterclaims and third-party claims derive in substantial part from its alleged contractual relationship with Ford under the Second Contract.  However, Ford argues that "neither of the Ford Defendants is a party to that contract" because Ford did not sign the Second

Contract, and there are not "any obligations flowing to Edgewood from Ford Defendants."

(Ford's Newark Br. at 6, 9.)   Edgewood counters that its "allegations sufficiently plead the

existence of the Second Contract and the Ford Defendants' assent thereto, which is all that is

required at this early pleading stage."  (Edgewood's Newark Br./Ford at 12.)  Thus, the parties

dispute whether there exists a valid contract between Ford, Ford Land and Edgewood.

       In order to state a valid claim for breach of contract, a party must allege "a valid contract,

defective performance by the defendant, and resulting damages."  *Coyle v. Englander's*, 199 N.J.

Super. 212, 223 (App. Div. 1985).  "The essentials of a valid contract are: mutual assent,

consideration, legality of object, capacity of the parties and formality of memorialization."  *Cohn*

*v. Fisher*, 118 N.J. Super. 286, 291 (Law Div. 1972).  "Under the objective theory of mutual

assent followed in all jurisdictions, a contracting party is bound by the apparent intention he

outwardly manifests to the other contracting party."  *Fletcher-Harlee Corp. v. Pote Concrete*

*Contractors, Inc.*, 421 F. Supp. 2d 831, 834 (D.N.J. 2006).  "The offer must contemplate the

assumption of legal rights and duties and must show a clear intention to assume liability."  *Id.*

       The question is whether Edgewood sufficiently pled *mutual* assent.  In its Counterclaims,

Edgewood alleges that Ford and/or Ford agents and Edgewood "began negotiating a second

contract that would permit Ford to lawfully continue transferring concrete to Edgewood from the

Edison Plant."  (Counterclaims, Factual Allegations at ¶ 28.)  Edgewood continues: "[F]ord acted

as if the Second Contract were legally effective and binding by performing obligations

contemplated thereunder."  (*Id.* at 32.)  Ford objects that "[a]n examination of the text of the

Second Contract plainly demonstrates that Ford and Ford Land are not parties to it."  (Ford's

Newark Br. at 7.)

In *Overseas Food Trading Ltd. v. Agro Acietunera S.A.*, the court found that the plaintiff failed to allege mutual assent in a purported contract with the defendant.  No. 06-800, 2006 WL 2482580, at *2 (D.N.J. Aug. 28, 2006).  The court stated: "Plaintiff fails to establish that [the defendant] was a party to a valid contract with Plaintiff.  [The defendant's] name, address, or signature do not appear on the [contract].  Further, [the defendant] has no discernable duties or obligations under the [contract].  Thus, it is unclear what [the defendant] assented to."  *Id.*  Accordingly, the court granted the defendant's motion to dismiss.

Here, Edgewood fails to allege Ford's or Ford Land's mutual assent under the Second Contract.  Notably, the Second Contract is entitled "Subcontractor Agreement Between EQ Northeast, Inc./Contractor and Edgewood Properties, Inc."  (Second Contract at 1.)  The end of the Second Contract lists the obligations to be performed by each contracting party.  Nowhere does it mention any obligations owed by Ford or Ford Land.  Rather, the Second Contract only references that "Edgewood [ ] and EQ [ ] agree" to the enumerated obligations.  (Second Contract, Agreement.)  The only mention of Ford Land comes in an indemnification clause at the end of the Second Contract, and in an empty signature block, with no mention of Ford itself anywhere.  Plainly, Edgewood cannot allege that Ford or Ford Land breached the terms of a document that do not set out any obligations for Ford or Ford Land to breach.  Thus, Edgewood does not state a claim *under the Second Contract*.  Accordingly, Count I of its Third-Party Complaint against Ford Land will be dismissed.  For the same reasons, the entirety of both Count V of Edgewood's Counterclaims and Count III of its Third-Party Complaint, each for contractual indemnification pursuant to the *Second Contract*, will be dismissed because Edgewood fails to allege that the Second Contract is enforceable against Ford or Ford Land.

34

Alternatively, Edgewood argues that "if the Court should hold that the Second Contract is unenforceable, then such a holding would mandate that the parties continued to perform under the First Contract." (Edgewood's Newark Br./Ford at 15.) Pursuant to the First Contract, Edgewood alleges that Ford "expressly warranted and described that the concrete Ford distributed to Edgewood would meet the [residential zone] criteria. This express warranty was a basis and benefit of the bargain." (Counterclaims at ¶¶ 54-55.) Ford and Ford Land offer no argument in rebuttal.

