**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| FORD MOTOR COMPANY, ) | |
| ) | Hon. Harold A. Ackerman |
| Plaintiff, ) | |
| ) | Civil Action No. 06-1278 |
| v. ) | |
| ) | *Consolidated with* |
| EDGEWOOD PROPERTIES, INC., ) | |
| ) | Civil Action No. 06-4266 |
| Defendant-Counterclaimant. ) | |
| ) | |
| EDGEWOOD PROPERTIES, INC., ) | **OPINION & ORDER** |
| ) | |
| Third-Party Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | |
| FORD MOTOR LAND DEVELOPMENT, ) | |
| CORPORATION, MIG/ALBERICI, LLC, ) | |
| and EQ NORTHEAST, INC. ) | |
| ) | |
| Third-Party Defendants. ) | |
| ) | |
| PREFERRED REAL ESTATE, ) | |
| INVESTMENTS, INC. and 240 ) | |
| PRINCETON AVENUE ASSOCIATES, L.P., ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | |
| ) | |
| EDGEWOOD PROPERTIES, INC., COLUMBIA ) | |
| GROUP AT HAMILTON, LLC, FORD MOTOR ) | |
| COMPANY, AND FORD MOTOR LAND ) | |
| DEVELOPMENT CORPORATION, ) | |
| ) | |
| Defendants. ) | |
| ) | |
| ) | |

1

EDGEWOOD PROPERTIES, INC., and )
COLUMBIA GROUP AT HAMILTON, LLC, )
)
                Third-Party Plaintiffs, )
)
     v. )
)
MIG/ALBERICI, LLC, and )
EQ NORTHEAST, INC. )
)
              Third-Party Defendants. )
_____)
)
MIG/ALBERICI, LLC, )
)
              Fourth-Party Plaintiffs, )
)
     v. )
)
GOLDER ASSOCIATES, INC., and )
ARCADIS U.S., INC., )
)
              Fourth-Party Defendants. )
_____)

John McGahren, Esq.
PATTON BOGGS LLP
One Riverfront Plaza, 6th Floor
Newark, New Jersey 07102
*Attorneys for Ford Motor Company and*
*Ford Motor Land Development Corporation*

James Stewart, Esq.
Khizar A. Sheikh, Esq.
LOWENSTEIN SANDLER PC
65 Livingson Avenue
Roseland, NJ 07068
*Attorneys for EQ Northeast, Inc.*

Martha N. Donovan, Esq.
NORRIS MCLAUGHLIN & MARCUS, PA
721 Route 202-206
Bridgewater, NJ 08807

*Attorneys for MIG/Alberici, LLC*

Jack Arseneault, Esq.
David Fassett, Esq.
ARSENEAULT, WHIPPLE, FARMER, FASSETT & AZZARELO, LLP
560 Main Street
Chatham, NJ 07928

Ronald P. Heksch, Esq.
GIORDANO HALLERAN & CIESLA, P.C.
125 Half Mile Rd. Ste. 300
Red Bank, NJ 07701

Ariana J. Tadler, Esq.
Jennifer L. Young, Esq.
MILBERG WEISS, LLP
One Pennsylvania Plaza
New York, NY 10119

Steven K. Davidson, Esq.
Seth Goldberg, Esq.
Brooke L. Gaede, Esq.
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue, N.W.
Washington, D.C. 20036
*Attorneys for Edgewood Properties, Inc.*

Christopher J. McKenzie, Esq.
Michael G. Murphy, Esq.
BEVERIDGE & DIAMOND
50 East Palisade Avenue, Suite 208
Englewood, NJ 07631
*Attorneys for Arcadis, U.S., Inc.*

**ACKERMAN, Senior District Judge:**

 This action arises from the demolition of a car manufacturing facility and the subsequent

attempt to reuse crushed concrete from that facility at other properties in New Jersey, where

some of the crushed concrete contained a quantity of a chemical in excess of statutory

environmental limits.  Before the Court are five motions to dismiss and various motions to strike and amend.  EQ Northeast, Inc. ("EQ") moves to dismiss MIG/Alberici, LLC's ("Alberici") cross-claims (Doc. No. 95); Edgewood Properties, Inc. ("Edgewood") moves to dismiss Alberici's counterclaim (Doc. No. 97), and EQ's counterclaims (Doc. No. 98); Edgewood moves to dismiss the crossclaims of Arcadis, U.S., Inc. ("Arcadis") (Doc. No. 141), and five counts of Ford Motor Company's ("Ford") First Amended Complaint (Doc. No. 152).  For the following reasons, EQ's motion to dismiss will be granted; Edgewood's motion to dismiss Alberici's counterclaim will be denied as moot; Edgewood's motion to dismiss EQ's counterclaims will be denied; Edgewood's motion to dismiss Arcadis's crossclaims will be denied as moot; and Edgewood's motion to dismiss Ford's claims will be granted in part and denied in part.

## BACKGROUND

Ford operated an automobile assembly plant located on U.S. Route 1 in Edison Township, New Jersey (the "Edison Plant" or the "Ford site").[1]  In February 2004, Ford closed the Edison Plant, and began dismantling and decommissioning the structure.  As required by the Industrial Site Recovery Act ("ISRA"), *see* N.J. Stat. Ann. § 13:1K-6, Ford entered into a Remediation Agreement with the New Jersey Department of Environmental Protection ("NJDEP") to facilitate the lawful demolition of the building.

In February 2004, Ford contracted with Alberici to conduct the demolition of the Plant's concrete floor slabs, which Alberici planned to reuse for on-site fill, road bed, and other similar uses.  The contract required Alberici to dispose of the concrete from the demolition project by

---

[1] Ford Motor Company is a corporation organized and existing under the law of the State of Delaware, with its principal place of business in Dearborn, Michigan.

4

following NJDEP regulations governing detections of polychlorinated biphenyls ("PCBs") in the concrete material.  Specifically, NJDEP regulations allow distribution of concrete material with a PCB detection level below 0.49 parts per million ("ppm") for use in residential zones, and distribution of concrete material with a detection level between 0.49 ppm and 2 ppm for use in commercial zones.  Concrete material that tests for PCB concentration above 2 ppm is prohibited by the NJDEP for reuse in any zone.  On November 9, 2004, NJDEP approved Alberici's request to reuse crushed concrete at the Edison Plant, provided that the crushed material did not contain unlawful detections of PCBs.  Accordingly, once the concrete was crushed, Alberici segregated the concrete material depending upon its concentration of PCB constituents.

On February 24, 2005, Ford and Edgewood[2] entered into a written agreement (the "First Contract").  Ford agreed to provide Edgewood with up to 50,000 cubic yards of crushed concrete from the Edison Plant containing PCB levels suitable for residential use, and in return Edgewood would transport the material off-site for use as fill.  Pursuant to the First Contract, Edgewood received approximately 32,000 cubic yards of crushed concrete material from the Edison Plant and subsequently transported the material to at least seven New Jersey properties (the "Properties").[3]

On June 10, 2005, Edgewood entered into a Subcontract (the "Second Contract") with Third-Party Defendant EQ to test crushed concrete from the Edison Plant.  According to the

---

[2] Edgewood Properties, Inc. is a corporation organized under the laws of the State of New Jersey, with its principal place of business in Piscataway, New Jersey.

[3] According to Ford, Edgewood transported concrete from the Edison Site to the following seven New Jersey properties: American Standard, Hamilton Township; Fulton Street, New Brunswick; Applegarth, Monroe Township; Laurelton Mobile Home Park, Brick Township; West Windsor Township Site, West Windsor; and Tingley Rubber, South Plainfield.

Second Contract, Edgewood crushed concrete at the Ford site after which EQ would test the material for environmental contamination.  Edgewood would then "remove all crushed material that has been proven to be free of contamination, or to have contamination levels below commercial standards, for use at [Edgewood's] Applegarth site or other [Edgewood] commercial sites."  (Edgewood Third-Party Compl., Ex. C (the "Second Contract"), Agreement at ¶ 3.)  Edgewood also agreed to indemnify EQ for any costs or claims arising out of or resulting from the work described in the Second Contract.

Beginning in September 2005, Ford responded to complaints from Edgewood regarding the levels of PCBs in the concrete by commencing excavation, removal, and disposal of concrete that Edgewood had transported to the Properties.  According to Ford, contaminated concrete found on the Properties was due to Edgewood's commingling of Ford concrete with contaminated concrete acquired from non-Ford suppliers.