N.J.S.A. Section 12A:2-313(1) provides that an express warranty is created by:

> (a) Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain; or
>
> (b) Any description of the goods which is made part of the basis of the bargain.

In New Jersey, "[t]he Uniform Commercial Code-Sales (UCC-Sales), N.J.S.A. 12A:2-101 to -725, applies to 'transactions in goods.'" *Quality Guaranteed Roofing, Inc. v. Hoffman-La Roche, Inc.*, 302 N.J. Super. 163, 166 (App. Div. 1997). Here, the First Contract states that Edgewood "will purchase and receive the *goods* described herein in accordance with the Ford Sales Agreement." (Edgewood's Answer, Ex. A at 1 (emphasis added).) Ford offers no argument that the First Contract does not involve a "transaction[ ] in goods" under the Uniform Commercial Code. N.J.S.A. § 12A:2-101. Further, Edgewood properly alleges that Ford made an express warranty and subsequently "breached its express warranties in that the concrete Ford distributed to Edgewood did not meet the [residential zone] criteria." (Counterclaims at ¶ 57.) Thus, Edgewood makes out a proper claim for breach of express warranty under the First Contract, and Ford's motion to dismiss Count I of Edgewood's Counterclaims, regarding *the First Contract*, is

denied.

### B.     Unjust Enrichment Claims Against Ford and Ford Land & Edgewood's Spill Act Claim Against Ford Land

Count III of Edgewood's Counterclaims against Ford and Count II of its Third-Party Complaint against Ford Land allege unjust enrichment.  "[I]n order to state a claim for unjust enrichment, a plaintiff must allege (1) at plaintiff's expense (2) defendant received benefit (3) under circumstances that would make it unjust for defendant to retain benefit without paying for it."  *In re K-Dur Antitrust Litig.*, 338 F. Supp. 2d 517, 544 (D.N.J. 2004).  "The unjust enrichment doctrine requires that plaintiff show that it expected remuneration from the defendant at the time it performed or conferred a benefit on defendant and that the failure of remuneration enriched defendant beyond its contractual rights."  *VRG Corp. v. GKN Realty Corp.*, 135 N.J. 539, 554 (1993).

Ford and Ford Land argue that "Edgewood fails to state a claim for unjust enrichment because it does not allege that it expected remuneration from Ford for removing concrete from the Edison Site. . . .  [A]bsent from Edgewood's Counterclaims and Third-Party Claims is any allegation that, if proven, would satisfy the elements that Ford received the alleged benefit 'without payment.'" (Ford's Newark Br. at 11-12.)  Edgewood counters that "the parties anticipated that the clean concrete would be Edgewood's payment.  Yet, the Ford Defendants provided Edgewood with unusable contaminated concrete.  As such, Edgewood removed the concrete from the Edison Site without receiving any benefit or payment."  (Edgewood's Newark Br./Ford at 19.)

Edgewood's argument is persuasive.  Edgewood alleges that it removed the concrete at its

own expense because "Edgewood sent trucks to the Edison Plant to pick up the concrete. . . . [and that] Edgewood transported concrete from the Edison Site." (Counterclaims, Factual Allegations at ¶¶ 24, 26.) Further, Edgewood alleges that Ford received the benefit of Edgewood's removal of "contaminated concrete" because Edgewood's expected payment was *un*contaminated concrete.[15] (Counterclaims at ¶ 82.) Finally, Edgewood alleges that Ford's failure to remunerate Edgewood works to Edgewood's detriment and is "unjust" and "unlawful." (Counterclaims at ¶¶ 84-85.) For instance, Edgewood's receipt of the contaminated concrete "enriched defendant beyond its contractual rights" because Edgewood alleges that it did not contract to transport contaminated concrete to other parties.[16] *VRG Corp.*, 135 N.J. at 554. Thus, Edgewood states a claim for unjust enrichment against Ford.

However, because Edgewood's unjust enrichment claim against Ford Land is a direct action pled in accordance with Rule 18(a), rather than a derivative action pled in accordance with Rule 14(a), *see supra* Part III.A, and because Edgewood's third-party Spill Act claim, Count IV,

_____

[15] Ford's argues in its Reply Brief that "Edgewood claims for the first time in its opposition brief that it expected 'clean' concrete as its remuneration." (Ford's Newark Reply Br. at 11 n.17.) However, as quoted above, Edgewood alleges in its Counterclaims that its "transport of *contaminated* concrete from the Edison Plant . . . conferred a significant benefit upon Ford." (Counterclaims at ¶ 82.) Further, Edgewood alleges that "representatives and/or agents of Ford and Alberici . . . discussed providing Edgewood with concrete meeting the RDCSCC criteria from the Edison Plant." (Counterclaims, Factual Allegations at ¶ 13.) Edgewood sufficiently alleges that it expected uncontaminated concrete.