On March 8, 2006, the NJDEP issued an Order, *In the Matter of Ford Motor Company/Ford Motor Land Development Corporation, Edgewood Properties Inc. and MIG/Alberici, L.L.C., Respondents*, EA ID# PI V1166 (the "Administrative Order"), pursuant to the New Jersey Spill Compensation & Control Act ("Spill Act"), the Solid Waste Management Act, and the Solid Waste Utility Control Act.  The Administrative Order declared that "concrete materials contaminated with PCBs of various ranges have been located" at the Properties, as well as at other non-Edgewood sites.  (First Am. Compl. ¶ 75.)[4]  The Administrative Order directed Ford, Edgewood and Alberici to submit a Response Plan to NJDEP "to complete the removal of

---

[4]All citations to "First. Am. Compl." refer to Ford's First Amended Complaint filed on June 9, 2008 (Doc. No. 125).

all contaminated concrete waste material transported from Ford Motor Company's Plant Site in Edison New Jersey and brought to the [Seven Properties]."  (*Id.* ¶ 77.)  Pursuant to the Administrative Order, Ford conducted investigations, remediation work, and other response actions at the Properties identified by NJDEP.  In January 2008, Ford and NJDEP entered into an Administrative Consent Order resolving Ford's liability to the state of New Jersey, subject to the completion of "any required public participation process" concerning the Consent Order.  (First Am. Compl., Ex. A at ¶ 70.)

On March 17, 2006, Ford filed a Complaint against Edgewood for recovery of costs and declaratory relief.  Edgewood timely answered and asserted Counterclaims against Ford, and third-party claims against EQ and Alberici.  On February 8, 2008, EQ filed third-party counterclaims against Edgewood, asserting claims for contractual indemnification under the Second Contract, declaratory judgment, breach of the Second Contract, and breach of good faith and fair dealing.  Alberici also filed counterclaims against Edgewood, seeking contribution and indemnification for cleanup costs.

On June 9, 2008, Ford filed its First Amended Complaint in this Court against Edgewood for recovery of costs and declaratory relief under the Spill Act, N.J. Stat. Ann. § 58:10-23.11(f)(a)(2); the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9607(a)(4)(B); as well as breach of contract, fraud, negligence, and unjust enrichment.

### ANALYSIS

Pursuant to Federal Rule of Civil Procedure 12(b)(6), a defendant may move to dismiss a

complaint or parts of a complaint before or after filing an answer.  A motion to dismiss will be

granted if a count or complaint fails to state a claim upon which relief can be granted.  In

evaluating a motion to dismiss pursuant to Rule 12(b)(6), the court must "accept as true all

allegations in the complaint and all reasonable inferences that can be drawn therefrom, and view

them in the light most favorable to the plaintiff." *Kanter v. Barella*, 489 F.3d 170, 177 (3d Cir.

2007) (quoting *Evancho v. Fisher*, 423 F.3d 347, 350 (3d Cir. 2005)); *see also Labov v. Lalley*,

809 F.2d 220, 221 (3d Cir. 1987).  A complaint must contain "enough facts to state a claim to

relief that is plausible on its face," and the "[f]actual allegations must be enough to raise a right

to relief above the speculative level on the assumption that all the allegations in the complaint are

true." *Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955, 1965, 1974 (2007) (internal citations

omitted).  Yet, "[u]nder the liberal federal pleading rules, it is not necessary to plead evidence,

and it is not necessary to plead all the facts that serve as a basis for the claim." *Foundation

Credit Funds, LLC v. Branch Banking & Trust Co.*, No. 06-0893, 2006 WL 3780677, at *1

(D.N.J. Dec. 21, 2006).  A court need not accept "'unsupported conclusions and unwarranted

inferences,'" *Baraka v. McGreevey*, 481 F.3d 187, 195 (3d Cir. 2007) (quoting *Schuylkill Energy

Res., Inc. v. Pa. Power & Light Co.*, 113 F.3d 405, 417 (3d Cir. 1997)), and "[l]egal conclusions

made in the guise of factual allegations . . . are given no presumption of truthfulness," *Wyeth v.

Ranbaxy Labs., Ltd.*, 448 F. Supp. 2d 607, 609 (D.N.J. 2006) (citing *Papasan v. Allain*, 478 U.S.

265, 286 (1986)); *see also Kanter*, 489 F.3d at 177 ("[A] court need not credit either 'bald

assertions' or 'legal conclusions' in a complaint when deciding a motion to dismiss.") (quoting

*Evancho*, 423 F.3d at 351).  Except where the parties expressly agreed to a choice of law

provision or where federal law governs a claim, this Court applies the law of the state of New

Jersey to test the sufficiency of the relevant parties' claims.

Cutting through the morass of briefs, the Court will address the present motions in the following manner, dealing first with the two most complex motions: In Part I, the Court will address Edgewood's motion to dismiss EQ's counterclaims.  In Part II, the Court will address Edgewood's motion to dismiss portions of Ford's First Amended Complaint.  In Part III, the Court will address EQ's motion to dismiss Alberici's cross-claims, and related motions. Edgewood's motion to dismiss Arcadis's cross-claims will be denied as moot, as requested by Edgewood.  (*See* Doc. No. 153.)

## I.  Edgewood's Motion to Dismiss EQ's Counterclaims

EQ pursues five counterclaims against Edgewood: (1) contractual indemnification; (2, 3) declaratory judgment; (4) breach of contract; and (5) breach of good faith and fair dealing. Edgewood moves to dismiss EQ's first, fourth, and fifth claims.  Bound by the choice of law provision agreed upon by the parties in the Second Contract, this Court adjudicates EQ's counterclaims "under the laws of the Commonwealth of Massachusetts."  (Second Contract at 1.) For the following reasons, the Court will deny Edgewood's motion to dismiss.

### A.  Contractual Indemnification

In its First Claim against Edgewood, EQ contends that Edgewood is liable to EQ based on a contractual indemnification agreement in the Second Contract.  The provision reads: "[Edgewood] agrees to indemnify and hold [EQ] . . .  harmless from any loss, cost, expense, damage, claim, demand, liability or cause of action of whatever kind of nature on account of damage to or destruction of property . . . arising out of or *resulting from* any act or omission . . .

caused by [Edgewood] . . . in the performance of *the work called for by this Agreement*."
(Second Contract at 2 (emphases added).)

Attached to the Second Contract is an addendum elaborating on the work called for by the
Second Contract, providing that Edgewood "shall crush . . . concrete material provided by EQ . . .
on site at the Ford plant," and that "EQ shall cause all crushed material to be tested for
environmental contamination." (*Id.* at 9.) EQ's testing activities were also to be accomplished at
the Ford plant. Further, Edgewood agreed to "remove all crushed material that has been proven
to be free of contamination . . . for use at [Edgewood's] Applegarth or other [Edgewood]
commercial sites." (*Id.*) Thus, the scope of work agreement provides that EQ shall conduct
testing for environmental contamination at the Ford plant, and that the crushed material shall
then be used at the Properties.

"Contracts of indemnity are to be fairly and reasonably construed in order to ascertain the
intention of the parties and to effectuate the purpose sought to be accomplished." *Century
Indem. Co. v. Bloom*, 325 Mass. 52, 56 (1949). Furthermore, "[t]he present rule of construction
recognizes that contract interpretation is largely an individualized process, with the conclusion in
a particular case turning on the particular language used against the background of other indicia
of the parties' intention." *Shea v. Bay State Gas Co.*, 383 Mass. 218, 222 (1981) (internal
quotation marks omitted); *see also Speers v. H.P. Hood, Inc.*, 22 Mass. App. Ct. 598, 600 (1986).
Unlike many jurisdictions, in Massachusetts, "[i]ndemnification provisions are to be read without
any bias for the indemnitor or against the indemnitee." *Herson v. New Boston Garden Corp.*, 40
Mass. App. Ct. 779, 782 (1996).

Reasonably construing the scope of work delineated in the Second Contract, and read

10

together with the indemnification clause, the Court concludes that Edgewood agreed to indemnify EQ for any damages resulting from Edgewood's work accomplished at the Ford site, and subsequent distribution of crushed concrete to the Properties.  From this reading, the Court finds that EQ states a claim for contractual indemnification.  EQ alleges that "claims, demands and/or causes of action have been made and/or brought against EQ," and that these claims "relate to crushed concrete obtained from the Ford Edison plant and used at the [sic] one or all of the Seven Properties."  (EQ Counterclaims ¶¶ 19, 20.)  EQ further claims that it "incurred costs and expenses in responding to and defending the third-party complaints."  (*Id.* ¶ 21.)  EQ names the Edgewood sites at issue in the suits against it, including Applegarth, the same sites contemplated by the parties in the Second Contract's scope of work agreement.  (*Id.* ¶ 12.)  Based on these allegations, EQ alleges that Edgewood's actions led to the costs now borne by, and claims pursued against, EQ.  In other words, EQ alleges that its damages "*resulted from*" its testing of concrete at the Ford plant, which was intended "for use" at Edgewood's commercial sites. (Second Contract at 2.)  These allegations, if true, would fall within the purported indemnification agreement.  Accordingly, EQ states a claim for contractual indemnification, and Edgewood's motion to dismiss EQ's First Claim will be denied.