[16] Ford advances an additional argument that "Edgewood's assertion that Ford Defendants 'currently retain' a benefit from Edgewood's removal of concrete from the Edison Site . . . is a mere conclusory allegation without any factual support." (Ford's Newark Reply Br. at 12.) However, Edgewood alleges that "[t]o date, the Properties have not been remediated" which has resulted "in millions of dollars of damages and harm to Edgewood's reputation." (Counterclaims, Factual Allegations at ¶¶ 47, 49.) Thus, the Court infers that Edgewood alleges that Ford's preparation and delivery of contaminated concrete bestowed a benefit on Ford.

pled in accordance with Rule 14(a), is dismissed for the reasons discussed earlier regarding Edgewood's deficient Spill Act claims, Edgewood's unjust enrichment claim against third-party defendant Ford Land may not stand alone.

To save its unjust enrichment claim against Ford Land, Edgewood contends that "the entire controversy doctrine provides an independent basis for deeming Edgewood's third-party claims proper." (Edgewood's Newark Br./Ford at 24.)  The New Jersey entire controversy doctrine is "an equitable preclusionary doctrine whose purposes are to encourage comprehensive and conclusive litigation determinations, to avoid fragmentation of litigation, and to promote party fairness and judicial economy and efficiency[.]"  *K-Land Corp. No. 28 v. Landis Sewerage Auth.*, 173 N.J. 59, 70 (2002).  However, the doctrine is "an affirmative defense," and is applied by New Jersey courts to dismiss a claim when the claimant had the opportunity to bring the claim in an earlier suit involving the same underlying facts decided on the merits.  *Paramount Aviation Corp. v. Agusta*, 178 F.3d 132, 137, 138 (3d Cir. 1999) ("[T]he entire controversy doctrine is not the right preclusion doctrine for a federal court to apply when prior judgments were not entered by the courts of New Jersey.") *see also Moore v. Passaic Cty. Tech. Inst.*, No. 06-1373, 2006 WL 3791327, at *5 (D.N.J. Dec. 22, 2006) ("[A] federal court deciding a federal cause of action is bound by the entire controversy rule when determining the effect of a prior New Jersey state court judgment.").

This Court has discussed the 1998 amendment to the entire controversy doctrine in *Center for Professional Advancement v. Mazzie*, finding that "New Jersey's entire controversy doctrine, as it presently exists, is an equitable claim-joinder requirement that *no longer mandates the joinder of parties*."  347 F. Supp. 2d 150, 156 (D.N.J. 2004) (emphasis added).  It is "intended

to be applied to prevent a party from voluntarily electing to hold back a related component of the controversy in the first proceeding by precluding it from being raised in a subsequent proceeding thereafter." *Oltremare v. ESR Custom Rugs, Inc.*, 330 N.J. Super. 310, 315 (App. Div. 2000).

Here, Edgewood's unjust enrichment claim against Ford Land cannot survive because the entire controversy doctrine is inapplicable on the instant facts. Edgewood's argument is better directed to any future suit in New Jersey state court by Edgewood against Ford Land on unjust enrichment grounds.[17] "Any court that may adjudicate a future claim between [Edgewood] and [Ford Land] should take note of the fact that [Edgewood] sought to join [Ford Land] in this action in accordance with the entire controversy doctrine." *Wallkill 5 Assoc. II v. Tektonic Eng'g, P.C.*, No. 95-5984, 1997 U.S. Dist. LEXIS 11694, at *30 n.7 (D.N.J. July 24, 1997). Because Edgewood does not plead a proper derivative action in accordance with Rule 14(a), and because the entire controversy does not save its claim, Edgewood's unjust enrichment claim against Ford Land is dismissed without prejudice.

### C.    New Jersey Consumer Fraud Act Claim

In Count IV of its Counterclaims against Ford, Edgewood alleges that "[i]n negotiating and contracting to provide Edgewood with concrete, Ford engaged in inconscionable [sic] practices**,** deception, fraud, false pretense, false promise, misrepresentation, and the knowing concealment, suppression, or omission of a material fact, in that Ford knowingly misrepresented the quality of the concrete," in violation of the New Jersey Consumer Fraud Act (the "Consumer

---

[17] "In the event this Court should rule that Edgewood's breach of express warranty and unjust enrichment claims against Ford Land are improper third-party claims, Edgewood respectfully requests that any such dismissal be without prejudice so that Edgewood may assert its breach of express warranty and unjust enrichment claims against Ford Land in a separate action." (Edgewood's Newark Br./Ford at 24-25.)