### B.    Breach of Contract

Edgewood next challenges EQ's breach of contract claim.  "Under the law of Massachusetts, to state a claim for breach of contract, a plaintiff must allege, at a minimum, that there was a valid contract, that the defendant breached its duties under the contractual agreement, and that the breach caused the plaintiff damage."  *Moghaddam v. Dunkin' Donuts, Inc.*, 295 F. Supp. 2d 136, 139 (D. Mass. 2003) (internal quotation marks omitted).  Here, there is no dispute

that EQ alleges a valid contract and breach.  EQ alleges that Edgewood contracted to "remove crushed concrete material and use it at" designated sites, but that Edgewood breached this agreement by using the concrete at non-designated sites.  (EQ's Counterclaims ¶¶ 46-49.)  "As a direct and proximate result of Edgewood's breach of the Second Contract, EQ has suffered damages[.]"  (*Id.* ¶ 51.)

Edgewood challenges the third element of EQ's breach of contract claim, arguing that "Edgewood's alleged breach could not have *caused* EQ's damages."  (Edgewood Br. at 6 (emphasis added).)  Edgewood argues that the NJDEP ordered remediation of *all* sites where the crushed concrete was brought, and thus, EQ's alleged damages could not possibly have been caused by Edgewood's alleged breach.  In other words, because the NJDEP found contaminated concrete originating from the Ford site at locations unrelated to Edgewood, this finding necessarily establishes that EQ's damages were caused by another party at the Ford site where the concrete originated.  In support of this argument concerning the NJDEP, Edgewood attaches the Administrative Order outlining the parameters of the cleanup effort.

Generally, a court may only adjudge a motion to dismiss on the face of the non-moving party's pleadings.  *Angelastro v. Prudential-Bache Sec., Inc.*, 764 F.2d 939, 944 (3d Cir. 1985).  However, a court may also consider "matters incorporated by reference or integral to the claim, items subject to judicial notice, matters of public record, orders, [and] items appearing in the record of the case."  *Buck v. Hampton Twp. Sch. Dist.*, 452 F.3d 256, 260 (3d Cir. 2006) (internal quotation marks omitted).  The Third Circuit has defined a "matter of public record" to include documents to which the public has "unqualified access."  *Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1197 (3d Cir. 1993).  Here, the attached document is

available through the NJDEP website, to which the public has unqualified access, and which the

Court considers a matter of public record.

Nevertheless, the Administrative Order does not foreclose EQ's breach of contract claim

because it does not establish as a matter of law that Edgewood's alleged breach did not cause EQ

damages.  After all, even if Edgewood played no role in the contamination itself — a point EQ

does not concede — EQ alleges that Edgewood disseminated the contaminated concrete to non-

designated sites, leading to claims against EQ.  Furthermore, the question of causation is

typically reserved for determination by the finder of fact.  *See Commonwealth. v. Carlson*, 447

Mass. 79, 84 (2006) (recognizing that proximate cause "is a question of fact for the jury to decide

based on an assessment of the circumstances").  Thus, EQ sufficiently alleges causation.

In sum, EQ alleges a valid agreement in the Second Contract, that Edgewood breached its

terms by transporting the crushed concrete to non-designated sites, and various forms of damages

resulting from Edgewood's breach.  (EQ's Counterclaims ¶¶ 44-74.)  Thus, EQ states a proper

breach of contract claim and Edgewood's motion to dismiss EQ's Fourth Claim will be denied.

### C.   Breach of Good Faith and Fair Dealing

EQ's fifth claim sounds in breach of the duty of good faith and fair dealing.  "Every

contract implies good faith and fair dealing between the parties to it."  *Warner Ins. Co. v.

Comm'r of Ins.*, 406 Mass. 354, 362 n.9 (1990) (internal quotation marks omitted).  This

principle provides "that neither party shall do anything which will have the effect of destroying

or injuring the right of the other party to receive the fruits of the contract[.]"  *Druker v. Roland

Wm. Jutras Assoc., Inc.*, 370 Mass. 383, 385 (1976).  However, "the scope of the covenant is

only as broad as the contract that governs the particular relationship.  The covenant does not

supply terms that the parties were free to negotiate, but did not, nor does it create rights and duties not otherwise provided for in the contract." *Chokel v. Genzyme Corp.*, 449 Mass. 272, 276 (2007) (quotation marks and citations omitted).  To succeed on this claim, one must allege a lack of good faith in the performance or enforcement of the contract.  *See Hawthorne's, Inc. v. Warrenton Realty, Inc.*, 414 Mass. 200, 211 (1993); *see also Equip. & Sys. For Indus., Inc. v. Northmeadows Constr. Co.*, 59 Mass. App. Ct. 931, 932 (2003) ("[A] breach of an implied contract of good faith and fair dealing . . . implicat[es] a dishonest purpose, consciousness of wrong, or ill will in the nature of fraud.").

EQ alleges that Edgewood breached the duty of good faith by pursuing a third–party contract claim against EQ that it knew was without merit.  The relevant language of the Second Contract reads: "[Edgewood] shall remove all crushed material that has been proven to be free of contamination, or to have contamination levels below commercial standards[, as tested by EQ.]" (Second Contract at 9.)  Based on this provision, EQ alleges that Edgewood understood that it contracted with EQ to receive crushed concrete suitable for residential *or commercial use*, but that Edgewood nevertheless brought suit asserting that EQ contracted to supply Edgewood with crushed concrete suitable only for *residential use*.  EQ argues that Edgewood's pursuit of litigation with the knowledge that its interpretation is erroneous is itself a breach of the implied duty of good faith.

In support of its counterclaim, EQ relies primarily on the comments to § 205 of the Restatement (Second) of Contracts ("Restatement"), and several related cases.  Section 205 provides that "[e]very contract imposes upon each party a duty of good faith and fair dealing in its performance *and its enforcement*."  Restatement (Second) of Contracts § 205 (emphasis

14

added).  This section is regularly cited for support by Massachusetts courts.  *See, e.g.*, *Davidson v. Gen. Motors Corp.*, 57 Mass. App. Ct. 637, 647 (2003) ("We have recently expressed our preference for the terminology of the Restatement (Second) of Contracts § 205[.]"); *see also Uno Restaurants, Inc. v. Boston Kenmore Realty Corp.*, 441 Mass. 376, 385 (2004); *Nile v. Nile*, 432 Mass. 390, 399 (2000).

Relevant to this claim is comment (e) to Restatement § 205, entitled "Good faith in enforcement."  Comment (e) puts flesh on the "enforcement" phrase of § 205, stating that the covenant of good faith extends to the "assertion, settlement and litigation of contract claims and defenses."  Restatement § 205 cmt. e.  According to comment (e), the covenant is breached by "conduct such as conjuring up a pretended dispute, [or] asserting an interpretation [of the contract] contrary to one's own understanding."  *Id.*; *see also Estate of Johnson v. Melvin Rose, Inc.*, No. 200400622, 2007 WL 1832029, at *34 (Mass. Super. May 9, 2007) ("The duty of good faith and fair dealing is implied in every contract and extends to the assertion, settlement, and litigation of contract claims.").  EQ argues that Restatement § 205, comment (e) supports its cause of action.

For additional support, EQ relies on a case from this district, *Riveredge Associates v. Metropolitan Life Insurance Company*, 774 F. Supp. 897 (D.N.J. 1991), which addressed nearly-identical circumstances to those before this Court.  In *Riveredge*, the defendant alleged in its counterclaim that plaintiff, by pursuing a lawsuit based on its bad faith interpretation of a contract, breached the implied covenant of good faith and fair dealing.  *Id.* at 899.  Specifically, the defendant alleged that the plaintiff maintained its lawsuit based on interpretations "it knew were clearly contradicted by the express language of those agreements."  *Id.*  Relying largely on

Restatement § 205 and the comments thereto, the court held that the defendant alleged a proper claim for breach of the implied covenant of good faith. *Id.* at 899-900. The court reasoned that, accepting the defendant's allegations as true, the plaintiff instituted its action with knowledge that it was not entitled to relief under the contract. *Id.* at 900. The court also noted that New Jersey law was consistent with Restatement § 205 comment (e) because the New Jersey Supreme Court had found previously that the covenant of good faith and fair dealing "could be breached even when the defendant's acts 'did not literally violate' the agreement at issue." *Id.* (quoting *Assoc. Group Life, Inc. v. Catholic War Veterans of the United States of Am.*, 61 N.J. 150, 153 (1972)). Thus, the court found that, even where the alleged breach of good faith did not breach an express term of the contract, the defendant's good faith claim may survive.