Fraud Act").  (Counterclaims at ¶ 87.)

To state a claim under the Consumer Fraud Act, Edgewood must allege that Ford engaged in "unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing concealment, suppression, or omission of any material fact . . . in connection with the sale of advertisement of any *merchandise* or real estate."  N.J. Stat. Ann. § 56:8-2 (emphasis added.)  "Merchandise" is defined as "objects, wares, goods, commodities, services, or anything offered, directly or indirectly to the public *for sale*."  N.J. Stat. Ann. § 56:8-1(c) (emphasis added).  "Sale" is defined as "any sale, rental or distribution, offer for sale, rental or distribution or attempt to directly or indirectly to sell, rent or distribute."[18]  N.J. Stat. Ann. § 56:8-1(e).  "[T]he Act has been interpreted to afford protection to corporate and commercial entities who purchase goods and services for use in their business operations."  *Arc Networks, Inc. v. Gold Phone Card Co., Inc.*, 333 N.J. Super. 587, 590 (Law Div. 2000).  The issue is whether the concrete transaction here may be considered a public distribution for purposes of the Consumer Fraud Act.

The parties have presented multiple authorities on both sides of the issue.  Ford argues that "[t]he concrete at issue in this case was not offered, directly or indirectly, to the general public for sale."  (Ford's Newark Br. at 14.)  Edgewood disagrees, stating that "courts addressing this issue have held that the Act applies to sales between commercial entities making business purchases."  (Edgewood's Newark  Br./Ford at 21.)

---

[18] Ford argues that "Edgewood paid $0 for the concrete and cannot be considered a 'consumer' or 'merchandise' in the popular sense."  (Ford's Newark Br. at 14.)  However, as quoted above, the Consumer Fraud Act proscribes not just deceptive "sale[s]," but deceptive "distribution[s]" as well.  N.J. Stat. Ann. § 56:8-1(e).  Edgewood sufficiently alleges that its transaction with Ford constitutes a distribution.

In *Naporano Iron & Metal Co. v. American Crane Corp.*, the court thoroughly examined the divergent authorities, including many of those cited by both parties in their papers here, and found that a corporate purchaser of machinery stated a claim against a manufacturer under the Consumer Fraud Act.  79 F. Supp. 2d 494, 509 (D.N.J. 1999).  The court wrote:

> [T]hese two lines of cases are not inconsistent. . . .  The purchase and sale of a franchise, at issue in *J & R Ice Cream*, [31 F.3d 1259, 1273 (3d Cir. 1994),]  involves considerations of markets, location, and on-going relations. Each franchise relationship is thus unique, and is logically excluded from the auspices of the statute. Similarly, the refining method and licensing agreement at issue in *BOC Group*[, 251 N.J. Super. 271 (Law Div. 1990),] were the products of years of bids, development, and testing. *The defendant there could not simply go out and enter a contract for use of the method.*  By contrast, the trucks at issue in *D'Ercole*, [206 N.J. Super. 11 (App. Div. 1985),] the computer parts at issue in *Hundred East Credit*, [212 N.J. Super. 350 (App. Div. 1986),] and the yachts at issue in *Perth Amboy*[, 226 N.J. Super. 200 (App. Div. 1988),] *constitute the type of merchandise that is generally available to the public - albeit expensive and within the grasp and/or needs of only a limited clientele.*  Naporano's purchase of the Crane more closely resembles the latter group of cases. Although a crane is a large, expensive piece of machinery, cranes are in use at construction sites across the globe. As the purchaser of the Crane for a business use, Naporano is a "consumer" within the meaning of the NJCFA, and defendants' motion to dismiss on this basis is also denied.

*Id.* (emphasis added); *see also Bosland v. Warnock Dodge, Inc.*, No. A-1369-06T5, 2007 WL 3085857, at *2 (App. Div. Oct. 18, 2007) ("The Court has emphasized the importance of broad construction of the [Consumer Fraud Act] in light of the myriad of unforeseeable practices merchants may devise[.]"); *New Mea Const. Corp. v. Harper*, 203 N.J. Super. 486, 543 (App. Div. 1985) ("The available legislative history demonstrates that the [Consumer Fraud Act] was intended to be one of the strongest consumer protection laws in the nation.") (citation omitted).

Analogously, Ford's distribution of the concrete material to Edgewood is a "public" sale

41

within the meaning of the Consumer Fraud Act.  Like the crane in *Naporano*, the concrete

material in the instant matter caters to a limited market, yet is generally available to the public by

entering into a discrete contract.  Ford's distribution of the concrete material to Edgewood is not

unique or custom-tailored in the manner characterized by the *Naporano* court as "involv[ing]

considerations of markets, locations, and on-going relations."  *Naporano Iron & Metal Co.*, 79 F.