This Court finds *Riveredge* compelling, and ultimately persuasive. Like New Jersey courts, Massachusetts courts have adopted *Restatement* § 205. And similar to the New Jersey Supreme Court in *Catholic War Veterans*, the Supreme Judicial Court of Massachusetts has long recognized that a party may breach the covenant of good faith and fair dealing without necessarily violating "a literal reading of the contract." *Fortune v. Nat'l Cash Register Co.*, 373 Mass. 96, 101 (1977); *see also Speakman v. Allmerica Fin. Life Ins. & Annuity Co.*, 367 F. Supp. 2d 122, 133 (D. Mass. 2005) ("A party may breach the covenant of good faith and fair dealing implicit in every contract without breaching any express term of that contract."). Thus, interpreting *Restatement* § 205 and Massachusetts caselaw together, where a claimant alleges that a co-party to a contract pursues litigation over that contract with the knowledge that its interpretation of the contract was fallacious, the claimant may pursue a breach of good faith claim even where that co-party's pursuit of litigation does not violate an express term of contract.

16

That is exactly what EQ alleges.  Accepting EQ's allegations as true, "Edgewood is aware of and understands that the correct interpretation of the language contained in the [Second Contract's] Scope of Work is that Edgewood contracted to remove crushed concrete material free from contamination, or having contamination levels at or below [residential or commercial use] criteria."  (EQ's Counterclaims ¶ 70.)  EQ supports this contention with a detailed recitation of the circumstances surrounding Edgewood's alleged lack of good faith enforcement.  For instance, EQ alleges that, in a meeting with Edgewood representatives prior to executing the Second Contract, Edgewood agreed that it would accept crushed concrete in conformity with residential *or commercial use* criteria.  (*Id.* ¶ 58.)  Following that meeting, EQ alleges that Edgewood representatives emailed to EQ a draft of the contract stating, contrary to the parties' oral agreement, that Edgewood would accept "crushed material that has been proven to be free from contamination, or to have contamination levels below *residential* standards[.]"  (*Id.* ¶ 63 (emphasis added).)  EQ then alleges that it expressed disagreement with Edgewood's formulation before the parties resettled on the final language of the contract to reflect their earlier oral agreement: "Edgewood shall remove all crushed material that has been proven to be free from contamination, or to have contamination levels below *commercial* standards[.]"  (*Id.* ¶ 67 (emphasis added).)  Accordingly, EQ contends that Edgewood pursues its interpretation of the contract with knowledge of its falsity and with the purpose "to frustrate the justified expectations of EQ[.]"  (*Id.* ¶ 73.)  Under the standards set out by Restatement § 205 and Massachusetts caselaw, EQ alleges facts sufficient to state a claim because Edgewood's behavior, if true, would constitute the absence of good faith in the enforcement of the Second Contract.

Edgewood argues that *Fortune* is distinguishable from this case because, there, the

Supreme Judicial Court of Massachusetts addressed a "limited circumstance of an at-will contract in which an employer was unjustly enriched by the termination of an employee to minimize the employee's right to a bonus payment or to wages." (Edgewood's Reply Br. at 5.) While it is true that *Fortune* and similar cases cited by EQ involve at-will contracts, this Court fails to see why this distinction would preclude a Massachusetts court from hearing EQ's claim, which is based on an allegedly improper litigation. Notably, *Riveredge* did *not* involve an at-will contract, and Massachusetts courts have also not limited claims sounding in breach of the covenant of good faith — where there is no attendant breach of contract — to at-will employment disputes. *See, e.g.*, *Speakman*, 367 F. Supp. 2d at 134 (finding that plaintiffs sufficiently alleged that the defendant interfered with plaintiffs' right to reap the benefits of an agreement reached between the two litigants, both commercial insurance parties); *Larson v. Larson*, 37 Mass. App. Ct. 106, 109 (1994) (upholding breach of good faith covenant in the context of divorce agreement); *see also Tanol Distrib., Inc. v. Panasonic Co., Div. of Matsushita Elec. Corp. of Am.*, No. 86-3355, 1987 WL 13319, at *6 (D. Mass. July 2, 1987) ("Massachusetts courts have not restricted the implied covenant of good faith and fair dealing to employment contracts.").

The only rationale that Edgewood offers concerning the application of *Fortune* to exclusively at-will employment scenarios is that, in such disputes, the parties are unequal commercial parties, thus requiring, arguably, a liberal application of the covenant of good faith. Yet, again, the Court fails to discern why this distinction is one with a difference, an observation shared by other courts. *See Speakman*, 367 F. Supp. 2d at 134 n.23 (upholding claim for breach of covenant of good faith with facts involving "a contract executed in a commercial setting");

*Anthony's Pier Four, Inc. v. HBC Assoc.*, 411 Mass. 451, 473 (1991) (extending covenant of good faith to "contracts between sophisticated businesspeople.").

To the extent that *Fortune* and similar at-will employment cases differ from this suit, those cases addressed a breach of good faith in the *performance* of the contract, not, as here, a breach of good faith in the *enforcement* of the contract. *See Hawthorne's, Inc.*, 414 Mass. at 211 ("Parties to a contract are obligated to deal honestly and in good faith in both the performance *and enforcement* of the terms of their contract[.]") (emphasis added) (citing Restatement § 205). It is thus natural that this case does not fall within the direct ambit of *Fortune*.  But Massachusetts courts, as illustrated, have not read *Fortune* as an exclusive manifestation of a *Restatement* § 205 claim, where the breach of good faith does not also serve itself as an express breach of contract.  In other words, no Massachusetts decision has barred a good faith covenant claim brought against a party seeking to improperly enforce a contract.

Courts in other jurisdictions have recognized comparable claims.  *See, e.g.*, *Cohn v. Taco Bell Corp.*, No. 92-5852, 1995 WL 247996, at *7-8 (N.D. Ill. April 24, 1995); *Riveredge*, 774 F. Supp. at 900; *ABA Distrib., Inc., v. Adolph Coors Co.*, 542 F. Supp. 1272, 1285 (W.D. Mo. 1982); *Atl. Mortg. & Inv. Corp. v. Stephenson*, 86 Conn. App. 126, 143, 145 (2004); *Medtronic, Inc. v. NuVasive, Inc.*, No. 1642, 2003 WL 21998480, at *8 (Tenn. Ct. App. Aug. 20, 2003); *McCarthy W. Constr., Inc. v. Phoenix Resort Corp.*, 169 Ariz. 520, 526 (Ariz. App. 1991); *cf. Roe v. Cargill Inc.*, 333 F. Supp. 2d 808, 814 (W.D. Ark. 2004); *Monahan v. GMAC Mortg. Corp.*, 179 Vt. 167, 179 (2005).  *But see Shibata v. Lim*, 133 F. Supp. 2d 1311, 1322 n.4 (M.D. Fla. 2000).  This Court predicts that, should this scenario reach the Supreme Judicial Court of Massachusetts, it would find similarly.  EQ states a claim for breach of the covenant of good

19

faith, and Edgewood's motion to dismiss EQ's Fifth Claim will be denied.  Thus, all of EQ's counterclaims will endure.

## II.    Edgewood's Motion to Dismiss Ford's First Amended Complaint

Edgewood moves to dismiss five counts of Ford's First Amended Complaint: CERCLA (Second Cause of Action), breach of contract (Third), fraud (Fourth), negligence (Fifth), and unjust enrichment (Sixth).  For the following reasons, the Court will dismiss Ford's CERCLA and unjust enrichment claims, but deny Edgewood's motion as to Ford's remaining counts.  In addition, the Court will dismiss Ford's contract and fraud claims against Edgewood's related entities.