Supp. 2d at 509.  Although Ford "is in the business of manufacturing and selling automobiles, not

concrete," (Ford's Newark Br. at 14 n.11), its stated business purpose does not save Ford from

liability arising from its cement "product" that it nonetheless distributed to Edgewood.

Edgewood's counterclaim, Count IV, is sufficiently pled, and Ford's motion to dismiss the

Consumer Fraud Act claim is denied.

**V.       Ford's and Ford Land's Motion to Dismiss (Trenton Docket No. 31)**

Prior to the consolidation of the Trenton and Newark Actions, Ford and Ford Land moved

to dismiss Edgewood's Crossclaims against Ford and Ford Land in the Trenton Action.  (*See*

Trenton Docket No. 31.)  Ford's and Ford Land's arguments against Edgewood's unjust

enrichment (Count III), Consumer Fraud Act (Count IV), and contractual indemnification (Count

V) crossclaims are nearly identical to its arguments analyzed by this Court above with regard to

the Newark Action.  Thus, for those same reasons discussed above, Ford's and Ford Land's

motion to dismiss Counts I, III and IV will be denied, and its motion to dismiss Count V will be

granted.

Ford and Ford Land raise one different argument in the Trenton Action, in moving to

dismiss Edgewood's Spill Act crossclaim, Count VI.  Ford and Ford Land argue that "Edgewood

has failed to state a claim for contribution under the Spill Act upon which relief may be granted

because it has not pled that it has suffered any damages recoverable under the Spill Act." (Ford's & Ford Land's Trenton Br. at 15.)

Ford and Ford Land made this argument in an earlier motion before Judge Thompson prior to the Trenton Action's consolidation with the Newark Action. This Court adopts Judge Thompson's reasoning, quoted in relevant part:

> The Ford Defendants assert that Plaintiffs failed to allege they engaged in any act of clean-up or removal and, therefore, even taking all Plaintiffs allegations as true, they fail to meet the elements of a Spill Act claim. Plaintiffs never specifically allege that they engaged in acts of clean-up or removal, but did they [sic] allege that they "incurred cleanup and removal costs." (Compl. § 73). Though it may be metaphysically possible for Plaintiffs to have incurred clean-up or removal costs without actually engaging in clean-up and removal, the reasonable inference from the allegations is that they engaged in such acts. Therefore, at the motion to dismiss stage, Plaintiffs have made a sufficient allegation under the Spill Act, and the claim will stand.

*Preferred Real Estate v. Edgewood Prop. Inc.*, No. 06-4266, 2007 WL 81881, at *2 (D.N.J. Jan. 9, 2007). Accordingly, Ford's and Ford Land's motion to dismiss Count VI of the Edgewood's Trenton Action Crossclaims will be denied.

### Conclusion & Second Amended Order

It is hereby ORDERED that:

1.  Alberici's motion to dismiss (Trenton Docket No. 53) Edgewood's Third-Party Complaint is GRANTED with respect to Count I and DENIED with respect to Count II. Count I is dismissed.

2.  Alberici's motion to dismiss (Newark Docket No. 30) Edgewood's Third-Party Complaint is GRANTED with respect to Count V and DENIED with respect to

Count VI.  Count V is dismissed.

3.      EQ's motion to dismiss (Trenton Docket No. 54) is GRANTED with respect to Count VI (Spill Act) and DENIED with respect to Counts III, IV, and VI (Contractual Indemnification).  Count VI (Spill Act) is dismissed.

4.      EQ's motion to dismiss (Newark Docket No. 31) is GRANTED with respect to Count IX and DENIED with respect to Counts VII, VIII and X.  Count IX is dismissed.

5.      Ford's and Ford Land's motion to dismiss (Trenton Docket No. 31) Edgewood's Crossclaims is GRANTED with respect to Count V and DENIED with respect to Counts I, III, IV, & VI.  Count II of Edgewood's Crossclaims remains active.

6.      Ford's and Ford Land's motion to dismiss (Newark Docket No. 32) Edgewood's Counterclaims is GRANTED with respect to Count V and DENIED with respect to Counts I, III, & IV.  Counts II & VI of Edgewood's Counterclaims remain active.  In addition, all four counts of Edgewood's Third-Party Complaint against Ford Land are dismissed.


Dated:  December 17, 2007
Newark, New Jersey


                                        s/ Harold A. Ackerman
                                        U.S.D.J.