### A.    Ford Fails to State a Claim for Contribution under CERCLA.

In its second claim against Edgewood, Ford seeks recovery and contribution from Edgewood pursuant to CERCLA, 42 U.S.C. § 9607.  Under CERCLA, a settling party may seek contribution from a third-party if the settling party "has resolved its liability to the United States or a State."  42 U.S.C. § 9613(f)(3)(B); *see also United States v. Atl. Research Corp.*, __ U.S. __, 127 S. Ct. 2331, 2334 n.1 (2007) ("Section [96]13(f)(3)(B) permits private parties to seek contribution after they have settled their liability with the Government.").  In its First Amended Complaint, Ford alleges that it "entered into an administrative settlement with the State of New Jersey . . . resolving its liability to the State of New Jersey[.]"  (First Am. Compl. ¶ 123.) Attached to its First Amended Complaint is the Administrative Consent Order ("ACO") to which

Ford refers.[5]

In this agreement, signed by both parties, Ford and the State of New Jersey expressly address the issue of CERCLA contribution: "It is the intent of the Department and Ford that this ACO constitutes an administrative settlement within the meaning of CERCLA Section 113(f)(2), 42 U.S.C. 9613(f)(2), and is intended to resolve the liability of Ford to the State of New Jersey[.]"  (First Am. Compl., Ex. A ("ACO") ¶ 42.)  In the last paragraph of the ACO, however, the parties stipulate that the "ACO shall become effective upon the execution hereof by all parties, *subject to completion of any required public participation process*."  (*Id.* ¶ 70 (emphasis added).)

Edgewood argues that Ford has not "resolved" its liability to New Jersey under CERCLA because the public participation process is not yet complete.  To wit, Edgewood contends that it leveled lengthy objections to the ACO during the public participation process and hopes for potential changes to the ACO to reflect those objections.  Thus, Edgewood argues that Ford's allegation that it "entered into an administrative settlement . . . resolving its liability to the State of New Jersey" is incorrect as a matter of law because the ACO is not yet final.  (First Am. Compl. ¶ 123.)  Further, in a supplementary filing, Edgewood produces a letter from NJDEP dated September 10, 2008, stating that "while the ACO remains under review, it is the

_____

[5] As described earlier, a court may only adjudge a motion to dismiss on the face of the non-moving party's pleadings.  *Angelastro*, 764 F.2d at 944.  However, a "'document *integral to or explicitly relied* upon in the complaint' may be considered 'without converting the motion [to dismiss] into one for summary judgment.'"  *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d at 1426) (emphasis in original) (quoting *Shaw v. Digital Equip. Corp.*, 82 F.3d 1194, 1220 (1st Cir. 1996)).  Here, in rendering its Opinion, the Court includes in its consideration the authentic, undisputed ACO, attached to Ford's First Amended Complaint.

Department's position that the ACO is not yet finalized." (Edgewood Supp. Br., Ex. A.) In another letter dated September 26, 2008, NJDEP again acknowledges that it "is currently reviewing the Findings section of the [ACO]." (Ford Supp. Br., Ex. A.) While the Court ordinarily does not consider documents outside the pleadings, these NJDEP letters are "integral" to Ford's CERCLA claim because they establish that the ACO is not yet final. *See In re Burlington Coat Factory Sec. Litig.*, 114 F.3d at 1426. Thus, at this juncture, Ford has not resolved its liability to the State of New Jersey within the meaning of CERCLA § 9613, and cannot yet maintain a CERCLA claim. Accordingly, the Court will dismiss Ford's CERCLA claim without prejudice. Should the ACO later embody a final resolution of Ford's liability to the State of New Jersey, Ford may seek leave to amend its First Amended Complaint at the propitious time with Magistrate Judge Salas.

### B.      **Ford's Unjust Enrichment Claim Fails**

Edgewood next moves to dismiss Ford's unjust enrichment claim.[6]  "[I]n order to state a claim for unjust enrichment, a plaintiff must allege (1) at plaintiff's expense (2) defendant received benefit (3) under circumstances that would make it unjust for defendant to retain benefit without paying for it." *In re K-Dur Antitrust Litig.*, 338 F. Supp. 2d 517, 544 (D.N.J. 2004). "The unjust enrichment doctrine requires that plaintiff show that it expected remuneration from the defendant at the time it performed or conferred a benefit on defendant and that the failure of remuneration enriched defendant beyond its contractual rights." *VRG Corp. v. GKN Realty Corp.*, 135 N.J. 539, 544 (1993).

---

[6] Because the Court will dismiss Ford's federal CERCLA claim, leaving only New Jersey state law claims, the Court examines Ford's remaining claims under diversity jurisdiction, 28 U.S.C. § 1332, as pled by Ford in its First Amended Complaint. (First Am. Compl. ¶ 19.)

Ford posits that it gave Edgewood crushed concrete with the expectation "that Edgewood would properly and lawfully reuse or dispose of the concrete at no cost to Ford." (First Am. Compl. ¶ 178.) Yet in return, Edgewood "failed to properly and lawfully reuse or dispose of the concrete." (*Id.* ¶ 179.) Consequently, Ford suffered "damages as a result of the unjust enrichment conferred upon Edgewood by Ford's cleanup, removal, and disposal of concrete from the Seven Properties." (*Id.* ¶ 6.) Thus, Ford alleges that Edgewood received a benefit — remediated sites — at Ford's expense, which was "unjust." (*Id.* ¶ 182.)

Edgewood argues that "Ford's unjust enrichment claim must be dismissed because Ford had an independent duty to clean the contaminated sites." (Edgewood's Br. at 20.) The Court agrees. "Courts addressing common law claims for restitution based on unjust enrichment in the context of CERCLA have consistently held that where the plaintiff has a legal duty to clean up waste on a contaminated site, recovery based on unjust enrichment is foreclosed." *In re Energy Co-op., Inc.*, No. 92-2392, 1995 WL 330876, at *8 (N.D. Ill. May 30, 1995); *see., e.g.*, *Lenox Inc. v. Reuben Smith Rubbish Removal*, 91 F. Supp. 2d 743, 753 (D.N.J. 2000) (dismissing, in alternative holding, unjust enrichment claim where "plaintiffs had an independent duty, pursuant to the NJDEP Administrative Consent Order, to cleanup the Site."); *SC Holdings, Inc. v. A.A.A. Realty Co.*, 935 F. Supp. 1354, 1372 (D.N.J. 1996) (holding that, where plaintiff "was under a legal duty pursuant to both CERCLA and the Spill Act to remediate the site, . . . its claim for unjust enrichment must be dismissed as a matter of law"); *Ciba-Geigy Corp. v. Sandoz Ltd.*, No. 92-4491, 1993 WL 668325, at *8 (D.N.J. June 17, 1993) (dismissing restitution claim where plaintiff under independent duty to clean up site); *Rockaway v. Klockner & Klockner*, 811 F. Supp. 1039, 1058 (D.N.J. 1993) (foreclosing unjust enrichment claim where plaintiff had

23

independent duty to remediate site under New Jersey's Environmental Cleanup Responsibility Act) (Ackerman, J.). Here, Ford has an independent legal duty to remediate the Properties pursuant to the Administrative Order. Thus, it cannot recover for unjust enrichment.

Ford argues that *Lenox* and presumably similar cases like those cited above are distinguishable because, in such cases, those "unjust enrichment claims were based, not upon any exchange or transaction between the parties, but solely on the plaintiffs' cleanup of a contaminated site." (Ford's Br. at 13 n.7.) Ford's argument is difficult to comprehend, and probably for good reason: it is meritless. To the extent that Ford argues that its unjust enrichment claim should not be dismissed because its legal duty to remediate the Properties arises by consequence of *Edgewood's* malfeasance, this Court is aware of no authority supporting this view. And nor does Ford marshal any. Furthermore, other district courts have dismissed unjust enrichment claims even where a plaintiff alleges that the site at issue was contaminated by the defendant, and not by the plaintiff. *See Andritz Sprout-Bauer, Inc. v. Beazer E., Inc.*, 174 F.R.D. 609, 629 (M.D. Pa. 1997); *Nielsen v. Sioux Tools, Inc.*, 870 F. Supp. 435, 443 (D. Conn. 1993).[7] The Court will dismiss Ford's unjust enrichment claim.

### C.   Ford States a Claim for Breach of Contract Against Edgewood

In its third count, Ford alleges that Edgewood breached the First Contract. In the First

---

[7] Ford also argues: "If the Court should nonetheless find that Ford's unjust enrichment claim cannot stand based upon Edgewood's argument that Ford had an independent duty to remediate the sites, Edgewood's unjust enrichment claims against Ford must fail for the same reason." (Ford's Br. at 14 n.8.) Ford notes that Edgewood, too, was named in the NJDEP's March 8, 2006 Order. However, even if Ford's argument had merit, it is moot because this Court has already dismissed Edgewood's unjust enrichment claim against Ford. *See Ford Motor Co. v. Edgewood Properties, Inc.*, Nos. 06-1278, -4266, 2007 WL 4526594, at *19 (D.N.J. Dec. 18, 2007).

Contract, the parties expressly agreed that the agreement "shall be governed by the law of [Ford's] principal place of business."  (First Contract ¶ 13.)  Neither party disputes that Michigan is Ford's principal place of business, and thus, this Court employs Michigan law to examine Ford's contract claim.

"[T]he elements of a breach of contract cause of action are that a contract existed between the parties and that a breach of one or more of the contractual terms occurred."  *Lindsay & Lindsay, LLP v. Rausch*, No. 268703, 2007 WL 4270771, at *3 (Mich. App. Dec. 6, 2007) (unpublished).  Further, a "party to a contract who is injured by another's breach may recover only those damages which are the direct, natural, and proximate result of the breach."  *Matter of F. Yeager Bridge & Culvert Co.*, 150 Mich. App. 386, 401 (1986).

Edgewood first argues that Ford improperly named additional parties to the action as Edgewood's subsidiaries or related companies without pleading alter-ego liability.  Ford names Columbia Group at Hamilton, LLC; JSM at Tingley, LLC; JSM at Route 70, LLC; JSM at Brick, LLC; JSM at Applegarth, LLC; JSM at Martin Blvd., LLC; W.W.M. Properties, LLC; and Fulton Square Urban Renewal, LLC as "affiliate[s], subsidiar[ies], or otherwise related to Edgewood." (First Am. Compl. ¶¶ 10-17.)  Ford pursues its contract claim against Edgewood and these "related" parties, referred to collectively as "Edgewood."  (*Id.* ¶ 18.)

Ford's claims against these "related" entities fail because they are not parties to the First Contract.  Nor does Ford adequately plead alter-ego liability.  While Ford pursues its contract claim against the "Edgewood" collective entities, the First Contract sets out an agreement between "Edgewood Properties" and "Ford Motor Company" only.  (First Contract at 1.) Nowhere in the First Contract is there mention of these additional corporate parties.  Thus, absent

an allegation of alter-ego liability, Ford's contract action against these entities fail for lack of the existence of a contract with these parties — the most rudimentary element of any breach of contract claim.

In lieu of a contract, however, a court "may find that one entity is the alter ego of another and pierce the corporate veil upon proof of three elements: first, the corporate entity must be an instrumentality of another; second, the corporate entity must be used to commit a fraud or wrong; and, third, there must have been an unjust loss or injury to the plaintiff." *Shoaff v. Baldwin*, Nos. 248606, 248609, 255460, 2005 WL 267796, at *6 (Mich. App. Feb. 3, 2005) (unpublished). In its brief, Ford argues persuasively that the related entities act merely as Edgewood's alter-egos: "[T]he companies appear to be nothing more than a unified business entity controlled by the same few individuals for the same ends, divided in name only." (Ford's Br. at 20.) Were the Court to treat Ford's briefing as its pleading, the Court may find it sufficient. However, Ford "may not proceed to the discovery stage to support an allegation that does not exist in the pleadings." *Chen v. Imperial Buffet & Restaurant, Inc.*, No. 06-3459, 2007 WL 3125229, at *2 (D.N.J. Oct. 23, 2007) (Ackerman, J.). "[T]he Rules require [ ] 'a short and plain statement of the claim' that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Conley v. Gibson*, 355 U.S. 41, 47 (1957) (quoting Fed. R. Civ. P. 8(a)(1)). Ford fails to plead the grounds upon which its alter-ego argument rests. *Cf. Shoaff*, 2005 WL 267796, at *6 ("[P]laintiff alleged in paragraphs 53-56 that the limited partnership and corporation defendants were created solely to avoid creditors[,] . . . thus providing a basis for the trial court to pierce the corporate veil."). Thus, Ford's contract claim is foreclosed as to Edgewood's "related" entities.

Turning to Ford's claim against Edgewood itself, Ford sufficiently alleges the existence of a contract and a breach thereof.  In its First Amended Complaint, Ford bases its claim on the First Contract's indemnity provision:

> [Edgewood] will handle and be responsible for every claim *that arises from activity pursuant to this Sales Agreement* by [Edgewood], any of [Edgewood]'s customers, contractors or any employee or agent of [Edgewood] or its customers or contractors, and that is for actual or alleged (i) injury to any person, (ii) *damages to any property*, (iii) economic loss, or (iv) violation of any law, ordinance or regulation, except where such costs arise from the sole negligence or recklessness of [Ford], its directors or its employees.

(First Contract at ¶ 9(b) (emphases added).)  The Sales Agreement (First Contract) provides that Edgewood "will purchase and receive . . . crushed concrete" from the Ford plant.  (*Id.* at 1.)

Ford alleges that Edgewood breached the indemnity provision "[b]y failing to conduct response actions and remediation work in response to the [Administrative Order]," and by "failing to indemnify Ford for damages and costs incurred by Ford as a result of Edgewood's improper use of concrete it obtained[.]"  (First Am. Compl. ¶¶ 132-33.)  Furthermore, Ford alleges that Edgewood "commingled the crushed concrete obtained from the Edison Plant" with contaminated concrete obtained from other sources, (*id.* ¶ 64), and that partly as a result, the NJDEP issued the Administrative Order requiring Ford to incur costly cleanup efforts, (*id.* ¶¶ 72-78).  Thus, accepting Ford's allegations as true, Edgewood failed to indemnify Ford for damages stemming from the Administrative Order, which arose, in part, from Edgewood's improper use of concrete obtained under the First Contract.

Edgewood argues that the phrase "arises from activity pursuant to the Sales Agreement" should be read narrowly to include only the *collection* of concrete at the Ford plant, while

27

excluding Edgewood's subsequent *distribution* of the concrete to the Properties.  While Edgewood's interpretation is plausible, it is just that: an interpretation of a provision that is, at best, ambiguous.  *See Klapp v. United Ins. Group Agency, Inc.*, 468 Mich. 459, 467 (2003) (advancing that a contract is ambiguous "when its provisions are capable of conflicting interpretations"); *Davis v. Kramer Bros. Freight Lines, Inc.*, 361 Mich. 371, 377 (1960) ("A one-sided, self-serving interpretation by one party is of no help in interpretation.").

The indemnification provision is susceptible to conflicting interpretations, and may be read broadly to include Edgewood's distribution of concrete to the Properties.  For example, the First Contract states that Edgewood shall indemnify Ford for damages "to any property," among other claims.  (First Contract at ¶ 9(b).)  If the parties intended to limit Edgewood's liability to damages arising solely from its collection of concrete from the Ford site, the inclusion of "to any property" would make little sense.  Thus, accepting Ford's allegations and interpretation as true, as the Court must, Edgewood failed to take responsibility for the damages resulting from its concrete transaction with Ford.  These damages were proximately caused by Edgewood's breach because Ford incurred cleanup costs required by NJDEP, which investigated Edgewood's supposed contamination.  Accordingly, Ford sufficiently alleges that Edgewood violated the indemnity provision.

Edgewood argues that the indemnification provision is nevertheless inoperable because it observes that the provision precludes its liability where Ford's "costs arise from the sole negligence or recklessness of [Ford]."  (First Contract at ¶ 9(b).)  Edgewood asserts that Ford's costs arose from Ford's own and sole negligence because Ford violated a November 2004 NJDEP variance, which ultimately led to the Administrative Order and Ford's damages.  In this

variance, NJDEP approved Ford's proposal to use clean concrete "on site" at its plant as fill. (Fassett Cert., Ex. A.)  But "concrete that will not be used as fill *and will be disposed offsite* includes . . . (d) concrete floor surfaces that have been determined to contain positive detections of PCBs."  (*Id.* (emphasis added).)  Edgewood seems to argue that "disposed offsite" may *not* be read to include *distribution* to Edgewood, and thus, that Ford violated the variance by entering into the First Contract with Edgewood and is solely responsible for its own consequent damages.

Edgewood's argument is clever, but the Court declines to perform gymnastics with logic. Even if the variance is interpreted as prohibiting Ford from distributing its concrete to Edgewood, NJDEP nevertheless named Edgewood as an involved party in the contamination in its Administrative Order — facts expressly alleged by Ford in its First Amended Complaint. (First Am. Compl. ¶¶ 73, 75.)  Thus, Ford alleges that it is not *solely* responsible for its costs; and, in any event, the variance hardly establishes that Ford is *solely* responsible for its costs as a matter of law.

Finally, Edgewood argues that Ford waived contractual indemnification because Ford began remediation on its own before the Administrative Order required it to do so.  Edgewood contends that Ford implicitly acknowledged that remediation was indeed Ford's sole responsibility by virtue of its course of conduct, and it thus waived its right to enforce the indemnification clause.  The Court is thoroughly unconvinced.

Waiver is a voluntary and intentional abandonment of a known right.  *Roberts v. Mecosta Co. Hosp.*, 466 Mich. 57, 64 n.4 (2002).  "Although course of conduct can constitute a waiver, there must be evidence that [the other party] intentionally relinquished its rights."  *Iverson Indus., Inc. v. Metal Mgmt. Ohio, Inc.*, 525 F. Supp. 2d 911, 921 (E.D. Mich. 2007) (internal quotation

marks omitted).  The question of waiver is more appropriately decided by the trier of fact.

*Hilman v. Am. Axle & Mfg., Inc.*, No. 05-73162, 2005 WL 2649265, at *4 n.4 (E.D. Mich. Oct.

17, 2005).  At this pleading stage, there is plainly no evidence upon which to form the conclusion

that Ford intended to waive indemnification by virtue of its unprompted attempt to remediate the

contaminated sites.

Ford states a claim for breach of contract.  Edgewood's motion to dismiss Ford's breach

of contract claim will be denied as to Edgewood itself.  However, Ford's contract claims against

the "related" entities will be dismissed without prejudice for failure to sufficiently allege alter-

ego liability.

### D.      Ford States a Claim for Fraud Against Edgewood

Edgewood next moves to dismiss Ford's fraud claim.  To state a claim for fraud, Ford

must allege that Edgewood perpetrated "[1] a material representation of a presently existing or

past fact, [2] made with knowledge of its falsity and [3] with the intention that the other party

rely thereon, [4] resulting in reliance by that party [5] to his detriment."  *Jewish Ctr. of Sussex*

*Cty. v. Whale*, 86 N.J. 619, 624 (1981).  "Statements as to future or contingent events, to

expectations or probabilities, or as to what will or will not be done in the future, do not constitute

misrepresentations, even though they may turn out to be wrong."  *Alexander v. CIGNA Corp.*,

991 F. Supp. 427, 435 (D.N.J. 1998).  However, "where a promise is given and the promisor

knows at the time of promising that he has no intention of fulfilling it, the promise will constitute

a misstatement of present fact and may support an allegation of fraud."  *Lo Bosco v. Kure Eng'g.*

*Ltd.*, 891 F. Supp. 1020, 1031 (D.N.J. 1995); *see also Mallon v. Prudential Prop. & Cas. Ins.*

Co., 688 F. Supp. 997, 1008 (D.N.J. 1988).

"In alleging fraud, . . . a party must state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b).  To satisfy this standard, "the plaintiff must plead or allege the date, time and place of the alleged fraud or otherwise inject precision or some measure of substantiation into a fraud allegation." *Frederico v. Home Depot*, 507 F.3d 188, 200 (3d Cir. 2007).  "Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b).  The purpose of Rule 9(b) "is [to] provide defendants with notice of the precise misconduct that is alleged and to protect defendants' reputations by safeguarding them against spurious allegations of immoral and fraudulent behavior." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d at 1418.  Furthermore, "[t]he Third Circuit has held that focusing exclusively on [Rule 9(b)'s] particularity language is too narrow an approach and fails to take account of the general simplicity and flexibility contemplated by the rules." *Rockaway*, 811 F. Supp. at 1059 (Ackerman, J.) (internal quotation marks omitted).

Ford adequately pleads fraud.  Generally, Ford alleges that Edgewood misrepresented to Ford that it would comply with an NJDEP filing requiring Edgewood not to redistribute the crushed concrete to outside parties and/or properties, when in fact it did not intend to uphold this promise.  Specifically, Ford alleges that "Edgewood submitted a Notification of Exempt Recycling Activities to NJDEP for its crushing, transport, and reuse of concrete from the Edison Plant under Exemption 20 of N.J.A.C. § 7:26A-1.4(a)."[8]  (First Am. Compl. ¶ 141.)  In order to comply with this provision of the New Jersey Administrative Code, a party that generates crushed concrete — like Edgewood — must "be the sole end-user and/or end-market of the end

---

[8] Viewing Ford's allegations in a light most favorable to it, Edgewood conveyed its promise to abide by Exemption 20 to Ford.  (*See* First Am. Compl. ¶ 50 ("Edgewood specifically represented that it would remove concrete . . . to commercial sites owned by Edgewood.").)

31

product that is generated and the end product shall be used exclusively for future projects of the company or contractor."  N.J.A.C. § 7:26A-1.4(a).  Ford contends that Edgewood misrepresented that, in pursuing Exemption 20, it would not redistribute concrete to parties and properties that were not "end-users," when in fact, Edgewood intended to, and did, redistribute the concrete to other locations such as the Tingley Rubber property.  (First Am. Compl. ¶¶ 142, 144-46.)  Thus, Ford alleges with precision and substantiation Edgewood's misrepresentation that it would abide by Exemption 20.

While it would seem, at first blush, that Ford is improperly alleging that Edgewood misrepresented a mere *future intention* to satisfy Exemption 20, *see Alexander*, 991 F. Supp. at 435, Ford does indeed allege a present misrepresentation: "Edgewood knew that its misrepresentations regarding its intended reuse of the concrete were false at the time Edgewood made the mispresentations."  (First Am. Compl. ¶ 147.)  Thus, Ford sufficiently alleges the first two elements of fraud.  *See generally In re Prudential Ins. Co. of Am. Sales Practices Litig.*, 975 F. Supp. 584, 609-11 (D.N.J. 1996) (discussing general pleading requirements for scienter in the context of a misrepresentation of present intent).  Ford also satisfies the third element of fraud — that "Edgewood intended that Ford rely on its fraudulent misrepresentation" — which, like the second element, may be averred generally.  (*Id.* ¶ 149.)

As for reliance and damages, Ford alleges that, as a result of Edgewood's misrepresentation to satisfy Exemption 20, "Ford allowed Edgewood to take concrete . . . [and] use the concrete only at commercial, deed-restricted sites" and in compliance with "Exemption 20."  (*Id.* ¶ 150.)  Because Ford relied on Edgewood's mispresentations by completing the transaction, and because Edgewood distributed concrete to other users, (*id.* ¶ 61.), Ford suffered

damages, (*id.* ¶ 152.).

Ford makes out a claim for fraud, and Edgewood's motion to dismiss Ford's third count will be denied.  But insofar as Ford pursues its fraud claim against Edgewood's "related" entities, for the reasons stated earlier, Ford's claim will be dismissed for failure to plead alter-ego liability, or any facts supporting that such entities themselves perpetrated fraud.  *See Naporano Iron & Metal Co. v. Am. Crane Corp.*, 79 F. Supp. 2d 494, 511 (D.N.J. 1999) ("Pleadings containing collectivized allegations against 'defendants' do not suffice.").

### E.      Ford States a Claim for Negligence

Edgewood next argues that Ford fails to state a claim for negligence because "Ford cannot and has not pled facts suggesting that Edgewood's alleged breach proximately caused Ford's injuries."  (Edgewood's Br. at 17.)  The "traditional negligence elements [are] duty, foreseeability, breach, and causation."  *Consolidated Rail Corp. v. Gottshall*, 512 U.S. 532, 566 (1994).  Edgewood does not dispute, and this Court finds, that Ford sufficiently alleges that Edgewood owed Ford a duty of care to follow regulations concerning contaminated concrete, and that Edgewood breached its duty by, for instance, commingling concrete obtained from Ford with contaminated concrete obtained elsewhere.  (First Am. Compl. ¶¶ 167-174.)

As for causation and forseeability, a defendant's breach is a proximate cause of damages when it is "reasonably to be anticipated in view of defendant's capacity to have foreseen that the particular plaintiff . . . is demonstrably within the risk created by defendant's negligence." *People Exp. Airlines, Inc. v. Consol. Rail Corp.*, 100 N.J. 246, 267 (1985).  "[I]f the original defect, although not the sole cause of the accident, constituted a contributing or concurrent proximate cause in conjunction with the subsequent alteration, the defendant manufacturer will

remain liable." *Brown v. U.S. Stove Co.*, 98 N.J. 155, 171 (1984).  In other words, "a tortfeasor will be held answerable if its 'negligent conduct was a substantial factor in bringing about the injuries,' even where there are 'other intervening causes which were foreseeable or were normal incidents of the risk created.'"  *Id.* at 171 (quoting *Rappaport v. Nichols*, 31 N.J. 188, 203 (1960)).  In general, "the issue of proximate cause is left to the jury for its factual determination." *Crowley v. Chait*, No. 85-2441, 2004 WL 5434953, at *7 (D.N.J. Aug. 25, 2004) (Ackerman, J.).

Ford sufficiently pleads proximate cause and foreseeability.  Accepting Ford's allegations as true, Edgewood commingled concrete received from Ford with contaminated concrete obtained from other sources and distributed contaminated concrete to outside parties and/or properties in violation of New Jersey regulations.  As a result of Edgewood's actions, Ford contends, Ford was held responsible by NJDEP to remediate sites under Edgewood's authority. Thus, Edgewood sufficiently alleges that it could have reasonably foreseen that its negligent actions in contravention of New Jersey regulations would place Ford — one of its suppliers — "within the risk" of harm.  *People Exp. Airlines*, 100 N.J. at 267.

Edgewood argues that Ford's damages could not have been caused by Edgewood's alleged negligence because NJDEP found Ford responsible for contaminated concrete found at sites outside Edgewood's control, as well as at those sites within Edgewood's control.  In other words, Edgewood contends, because NJDEP found contaminated concrete supplied by Ford at sites not within Edgewood's domain, this finding establishes that *Ford's own actions* at its plant must have proximately caused its damages at all sites as a matter of law.  Edgewood recycles an argument not fit for consumption, and one this Court has already rejected in this Opinion.

Just because NJDEP named Ford as a culpable party for *all contaminated sites* does not

34

absolve Edgewood of its shared, named involvement in those contaminated sites at issue in this suit.  That Ford may have helped cause the contamination at the Properties — which Ford does *not* allege — does not mean Edgewood did not cause contamination.  Proximate cause does not mean sole cause.  *See Brown*, 98 N.J. at 171.  Assuming the truth of Ford's allegations, Edgewood's malfeasance following its receipt of concrete from Ford constitutes a substantial factor in bringing about Ford's damages on those sites at issue in this case.  It is immaterial, at this juncture, whether Ford may ultimately be found more liable than Edgewood, or fully liable, or that Edgewood had nothing to do with unrelated sites where NJDEP found Ford responsible.  Given that proximate cause is a question usually left to a jury, Ford sufficiently alleges that Edgewood could reasonably have foreseen that its actions would cause damage to Ford on the Edgewood sites.  Edgewood's motion to dismiss Ford's negligence claim will be denied.

In sum, Ford's CERCLA (Second Cause of Action) and unjust enrichment (Sixth Cause of Action) claims will be dismissed.  In addition, Ford's contract (Third Cause of Action) and fraud (Fourth Cause of Action) claims against Edgewood's "related" entities will be dismissed for failure to adequately plead alter-ego liability.  All other claims remain pending.


### III.     EQ's Motion to Dismiss Alberici's Cross-claims

EQ moves to dismiss Alberici's contribution and indemnification cross-claims.  EQ challenges Alberici's cross-claims for failure "to present *any* facts indicating that it is entitled" to relief.  (EQ's Br. at 5 (emphasis in original).)  The Court agrees.

To state a claim under the New Jersey Tortfeasors Contribution Law, a plaintiff must allege that the party from whom contribution is sought is a joint tortfeasor.  *Sattelberger v. Telep*,

14 N.J. 353, 364 (1954); *see also Zotta v. Otis Elevator Co.*, 64 N.J. Super. 344, 348-49 (App.

Div. 1961) ("The essence of the doctrine of contribution, by the New Jersey and majority view, is

a common obligation to the person injured by the common tortious conduct.").  In its cross-

claims, Alberici alleges, in total: "[Alberici] demands contribution from co-third-party defendant

EQ under the common law, the Joint Tortfeasors Contribution Act and the Comparative

Negligence Act for any judgments which may be recovered against [Alberici] by Edgewood in

this action."  (Alberici's Cross-Claims at 26.)  Alberici does not allege that EQ is a joint

tortfeasor.  Nor does Alberici provide supporting "factual allegations" of any sort that "raise[] a

right to relief above the speculative level." *Twombly*, 127 S. Ct. at 1965.  Alberici offers no

argument to the contrary, and this Court will dismiss its contribution cross-claim without

prejudice.

Similarly, Alberici fails to properly plead a claim for indemnification.  Under New Jersey

law, "[t]wo different situations can give rise to indemnification: either when a contract expressly

provides for it, or when a special legal relationship creates an implied right of indemnity."

*Ferriola v. Stanley Fastening Sys., L.P.*, No. 04-4043, 2007 WL 2261564, at *3 (D.N.J. Aug. 1,

2007).  If a plaintiff pursues the latter, "it is the existence of a special legal relationship sufficient

to impose certain duties and a subsequent breach of those duties that permits an implied

indemnification." *Ruvolo v. United States Steel Corp.*, 133 N.J. Super. 362, 367 (Law Div.

1975).  Here, Alberici "demands indemnification under the common law from co-third-party

defendant EQ for any judgments which may be recovered against [Alberici] by Edgewood in this

action."  (Alberici Cross-Claims at 27.)  Alberici fails to plead the existence of a special legal

relationship with EQ to give rise to a duty to indemnify.  Accordingly, Alberici's indemnification

claim will be dismissed without prejudice.

Alberici cross-moves to amend its cross-claims.  (Alberici's Br. at 2.)  Federal Rule 15(a) provides that "a party may amend [its] pleading only by leave of court or by written consent of the adverse party; and leave shall be freely given when justice so requires."  Fed. R. Civ. P. 15(a).  However, "[t]he policy favoring liberal amendment of pleadings is not . . . unbounded." *Dole v. Arco Chem. Co.*, 921 F.2d 484, 487 (3d Cir. 1990).  Where an amendment of pleading is futile, the Court may deny leave to amend.  *Id.*

EQ argues that an amendment is futile because Alberici's proposed amendment is inadequate.  The Court concurs.  In its proposed amended pleading, Alberici's cross-claims remain deficient for the same reasons discussed above.  For its contribution claim, Alberici states in its proposed amended cross-claims that "Edgewood is alleging that [Alberici] and [EQ] are joint tortfeasors."  (Donovan Cert., Ex. C at 26.)  Yet, Alberici still does not *itself allege* that EQ is a joint tortfeasor.  *See N.J. Office Supply, Inc. v. Feldman*, No. 89-3990, 1990 WL 153962, at *2 (D.N.J. Oct. 10, 1990) ("To state a legally sufficient claim for anticipatory relief [under the Contribution Law], . . . the party asserting [the right to contribution] must allege and prove that the party against whom he makes it is a joint tortfeasor within the meaning of the act.").  As for its indemnification claim, Alberici still does not plead the existence of a special legal relationship with EQ to give rise to a duty to indemnify.  Thus, Alberici's cross-motion to amend its cross-claims is futile because its proposal retains the same deficiencies as its current cross-claims. Alberici's cross-motion to amend will be denied without prejudice.

In addition, Alberici requests leave to convert its counterclaim against Edgewood, based on assumption of the risk, into an affirmative defense.  Edgewood does not object, and the Court

will grant Alberici's request.  *See* Fed. R. Civ. P. 8(c) ("If a party mistakenly designates a defense as a counterclaim, . . . the court must, if justice requires, treat the pleading as though it were correctly designated[.]").

In sum, Alberici's cross-motion for leave to amend its pleading (Doc. No. 107) will be granted in part and denied in part.  EQ's motion to dismiss Alberici's cross-claims will be granted (Doc. No. 95).  Edgewood's motion to dismiss Alberici's counterclaim (Doc. No. 97) will be denied as moot.


### CONCLUSION & ORDER

For the foregoing reasons, it is hereby ORDERED that:

1.     Edgewood's motion to dismiss EQ's counterclaims (Doc. No. 98) is DENIED. All of EQ's counterclaims remain pending.

2.     Edgewood's motion to dismiss Ford's First Amended Complaint (Doc. No. 152) is GRANTED IN PART and DENIED IN PART.  Ford's Second Cause of Action, under CERCLA, is DISMISSED WITHOUT PREJUDICE.  Ford's Sixth Cause of Action, for unjust enrichment, is DISMISSED.  Ford's remaining claims are still at issue.  However, Ford's contract and fraud claims are DISMISSED WITHOUT PREJUDICE insofar as they are brought against Edgewood's "related" entities.  Edgewood's motion to strike portions of Ford's First Amended Complaint is DENIED AS MOOT.

3.     Edgewood's motion to dismiss Arcadis's cross-claims (Doc. No. 141) is DENIED AS MOOT.

4.     EQ's motion to dismiss Alberici's cross-claims (Doc. No. 95) is GRANTED.
Alberici's contribution and indemnification cross-claims are DISMISSED
WITHOUT PREJUDICE.

5.     Alberici's cross-motion to amend (Doc. No. 107) is GRANTED IN PART and
DENIED IN PART.  Alberici is granted leave to amend/convert its assumption of
the risk counterclaim against Edgewood into an affirmative defense.  Alberici's
proposed amended pleading against EQ is denied for futility.

6.     Edgewood's motion to dismiss Alberici's assumption of the risk counterclaim
(Doc. No. 97) is DENIED AS MOOT.


Dated: October 8, 2008
Newark, New Jersey


                              s/ Harold A. Ackerman
                              U.S.D.J.