**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

<u>**NOT FOR PUBLICATION**</u>

| | |
|---|---|
| **FORD MOTOR COMPANY** | : **Civil Action Nos. 06-1278, 06-4266** |
| | : **(HAA)** |
| | : |
| | : **OPINION AND ORDER** |
| **Plaintiff-Counterclaim-Defendant** | : **ON FORMAL MOTION** |
| | : |
| **v.** | : |
| | : |
| **EDGEWOOD PROPERTIES, INC** | : |
| | : |
| **Defendant-Counterclaimant** | : |
| | : |
| **EDGEWOOD PROPERTIES, INC** | : |
| | : |
| **Third-Party Plaintiff** | : |
| | : |
| **v.** | : |
| | : |
| **FORD MOTOR LAND DEVELOPMENT** | : |
| **CORP, MIG/ALBERICI, LLC, and EQ** | : |
| **NORTHEAST, INC.** | : |
| | : |
| **Third-Party Defendants** | : |
| | : |
| | : |
| **PREFERRED REAL ESTATE INVEST-** | : |
| **MENTS, INC. and 240 PRINCETON** | : |
| **AVENUE ASSOCIATES, L.P.** | : |
| | : |
| **Plaintiffs** | : |
| | : |
| **v.** | : |
| | : |
| **EDGEWOOD PROPERTIES, INC.,** | : |
| **COLUMBIA GROUP AT HAMILTON LLC,** | : |
| **FORD MOTOR COMPANY and FORD** | : |
| **MOTOR LAND DEVELOPMENT CORPOR-** | : |
| **ATION** | : |
| | : |

|                                                          |     |
| -------------------------------------------------------- | --- |
| **Defendants**                                           | :   |
|                                                          | :   |
| **EDGEWOOD PROPERTIES, INC. AND COLUMBIA GROUP AT HAMILTON LLC** | :   |
|                                                          | :   |
| **Third-Party Plaintiffs**                               | :   |
|                                                          | :   |
| **v.**                                                   | :   |
|                                                          | :   |
| **MIG/ALBERICI, LLC AND EQ NORTH-EAST,INC.**             | :   |
|                                                          | :   |
| **Third-Party Defendants**                               | :   |
|                                                          | :   |
| **MIG/ALBERICI, LLC**                                    | :   |
|                                                          | :   |
| **Fourth-Party Plaintiff**                               | :   |
|                                                          | :   |
| **v.**                                                   | :   |
|                                                          | :   |
| **GOLDER ASSOCIATES, INC. and ARCA-DIS U.S.**            | :   |
|                                                          | :   |
| **Fourth-Party Defendants**                              | :   |
|                                                          | :   |

S̲ALAS̲, U̲NITED S̲TATES M̲AGISTRATE J̲UDGE:

Presently before the Court is a motion by Defendant Edgewood Properties, Inc. ("Edgewood") for leave to file Consolidated Amended Counterclaims, Cross-Claims and Third-Party Claims, pursuant to Fed. R. Civ. P. 15(a). The Court is deciding this motion without oral argument. Fed. R. Civ. P. 78. For the reasons set forth below, Edgewood's Motion is granted as to its claims for negligent misrepresentation, strict liability, civil conspiracy, and is denied as to claims for breach

of contract and contribution.  Leave is hereby granted to re-assert the NJRICO claims consistent with this opinion.

## I. FACTUAL BACKGROUND AND PROCEDURAL HISTORY

This action involves the removal and reuse of recycled concrete aggregate ("concrete") which Edgewood procured through the demolition of an automobile assembly plant owned by Ford Motor Company ("Ford") in Edison, NJ.  In February 2004, Ford, in accordance with the New Jersey Industrial Site Recovery Act ("ISRA"), N.J.S.A. §13:1K-6 *et seq.*, entered into a Remediation Agreement with the New Jersey Department of Environmental Protection ("NJDEP") to facilitate the lawful deconstruction of the building.  Ford contracted with MIG Alberici ("Alberici") to demolish the plant and reuse the concrete for on-site fill.  (Edgewood's Proposed Pleading ¶ 23). On November 9, 2004, the NJDEP permitted Alberici to reuse the concrete for construction projects on the Ford property provided that it was free of unlawful contaminants.  (*Id.* ¶ 25).  Well into its work, Alberici discovered that they had more concrete than they estimated.  (Ford's Opp. Br. at 3). As a result, Ford sought out buyers for the excess concrete.  (*Id.* at 3-4).

On or about February 23, 2005, Ford entered into a contract with Edgewood (the "First Contract") in which Ford agreed to provide 50,000 cubic yards of concrete to Edgewood free of charge in exchange for its removal from the site.  (Edgewood's Proposed Pleading, Exhibit A). Edgewood then contracted with EQ Northeast, Inc. ("EQ"), a company that Ford used during the deconstruction, wherein EQ agreed to be responsible for testing the concrete and in turn Edgewood would crush the concrete and remove the material to predominantly residential developments located

primarily in southern New Jersey. (Ford's Opp. Br. at 4). Ford was not a party to the Second Contract. Ford Motor Co. v. Edgewood Properties Inc. et al., No. 06-1278, 2007 WL 4526594, at *17 (D.N.J. Dec. 19, 2007).

On or about June 23, 2005, Edgewood discovered that the concrete taken to the sites contained levels of polychlorinated biphenyls ("PCB") in excess of the lawful limits for either residential or commercial use. (Edgewood's Proposed Pleading ¶ 87). Edgewood complained to Ford, and Ford commenced excavation and removal of the contaminated concrete from the various properties. (Ford's Opp. Br. at 4-5).

On March 8, 2006, the NJDEP issued an administrative order ("AO") compelling Ford, Alberici and Edgewood to submit a response plan to completely excavate the sites of all contaminated material and for Edgewood to stop all construction on the contaminated properties. (Edgewood's Proposed Pleading ¶¶ 91-96). As a result, Edgewood complains that it suffered damages. (See Edgewood's Proposed Pleading generally).

On March 17, 2006, Ford commenced an action against Edgewood in this Court under Sections 107(a)(4)(B) and 113(f)(3)(b) of the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended, 42 U.S.C. § 9601 et seq. ("CERCLA") and Section 58:10-23, 11f (a)(2) of the Spill Act ("Spill Act" or "Act") for contribution and indemnification for all costs as provided under the First Contract. (See Complaint generally). Ford included common law claims of breach of contract, unjust enrichment, indemnification, fraud and negligence. (Id.). On December 7, 2006, Edgewood filed an Answer and Counterclaim against Ford

4

and third-party claims against Ford Land Development Corp. ("Ford Land"), Alberici and EQ under various legal theories, including but not limited to, breach of contract, contribution, negligent misrepresentation, and civil conspiracy.

Subsequent to the filing of the Newark action, 240 Princeton Avenue Associates ("Princeton"), owner of one of the contaminated properties, American Standard, filed a complaint in Trenton against Edgewood and Columbia Group at Hamilton, LLC ("Columbia").  On September 15, 2006, Preferred Real Estate Investments, Inc. joined Princeton in their complaint and added Ford and Ford Land as Defendants and additional claims against Ford and Edgewood for contamination to the American Standard property. Edgewood and Columbia in turn filed cross-claims against Ford and Ford Land and third-party claims against Alberici and EQ for concrete used at the properties.

On February 22, 2007, this Court consolidated the Trenton Action with the Newark Action under the Newark docket number. Subsequently, Princeton and Edgewood entered into a stipulation of dismissal which was entered with prejudice on July 25, 2007, leaving Ford's action against Edgewood pending.  Edgewood's motion for leave to amend its counterclaims, cross-claims, and third-party claims are addressed by the Court in this opinion.


## II. DISCUSSION

In deciding a motion to amend, the "court applies the same standard of legal sufficiency as exists under Rule 12(b)(6)." Shane v. Fauver, 213 F.3d 113, 115 (3d Cir. 2000).  The court must "accept as true all allegations in the complaint and all reasonable inferences that can be drawn there

from and view them in the light most favorable to the plaintiff." Kanter v. Barella, 489 F.3d 170, 177 (3d Cir. 2007) (quoting Evancho v. Fisher, 423 F.3d 347, 350 (3d Cir. 2005)).

A motion for leave to amend a complaint shall be freely given when justice so requires. Forman v. Davis, 371 U.S. 178, 182 (1962); Fed. R.Civ. P. 15.   Although leave to amend the pleadings under Fed. R. Civ. P. 15 is granted liberally, the court may deny a motion to amend where there is "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [or] futility of the amendment." *Id*.   Finally, the decision whether to grant or deny a motion for leave to amend rests "within the discretion of the District Court." *Id.*

 " 'Futility' means that the complaint, as amended, would fail to state a claim upon which relief could be granted.' " In re Burlington Coat Factory Securities Litig., 114 F.3d 1410, 1434 (3d Cir. 1997) (quoting Glassman v. Computervision Corp., 90 F.3d 617, 623 (1st Cir. 1996).   As noted above, to determine whether a proposed amendment is futile the Court applies the same standard as a motion to dismiss under Rule 12(b)(6). Medpointe Healthcare, Inc. v. Hi-Tech Pharmacal Co., Inc., 380 F. Supp. 2d 457, 462 (D.N.J. 2005).

In   Bell Atlantic Corp. v. Twombly, the U.S. Supreme Court addressed the pleading requirements of Rule 8(a)(2) in the context of a motion to dismiss under Rule 12(b)(6).   127 S. Ct. 1955 (2007).   The Supreme Court stated that a complaint does not have to include detailed factual allegations but "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of

action will not do." *Id.* at 1964-65. Thus, the Court stated that the threshold requirement of Rule

8(a)(2) is "that the 'plain statement' possess enough heft to 'show that the pleader is entitled to [that]

relief.'" *Id.* at 1966. Expounding on <u>Twombly</u>, theThird Circuit stated that "[w]hile Rule 12(b)(6)

does not permit dismissal of a well-pleaded complaint simply because 'it strikes a savvy judge that

actual proof of those facts is improbable,' the '[f]actual allegations must be enough to raise a right

to relief above the speculative level.'" <u>Phillips v. County of Allegheny</u>, 515 F.3d 224, 234 (3d Cir.

2008) (quoting <u>Twombly</u>, 127 S. Ct. at 1965).

## III. ANALYSIS

Edgewood seeks to insert additional claims for negligent misrepresentation, strict liability,

common law conspiracy and violation of the New Jersey Racketeer Influenced and Corrupt

Organizations Act ("NJRICO"). Edgewood also seeks to reassert claims for breach of contract,

which were dismissed by the Honorable Harold A. Ackerman, U.S.D.J., on a prior motion to dismiss.

*Ford Motor Co.* 2007 WL 4526594 at *17. The Court will turn to each of the proposed

amendments.

### A. Breach of Express Warrant and Contractual Indemnification against Ford and Ford Land under the Second Contract

Edgewood for a second time alleges that Ford breached its contractual duties under the

Second Contract. On a motion to dismiss, Judge Ackerman ruled that Edgewood did not sufficiently

plead mutual assent to the Second Contract. <u>Id.</u> Judge Ackerman explicitly stated: "Plainly,

Edgewood cannot allege that Ford or Ford Land breached the terms of a document that do not set

out any obligations for Ford or Ford Land to breach." <u>Id.</u> at 52. Yet, Edgewood sees Judge

Ackerman's order as allowing it to reassert this allegation because such permission was "implicit in the Court's ruling, which did not dismiss Edgewood's claims with prejudice." *Id.* at n19.

Edgewood now claims that it cured the "defects" of its prior claims of breach of contract in accordance with Judge Ackerman's ruling by pleading with particularity that: (1) Ford mutually assented to the Second Contract; (2) Ford directed EQ to negotiate and execute the Second Contract with Edgewood and agreed to be a signatory to the Second Contract; (3) Ford performed obligations contemplated thereunder and agreed to by the parties; (4) Ford agreed to undertake certain obligations pursuant to the contract; and, (5) Ford conducted itself as if the Second Contract was legally effective and binding. Edgewood further argues that the Second Contract was not fully integrated, and therefore, extrinsic evidence of the aforementioned allegations should be permitted under New Jersey law. Edgewood's Reply Br. at n.20. Finally, Edgewood contends that if this Court does not find that the Second Contract is binding upon Ford, it should find that Edgewood has sufficiently pleaded the existence of an oral contract with Ford.[1] Id. at 46.

Ford in its opposition brief argues that Edgewood's amended claims involving the Second Contract are futile and have already been considered and rejected by Judge Ackerman. Ford's Opp. Br. at 7. Ford contends that: (1) there was no "mutual assent" of the Second Contract since, as Judge Ackerman ruled, Ford was not a signatory; and, (2) that the Second Contract was fully integrated by virtue of a merger clause. Id. at 8-10.

---

[1] The Court will not consider whether an oral contract may be pleaded, since it is not pleaded as a count in Edgewood's Proposed Pleading.

A plaintiff alleging breach of contract must establish: (1) the existence of a valid contract between plaintiff and defendant; (2) that defendant breached the contract; (3) that Plaintiff performed his or her obligations under the contract; and (4) resulting damages. Video Pipeline, Inc. v. Buena Vista Home Entm't, Inc., 275 F. Supp. 2d 543, 566 (D.N.J. 2003), aff'd, 342 F.3d 191 (3d Cir. 2003). A plaintiff cannot meet the burden of establishing these elements by merely making conclusory allegations. In re Nice Sys., Ltd. Secs. Litig., 135 F. Supp. 2d 551, 565 (D.N.J. 2001).  Rather, under New Jersey law, a contract is only enforceable if it is "sufficiently definite in its terms that the performance to be rendered by each party can be reasonably ascertained." Savarese v. Pyrene Mfg. Co., 9 N.J. 595, 599 (1952).  It is conceivable for a court to rule that a complainant cannot allege mutual assent where "[p]laintiff fails to establish that [the defendant] was a party to a valid contract with [p]laintiff." Overseas Food Trading Ltd. v. Agro Acietunera S.A., No. 06-800, 2006 WL 2482580, at *2 (D.N.J. Aug. 28, 2006).  It is apparent that mutual assent is lacking where:  "[The defendant's] name, address, or signature do not appear on the [contract], and further where [the defendant has no discernable duties or obligations under the [contract].  Thus, it is unclear what the defendant] assented to do." Id.

After careful review of Edgewood's Proposed Pleading, this Court finds no reason to give Edgewood another bite at the apple.  Judge Ackerman ruled that mutual assent was lacking because the Second Contract did not mention Ford or Ford Land on the document, they did not sign the Second Contract, and the contract does not set forth any obligations for Ford or Ford Land to breach. Ford Motor Co., 2007 WL 4526594 at *17.  Edgewood's new conclusory allegations do not change

the situation at hand.  Edgewood is attempting to hold Ford and Ford Land hostage to a contract that they did not sign and does not set forth any obligations for them to perform.  Conclusory statements that Ford and Ford Land mutually assented to the contract are insufficient to hold them liable.  See Overseas Food Trading, Ltd., 2006 WL 2482580 at *3.  Edgewood's assertion that Ford and Ford Land mutually assented to the Second Contract is contradicted by the contract itself which does not does not include them nor set forth any obligations for them to perform.

Judge Ackerman has already reviewed the second contract and has determined that it does not bind Ford or Ford Land.  The contract does not mention Ford and only mentions Ford Land in the indemnification clause.  Edgewood's new allegations are nothing more than bald assertions that do not contain any new factual information.  Therefore, Edgewood's cannot survive a motion to dismiss because they are contradicted by the Second Contract.   Accordingly, Edgewood's motion to amend Count I and V of the consolidated complaint is denied.

**B.    Strict liability against Ford**

Ford urges this Court to deny leave to amend the strict liability claim for futility, because Edgewood assumed a risk in accepting and handling recycled concrete. (Ford's Opp. Br. at 26).  In support of its position, Ford submits that Edgewood's pleadings "undermine" its claim because it admitted, particularly, in Consolidated Claim ¶ 71 "that it contracted with EQ to crush and reuse concrete containing contaminants up to commercial levels…[and that it agreed] to obtain contaminated concrete, transport contaminated concrete, and use contaminated concrete." (Id. at 27).  Thus, Ford argues, Edgewood knowingly contracted with others to obtain and use ultra-hazardous

material and should therefore bear the risk. Id.  Edgewood contends that Ford's argument fails for two reasons: (1) that Edgewood understood that the concrete was approved by the NJDEP; and (2) that "assumption of the risk" is a defense and not proper grounds for this Court to deny leave to amend.  (Edgewood's Reply Br. at 49).  This Court agrees.

Ford fails to provide this Court with case law where a complaintant was barred from asserting a strict liability claim based on the fact that the defendant had a possible, provable "assumption of the risk" defense.  Further, the paragraphs that Ford highlights indicate that Edgewood also expected to receive concrete which was "free of contamination." (Edgewood's Proposed Pleadings ¶ 71).  It is apparent, then, that Edgewood may have agreed to take concrete with some contamination levels, but it also expected to take concrete "free of contamination."  The Court finds that such an allegation is not speculative, since it is common sense that a reasonable buyer would expect to receive usable concrete. Phillips, 515 F.3d at 234.  Moreover, Edgewood does not have to prove the allegations at this point. Foundation Credit Funds, LLC, 2006 WL 3780677, at *1.  It merely has to state enough facts to make the complaint plausible. Twombly, 127 S. Ct. at 1965.  Granting Edgewood leave to amend this claim does not prejudice Ford since it can raise the affirmative defense of assumption of the risk at a later point, and then seek leave to file its motion for summary judgment if discovery vindicates Ford.

The Court finds that Edgewood has alleged enough facts to conclude that discovery may prove the "necessary element," which could be in this case that Ford is strictly liable, or perhaps that

Edgewood assumed a risk. *Phillips*, 515 F.3d at 234.[2]  Therefore, this Court finds that Edgewood has sufficiently plead with particularity a claim for strict liability and leave to amend Count VIII is granted.

### C.    Negligent Misrepresentation against Ford and EQ

Both Ford and EQ contend that Edgewood's negligent misrepresentation claims should be denied for futility purposes.[3]  Ford argues that Edgewood's claim is futile as the claim is contradicted by the documents and pleadings. (Ford's Opp. Br. at 23-24).   Specifically, Ford argues that Edgewood was aware that it would receive concrete in excess of residential standards. (Id.). Edgewood counters that it properly pleaded that Ford made representations that Edgewood would receive concrete which "was properly tested and…not exceed[ing] [residential] criteria." (Edgewood's Consolidated Reply Br. at 35).  EQ argues that Edgewood has failed to claim that Edgewood received or relied on any factual information or that EQ made any misrepresentations to Edgewood. (EQ Opp. Br. at 29-31).  On the other hand, Edgewood argues that its Proposed Pleading alleges that Edgewood did receive misrepresentations from EQ and that Edgewood relied on the misrepresentations.  (Edgewood's Consolidated Reply Br. at 39-40).

Negligent misrepresentation "requires a showing that defendant negligently provided false information and that the plaintiff incurred damages proximately caused by its reliance on that information." Highlands Ins. Co. v. Hobbs Group, 373 F.3d 347, 351 (3d Cir. 2004).  "The common

---

[2]This Court, of course, does not pass on the merits on the claim

[3] Edgewood also filed a negligent misrepresentation claim against Alberici.  However, Alberici does not object to the amendment and therefore the Court will not discuss it.

law tort of negligent misrepresentation shares all the components of fraud, but includes one additional factor: the misrepresentation must be made by a person with a duty to the plaintiff." In re Prudential Ins. Co. of Am. Sales Practices Litig., 975 F. Supp. 584, 619 (D.N.J. 1996), rev'd on other grounds, 133 F.3d 225 (3d Cir.), cert. denied, 525 U.S. 817, 119 S. Ct. 55, 142 L. Ed. 2d 43 (1998). See also Kronfeld v. First Jersey Nat. Bank, 638 F. Supp. 1454, 1467 (D.N.J. 1986) (holding that while "a fiduciary duty between the parties is [not] an element of a claim for negligent misrepresentation," a plaintiff seeking to recover for negligent misrepresentation must plead that the defendant owed it a duty of care). Therefore, Edgewood must include in their pleadings factual allegations to substantiate that: (1) Ford and EQ made representations to Edgewood that were false; (2) the statements were material; (3) Ford and EQ owed a duty to Edgewood; (4) Ford and EQ knew or should have known that those statements were false; (5) Edgewood relied on Ford and EQ's misrepresentations; and, (6) Edgewood suffered damages as a result of their reliance. *Kaufman*, 165 N.J. at 107.

Edgewood's proposed amendments for negligent misrepresentation would withstand a motion to dismiss under Rule 12(b)(6) and, therefore, this Court finds that the amendments survive the futility test as Edgewood has sufficiently pleaded the elements of negligent misrepresentation against Ford and EQ. Paragraphs 44-59 of Edgewood's Proposed Pleading describe the various meetings, individuals, and statements made by Ford and EQ to Edgewood regarding the disposition of the concrete that Edgewood relied on when entering into the contracts. Edgewood also alleges that these statements were material; that Ford and EQ breached its duty of care; that Edgewood relied

13

on the statements made by Ford and EQ as to the quality of the concrete, and as a result entered into

the Second Contract with EQ; that Ford and EQ knew or should have known based on those

meetings that Edgewood would have suffered damages based on the false information; and that

Edgewood did in fact suffer damages as a result of its reliance on said statements.[4] (Edgewood's

Proposed Pleading, ¶¶ 194-202, 204-206, 326-338). Edgewood's allegations sufficiently put EQ and

Ford on notice of the claims asserted against them.

Therefore based on the foregoing, this Court finds that Edgewood has sufficiently pleaded

a claim for negligent misrepresentation, and leave to amend this claim is hereby granted. However,

leave to amend is denied with respect to paragraph 203 since it references the Second Contract, and

this Court has ruled above that Ford has no obligations under the Second Contract.

### D. Contribution under the Spill Act

Edgewood moves the Court for permission to include contribution claims against Ford under

the Spill Act. On or about January 3, 2008, the NJDEP issued an Administrative Consent Order

("ACO") expressly providing that the Order "constitutes an administrative settlement within the

meaning of N.J.S.A. 58:10-23.11f(a)(2)(b)." (Ford Opp. Br. at 25). Edgewood contends that their

contribution claim should be allowed, because the NJDEP never notified Edgewood of the proposed

---

[4] EQ argues that the use of "and/or" throughout the Count of negligent misrepresentation fails to give EQ fair notice of the claim. This court disagrees. Count VI of the Third Party Complaint sets forth additional facts to support the elements of negligent misrepresentation and incorporates by reference paragraphs 44 through 59 which describe the negotiations and misrepresentations made among Ford, Alberici, EQ, Golder and Arcadis regarding the quality of the concrete. In particular, paragraphs 69 and 70 place EQ on notice that Dave Ciroli, who signed the Second Contract on behalf of EQ, was involved in the misrepresentations.

14

ACO in violation of N.J.S.A. 58:10-23.11e2.[5]  Since it was denied an opportunity to participate in the comment process, Edgewood argues that the ACO is "executory" and not final.  (Edgewood Consolidated Reply Br. at 48-9).  As a result, Edgewood concludes that Ford has no claim for contribution, yet believes that it should be allowed to claim contribution against Ford under the same Act. (*Id.* at 48).

Ford argues that it resolved its liability to the State of New Jersey under the Spill Act by paying a $250,000 fine to the NJDEP and a $50,000 fine to the Town of Edison. (Ford's Opp. Br. at 25).  Ford further contends that under the ACO, the NJDEP declared that Ford's obligations have been concluded. (*Id.* at 25).  As a result, Edgewood's claims for contribution are futile, since the ACO is a final declaration on Ford's obligations, and therefore, protects Ford from any contribution claims by Edgewood. (*Id.*). This Court agrees.

Under N.J.S.A. § 58:10-23.11f(a)(2)(a), whenever a person removes hazardous waste, that person can have a claim for contribution against anyone who may be liable for the cost of the clean

---

[5] N.J. Stat. Ann. 58:10-23.11e2 provides: "At least 30 days prior to its agreement to any administrative or judicially approved settlement entered into pursuant to P.L.1976, c.141 (C.58:10-23.11 et seq.), or at least 30 days prior to the issuance of any no further action letter issued pursuant to P.L.1993, c.139 (C.58:10B-1 et seq.), on or after the effective date of P.L.2005, c.348 (C.58:10-23.11e2 et al.), the Department of Environmental Protection shall publish in the New Jersey Register and on the New Jersey Department of Environmental Protection's website the name of the case, the names of the parties to the settlement or the no further action letter, as the case may be, the location of the property on which the discharge occurred, and a summary of the terms of the settlement or the no further action letter, including the amount of any monetary payments made or to be made. The Department of Environmental Protection shall provide written notice of the settlement or of the no further action letter, which shall include the information listed above, to all other parties in the case and to any other potentially responsible parties of whom the department has notice at the time of the publication."

up.[6]  Moreover, N.J.S.A. § 58:10-23.11f(a)(2)(b) provides that any person who has resolved their liability with the NJDEP and has either received a no action letter or "entered into an administrative or judicially approved settlement with the State, shall not be liable for claims for contribution." [7]

Courts in this District have reasoned that the Spill Act contemplates several liability in order for a contribution claim to stand.  N.J.S.A. 58:10-23f(a)(2) "reads much more closely to section 113(f) of CERCLA, by providing a right of contribution and authorizing the courts to equitably allocate the costs of cleanup and removal among the parties." SC Holdings, Inc. v. A.A.A. Realty Co., No. 95-0947, 1996 U.S. Dist. LEXIS 12428, at *29 (D.N.J. Aug. 19, 1996).  "Because rights of contribution in this case are analogous under CERCLA and the Spill Act and because [the third-

---

[6] N.J.S.A. § 58:10-23.11f(a)(2)(a) provides: "Whenever one or more dischargers or persons cleans up and removes a discharge of a hazardous substance, those dischargers and persons shall have a right of contribution against all other dischargers and persons in any way responsible for a discharged hazardous substance or other persons who are liable for the cost of the cleanup and removal of that discharge of a hazardous substance. In an action for contribution, the contribution plaintiffs need prove only that a discharge occurred for which the contribution defendant or defendants are liable pursuant to the provisions of subsection c. of section 8 of P.L.1976, c.141 (C.58:10-23.11g), and the contribution defendant shall have only the defenses to liability available to parties pursuant to subsection d. of section 8 of P.L.1976, c.141 (C.58:10-23.11g). In resolving contribution claims, a court may allocate the costs of cleanup and removal among liable parties using such equitable factors as the court determines are appropriate. Nothing in this subsection shall affect the right of any party to seek contribution pursuant to any other statute or under common law."

[7] N.J.S.A. § 58:10-23.11f(a)(2)(b) provides: "A person who has discharged a hazardous substance or is in any way responsible for the discharge of a hazardous substance who has resolved his liability to the State for cleanup and removal costs, including the payment of compensation for damage to, or the loss of, natural resources, or for the restoration of natural resources, and (I) has received a no further action letter from the State, or (ii) has entered into an administrative or judicially approved settlement with the State, shall not be liable for claims for contribution regarding matters addressed in the settlement or the no further action letter, as the case may be. The settlement shall not release any other person from liability for cleanup and removal costs who is not a party to the settlement, but shall reduce the potential liability of any other discharger or person in any way responsible for a discharged hazardous substance at the site that is the subject of the no further action letter or the settlement by the amount of the no further action letter or the settlement."

party plaintiff] will not be liable for an amount in excess of its pro-rata share of harm . . . it cannot

seek contribution from Third-Party Defendants under the Spill Act." <u>Reichhold, Inc. v. United States</u>

<u>Metals Refining Co.</u>, No. 03-453, 2004 WL 3312831, at *7 (D.N.J. Oct. 27, 2004).  Furthermore,

Judge Ackerman in a detailed analysis of the above ruled: "While the Spill Act supports contribution

for Ford against Edgewood, the Spill Act does not contemplate liability against Edgewood beyond

Edgewood's own fair share." <u>Ford Motor Co.</u>, 2007 WL 4526594 at * 20.

        In support of their claim, Edgewood attaches a letter from Gary W. Wolf, II, Deputy Attorney

General of the State of New Jersey, to John McGahren, Esq. of Patton Boggs, LLP, counsel for Ford.

(Edgewood's Consolidated Reply Br. Ex. A). The letter informed the parties that the NJDEP agreed

to extend the opening for public comment from April 21, 2008 until May 21, 2008. (<u>Id.</u>). The letter

says in part that the NJDEP will "consider all comments received, and *may* decide to *withdraw* or

withhold consent to the ACO if the comments received disclose facts or considerations which show

that the ACO is inappropriate, improper or inadequate.  If no such comments are received, the ACO

will become effective on May 21, 2008, when the comment period closes." (<u>Id.</u>). Edgewood reads

this language along with the thirty-day notice provision under N.J.S.A. 58:10-23.11f(a)(2)(b) to

mean that the "ACO is not final." (Edgewood's Consolidated Reply Br. at 48).

         Neither the language of the statute nor the contents of the letter indicate to this Court that

Ford is stripped of its right to plead a claim for contribution under the Spill Act.  The NJDEP stated

in the letter that it "may decide to withdraw," which would indicate to a reasonable person that the

ACO *remains in effect* until such time the NJDEP determines that the ACO is inadequate.  But

regardless of whether the ACO was executory or final is not a matter for the Court to decide at this juncture.  The question is whether Edgewood can claim contribution under the Spill Act and this Court finds that it cannot.

Ford has sufficiently pleaded that it incurred losses in complying with the ACO.  The language of the N.J.S.A. § 58:10-23.11f(a)(2)(a) is apparent: "In resolving contribution claims, a court may allocate the costs of cleanup and removal among liable parties using such equitable factors as the court determines are appropriate."  Since Ford and Ford Land pleaded that they collectively settled their liability with the NJDEP, First Amended Complaint, at ¶ 82, Ford has a right under the Spill Act to claim contribution against any other potentially liable party.  Conversely, as Judge Ackerman ruled, Edgewood does not have the same right to contribution under the statute, since the statute only contemplates several liability. Ford Motor Co., 2007 U.S. Dist. LEXIS at 20.  Edgewood cites no case law to the contrary.  Therefore, the Court finds that Edgewood's proposed amended claim for contribution would not withstand a motion to dismiss.  Leave to amend as to this claim is denied.

### E.  Civil Conspiracy

EQ and Alberici urge the Court to deny Edgewood leave to amend its pleadings so it may include a claim of civil conspiracy.  EQ bases its argument on the same reasoning it did above: "Edgewood does not claim that EQ conspired [alone]; Edgewood claims that only "Ford, Alberici, EQ, J&L, Golder and/or Arcadis" conspired." (EQ Opp Br. at 27).  Alberici's arguments, however, are even more tenuous.  Alberici claims that Edgewood "cannot show" that they "conspired with

18

anyone to do anything to Edgewood," and that it had "absolutely nothing to do with either the First or Second Contracts, or the Golder memorandum in which Edgewood allegedly relied." (*Id.*). at 12. Edgewood contends that EQ and Alberici's arguments are premature at this stage of litigation. (EQ Opp. Br. at 33). This Court agrees.

Under New Jersey law, a civil conspiracy is "a combination of two or more persons acting in concert to commit an unlawful act, or to commit a lawful act by unlawful means, a principal element of which is to inflict a wrong against or injury upon another, and an overt act that results in damage." Banco Popular N. Am. v. Gandi, 184 N.J. 161, 177 (2005). "To establish a conspiracy, it simply must be shown that there was a single plan, the essential nature and general scope of which [was] known to each person which is to be held responsible for its consequences." Morgan v. Union Co. Bd. of Chosen Freeholders, 268 N.J. Super. 337, 364 (App. Div. 1993). The heart of the claim is not the unlawful agreement, but the wrong which lies beneath the surface of the conspiracy. *Id.* Furthermore, a civil conspiracy can be inferred from circumstantial evidence as direct evidence of a civil conspiracy can rarely be shown. Id. at 365; Kronfeld, 638 F. Supp. at 1468-69 (holding that "a conspiracy often is established by inferences from circumstantial evidence."). However, "[s]pecific facts of an agreement must be alleged," conclusory statements will not suffice. Id.

Courts in this District have held that such claims must be pleaded with specificity under F. R. Civ. P. 9(b). Kronfeld, 638 F. Supp. at 1468. A plaintiff is also "required to identify the source of the allegedly fraudulent misrepresentation or omission at issue." Granite State Ins. Co. v. UJEX, Inc., Docket No. 03-1220, 2005 U.S. Dist. LEXIS 13692, at *24-25 (D.N.J. July 11, 2005), (citing

19

Klein v. Gen. Nutrition Cos., Inc., 186 F.3d 338, 345 (3d Cir. 1999)).  "Fed. R. Civ. P. 9(b) requires,

at a minimum, that the plaintiff identify the speaker of allegedly fraudulent statements.").  "Not every

conspirator must commit an overt act in furtherance of the conspiracy, so long as at least one does."

Morganroth & Morganroth v. Norris, McLaughlin & Marcus, P.C., 331 F.3d 406, 415 (3d Cir. 2003).

Alberici erroneously contends that Edgewood must "show" a conspiracy at this stage in the

litigation.  As held throughout this Opinion, Edgewood does not have to prove its case at this point.

Rule 8(a)(2) requires only a "showing" that the claimant is entitled to relief—not a "showing" of

evidence.  Thus, this Court finds that Edgewood properly alleged all the elements of civil conspiracy

with specificity.  Adams, 1989 U.S. Dist. LEXIS 4205, at *17.

Edgewood alleges that Ford, Alberici, EQ and others combined to commit a fraud to induce

them to enter into contracts while knowing that the concrete was contaminated.  Edgewood further

alleges that Ford, Alberici, EQ, and others "agreed" to "handle, test and/or distribute contaminated

concrete to Edgewood" and references the "speakers" of the alleged fraud. ¶ 344 (incorporating

paragraphs 111-133; 141-158, describing conversations between various representatives).

Moreover, this Court finds that Edgewood has alleged "overt acts" committed by the

conspirators.  In particular, Edgewood alleges that in or around January 2005, Ford, Alberici , and

J&L began distributing concrete with positive PCB detections…in an effort to avoid spending

millions of dollars in costs to transport and properly dispose of the concrete in an authorized landfill.

(Consolidated Amended Claims, ¶ 43).  Edgewood further claims that representatives and/or agents

of Ford, Alberici , and J&L, including Marty Huffman, discussed providing Edgewood with concrete

from the Edison plant which met RDCSCC criteria. (*Id.* at ¶ 45).  Additionally, Edgewood declares that under the First Contract, Ford, Alberici, EQ, and J&L oversaw and/or were responsible for crushing, stockpiling, testing, and designating which piles of concrete were to be loaded onto Edgewood's trucks. (*Id.* at ¶ 53).  At this stage of the litigation, none of the aforementioned "overt acts" require direct proof. <u>Kronfeld</u>, 638 F. Supp. at 1468; <u>Morgan</u>, 268 N.J. Super. at 365. Therefore, this Court finds that Edgewood has properly pleaded a claim for civil conspiracy and leave to amend is hereby granted.

**F.  NJRICO**

Finally, Edgewood seeks leave of this Court to include conspiracy claims under NJRICO. NJRICO provides:

> It shall be unlawful for any person employed by or associated with any enterprise engaged in or activities of which affect trade or commerce to conduct or participate, directly or indirectly, in the conduct of the enterprise's affairs through a pattern of racketeering activities or a collection of unlawful debt.

N.J.S.A. 2C:41-2(c).  It is important to note that NJRICO is broader in scope than the federal RICO statute. <u>State v. Ball</u>, 268 N.J. Super. 72, 104 (App. Div. 1993) <u>aff'd</u>, 141 N.J. 142 (1995). The New Jersey courts take a liberal stance in permitting plaintiffs to plead NJRICO violations, rejecting the narrow construction of the federal statute that many circuits, including this one, have adopted. <u>Id.</u> at 103-104.

In addition, pursuant to N.J.S.A. 2C:41-2c, a plaintiff must prove the following five elements: "(1) the existence of an enterprise; (2) that the enterprise engaged in or its activities

affected trade or commerce; (3) that defendant was employed by, or associated with the enterprise; (4) that he or she participated in the conduct of the affairs of the enterprise; and (5) that he or she participated through a pattern of racketeering activity." Since the NJRICO statute is predicated upon its federal cousin, Title IX of the Federal Organized Crime Control Act of 1970, 18 U.S.C.A. §§ 1961-1968, courts should seek guidance from those decisions. (*Id.* at 98).

Finally, there must be an injury to plaintiffs as a result of the conspiracy.  Shan Indus., 2005 U.S. Dist. LEXIS. at* 47; see also, First Nationwide Bank v. Gelt Funding Corp., 27 F.3d 763, 769 (2d Cir.), cert. denied, 513 U.S. 1079 (1995) (quoting Standardbred Owners Ass'n v. Roosevelt Raceway Assocs. L.P., 985 F.2d 102, 104 (2d Cir. 1993)) ("[t]o show that an injury resulted "by reason of" the defendant's action, and therefore to have standing under [civil] RICO, the plaintiff must allege "that the defendant's violations were a proximate cause of the plaintiff's injury, i.e., that there was a direct relationship between the plaintiff's injury and the defendant's injurious conduct.") "This language can, of course, be read to mean that a plaintiff is injured 'by reason of' a RICO violation, and therefore may recover, simply on showing that the defendant violated § 1962, the plaintiff was injured, and the defendant's violation was a 'but for' cause of plaintiff's injury." Holmes v. Securities Investor Protection Corp., 503 U.S. 258, 265 (1992).

### 1. Edgewood's Consolidated Amended Claims Properly Pleaded the Existence of an "Enterprise" Within the Meaning of N.J.S.A. 2C:41-1.

As discussed above, the New Jersey courts have construed NJRICO more broadly than its federal counterpart. Ball, 268 N.J. Super. at 107.  Under the federal RICO statute, a plaintiff cannot name an enterprise as a defendant. Glessner v. Kenny, 952 F.2d 702, 711-12 (3d Cir. 1991);

22

Brittingham v. Mobil Corp., 943 F.2d 297, 300-03 (3d Cir. 1991).  This became known as the Enright rule.[8] which was established to prevent the "persons" who make up the enterprise, from using the "enterprise" as a pass through to "extract money from third parties." Petro-Tech, Inc. v. Western Co. of North America, 824 F.2d 1349, 1359 (3d Cir. 1987).

In stark contrast, the New Jersey courts have determined that NJRICO departs from its federal counterpart in defining "enterprise."  Under N.J.S.A. 2C:41-1b, a "'person' includes any individual, entity, or enterprise as defined [t]herein holding or capable of holding a legal or beneficial interest in property." Likewise, under N.J.S.A. 2C:41-1c: "'Enterprise' includes any individual, sole proprietorship, partnership, corporation, business or charitable trust, association, or other legal entity, any union or group of individuals associated in fact, although not a legal entity, and it includes illicit as well as licit enterprises and governmental as well as other entities."  The New Jersey courts have reasoned that since a "broader definition of 'person' eliminates the Enright distinctiveness rule for an action under New Jersey RICO," a plaintiff may name the enterprise and the various individuals who constitute that enterprise within the same count. Ball, 268 N.J. Super. at 107; Maxim Sewerage Corp., 273 N.J. Super at 95.

In this District, New Jersey's broad interpretation of "enterprise" has been applied in deciding a motion for leave to amend. Shan Indus., LLC, 2005 U.S. Dist. LEXIS 37983 at, * 48.  Under

---

[8]Hirsch v. Enright Refining Corp., 751 F.2d 628 (3d Cir. 1984).  Enright offered two rationales for its holding: the first being the plain text of the RICO statute, and the second being a more policy based argument, that Congress intended to limit liability to persons rather than potentially innocent enterprises that were victims of individuals' rackateering activity.  The latter of these rationales was later rejected by the Supreme Court in Sedima v. Imrex Co., 473 U.S. 479, 105 S. Ct. 3275. 87 L. Ed. 2d 346 (1985).  However, the fulcrum of Enright has survived because the first rationale is mutually exclusive of the second.  See Jaguar Cars, Inc., 46 F.3d 258, 268 (3d Cir. 1995) ("[w]e conclude that the essential holding of Enright remains undisturbed.")

NJRICO, an enterprise may be pleaded as "no more than the sum of the racketeering acts," and that an "enterprise may also be identified by the existence of an ascertainable structure, such as that which exists within a corporation, or by an informal organization which demonstrates a division of labor among individuals." Id. at 49.   N.J. Stat. Ann. 2C:41-2(c) contemplates that a person is associated with an enterprise if they have "a position or functional connection with the enterprise that enables him or her to engage or participate directly or indirectly in the affairs of the enterprise." State v. Ball, 141 N.J. 142, 175 (1995).

Here, Edgewood has properly pleaded that Ford, EQ, Alberici, J&L, Golder and Arcadis formed an enterprise.   Edgewood claims that these entities formed an enterprise with the intent to engage in trade or commerce via distributing contaminated concrete in violation of environmental regulations. (Consolidated Amended Claims, at ¶¶ 219, 234, 240, 241).   In its Amended Pleading, Edgewood further alleges that, under the third NJRICO element, the group was "associated in-fact," in a principle-agent and contractor-sub-contractor relationship, and described the "functional connection" of each member. (Id. at ¶¶ 224-235).

According to Edgewood, Ford owned and controlled the concrete located at the Edison plant and determined how the concrete would be disposed of. (Id. at ¶¶ 227, 228).   Moreover, Edgewood asserts that Alberici assumed a managerial role on behalf of the enterprise, to wit: (1) Alberici served as general contractor assigned to decommission the Ford plant; (Id. at ¶ 20); (2) Ford and Alberici received permission from the NJDEP to reuse concrete as backfill on the Ford site provided there were no detections of PCBs; (Id. at ¶ 26, 27); (3) Ford and Alberici failed to receive proper approvals

to distribute concrete to redistribute concrete offsite; (Id. at ¶ 29); Edgewood was provided with a memorandum "reinforc[ing] the representation [Alberici] had made to Edgewood—that Edgewood received and would continue to receive, concrete with PCB concentrations below the unrestricted use cleanup criteria." (Id. at ¶ 65). Further, Edgewood alleged that EQ was hired to dispose of waste streams emitted from the Edison plant, and as a result, had authority to direct the disposal of the concrete. (Id. at 229).

As the court in Shan noted, "At this stage in the litigation, the Court need not engage in extensive analysis of this element, since on a motion to amend, provided that there is some version of the facts which will support the existence of a claim, this Court will allow the plaintiff to amend its Complaint and have its day in court." Shan Indus., LLC, 2005 U.S. Dist. LEXIS 37983 , *50.  At a minimum, Edgewood asserted the existence of an enterprise consisting of Ford, Alberici, EQ, J&L, Golder and Arcadis, and that they engaged in commerce.  Therefore, this Court finds that the first two NJRICO elements are satisfied.  Further, this court finds that Edgewood has satisfied the "associated with the enterprise" requirement and has sufficiently pleaded that he or she participated in the conduct of the affairs of the enterprise.

### 2.   Edgewood's Consolidated Amended Claims Properly Pleaded a "Pattern of Racketeering"

In order to properly plead an NJRICO violation, Edgewood must include allegations establishing a "pattern of racketeering." N.J.S.A. 2C:41-2c.  Unlike the federal statute, NJRICO, as interpreted by the New Jersey courts, does not place as much emphasis on "continuity," but instead, focuses on the "relatedness" of the activity. Metz v. United Counties Bancorp, 61 F. Supp. 2d 364,

373 (D.N.J. 1999) (citing <u>Ball</u>, 141 N.J. at 166-69)  The New Jersey Supreme Court, opining in <u>Ball</u>, interpreted NJRICO to include short-term patterns of racketeering activity:

> In the most likely setting, predicate incidents [acts] of racketeering conduct will occur sequentially over a period of time. New Jersey's legislative discussions, unlike Congress', do not indicate a concern for reaching only long-term criminal activity. But short-term criminal activity, to be covered, must encompass incidents of criminal conduct that are not disconnected or isolated. Incidents of racketeering that occur sequentially, to overcome any inference that they are totally disconnected or isolated, must exhibit some temporal connection or continuity over time.

<u>Ball</u>, 141 N.J. at 169.[9]   More particularly, under N.J.S.A. 2C41-1(d), a "pattern of racketeering activity" requires:

> (1) Engaging in at least two incidents of racketeering conduct one of which shall have occurred after the effective date of this act and the last of which shall have occurred within 10 years (excluding any period of imprisonment) after a prior incident of racketeering activity; and,

> (2) A showing that the incidents of racketeering activity embrace criminal conduct that has either the same or similar purposes, results, participants or victims or methods of commission or are otherwise interrelated by distinguishing characteristics and are not isolated incidents.

N.J.S.A. 2C41-1(d)(1); N.J.S.A. 2C41-1(d)(2).

---

[9] With respect to the federal standard, the Supreme Court in <u>H.J. Inc. v. Northwestern Bell Telephone Co.</u>, 492 U.S. 229, 242 (1989), ruled: "Predicate acts extending over a few weeks or months and threatening no future criminal conduct do not satisfy this requirement: Congress was concerned in RICO with long-term criminal conduct. Often a RICO action will be brought before continuity can be established in this way. In such cases, liability depends on whether the threat of continuity is demonstrated."  The Court opined that the way in which predicates establish a "threat" should be decided on a case-by-case basis.  <u>Id.</u>  Moreover, the Court ruled: "A RICO pattern may surely be established if the related predicates themselves involve a distinct threat of long-term racketeering activity, either implicit or explicit." (<i>Id.</i>).

Ford argues that Edgewood cannot plead a NJRICO claim, since the grounds of the claim are based upon a "single incident" involving a "single victim." (Ford's Opp. Br. at 15).  Ford further argues that the nine-month time frame in which the alleged acts took place was too narrow to be actionable under NJRICO. Id. at 16.  The statute, it argues, requires multiple incidents to more than one victim over a longer stretch of time, and in support of their position cite cases from this circuit interpreting federal RICO in that vain. Id.   Thus, Ford and EQ argue that the Court should deny leave to amend this claim, since under federal law the claim would not survive a 12(b)(6) motion, as the pattern only involves at most a nine month period and there is no threat of continuing criminal activity.  Id. at 17

This Court takes note that where the New Jersey courts are silent on a particular part of NJRICO, courts will look to federal law. Ball, 141 N.J. at 156; Interchange Bank v. Beglia, 286 N.J. Super. 164, 177 (App. Div. 1995).  But, there is guidance from the New Jersey courts on this issue. In Ball, liberally interpreting NJRICO, established that the statute permits short-term patterns of activity, provided that the related incidents are not disconnected or isolated. Ball, 141 N.J. at 169. [10] The remaining question is whether Edgewood sufficiently alleged predicate acts.

---

[10] Further, this circuit, in discussing H.J., Inc., noted that the Supreme Court vacated and remanded for reconsideration two cases upon which the district court relied, concluding that the "single injury, single victim scheme alleged by plaintiffs was legally insufficient to state a RICO pattern." Swistock v. Jones, 884 F.2d 755, 758 (3d Cir. 1989) (noting that "'[C]ontinuity' is both a closed- and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition") (citing the Supreme Court H.J., Inc., 492 U.S. at 241.)

### 3.   Edgewood Did Not Sufficiently Plead a Predicate Act Under N.J.S.A. 2C:21-16, Securing Execution of Documents by Deception.

Ford and EQ argue that Edgewood's amendment fails to allege the requisite predicate act of securing execution of documents by deception.   More particularly, Ford and EQ contend that Edgewood cannot state a prima facie case under N.J.S.A. 2C:21-16 for deception, since the pleading only alleges that Ford and EQ "made misrepresentations as to their performance under the contract, not as to the contents of the contract." (Ford Opp. Br. at 18).   They argue that the statute does not cover fraud in the inducement to sign, only with regard to the contents signed. Id.

Pursuant to N.J.S.A. 2C:21-16, a person "commits a crime in the fourth degree if by deception as to the contents of the instrument, he causes or induces another to execute any instrument affecting, purporting to affect, or likely to affect the pecuniary interest of any person." This Court finds that Edgewood has not sufficiently alleged in paragraph 263, a fraud-in-the-factum claim, pursuant to N.J.S.A. 2C:21-16. (Edgewood's Consolidated Amended Claims, at ¶ 263).   In particular, paragraph 263 is under the heading "The Pattern of Racketeering Activity Violated N.J.S.A. 2C:21-16," and states: "[a]s described in paragraphs 111 through 133, which are incorporated herein, Ford, Alberici, EQ, J&L, Golder and/or Arcadis induced Edgewood to enter into the First Contract and the Second Contract, which detrimentally affected Edgewood's pecuniary interest." (Id. at ¶ 263).

Moreover, paragraphs 111 through 133 pertain to "fraud in the inducement," which is not contemplated by N.J.S.A. 2C:21-16. (Id. at ¶ 111-133; see also, Comment 2 to N.J.S.A. 2C:21-16, which provides that the statute does not pertain to fraud in the inducement.)   Thus, this Court finds

28

that Edgewood has not properly plead a predicate act, securing execution of documents by deception. Furthermore, this Court finds that Edgewood has not pleaded with particularity that EQ committed a predicate act under N.J.S.A. 2C:21-16.  The only reference to EQ is contained in ¶ 263, which is brief and conclusory, and as a result, does not conform to Rule 9(b).  Therefore, the claim does not give EQ "fair notice…and the grounds upon which it rests." <u>Twombly</u>, 127 S. Ct. at 1964.

### 4.  Edgewood Properly Pleaded a Predicate Act that Ford Violated 2C:21-7(A)(d), Selling Adulterated or Mislabeled Commodities

Ford contends that Edgewood failed to properly plead a violation under N.J.S.A. 2C:21-7A(d), because the concrete was not "adulterated." (Ford's Opp. Br. at 19).  It contends that Edgewood must explain how the concrete varied from the standard composition of quality as provided by law. (Id.).  This Court disagrees. Whether or not the concrete is adulterated is a factual conclusion, the veracity of which is to be fleshed out through discovery.  Certainly, contaminated concrete is involved in this case.

N.J.S.A. 2C:21-7A(d) provides in relevant part, that it is unlawful to "sell[], offer[] or expose[] for sale adulterated or mislabeled commodities."  Adulterated is defined as: "varying from the standard of composition or quality prescribed by or pursuant to any statute providing criminal penalties for such variance, or set by established commercial usage."  <u>Id.</u>

Here, Edgewood claims that it sufficiently pleaded that the enterprise conspired to relieve itself of contaminated concrete through a series of contractual relationships in order to avoid the costs of proper disposal. (Edgewood's Consolidated Amended Claims, at ¶ 242-60).  Edgewood

further claims that there are several connected incidents of distributing contaminated concrete to various properties. (Id. at ¶ 60).  Moreover, the victims involved are not only Edgewood, but also the owners of the properties, such as, 240 Princeton Avenue Associates and Preferred Real Estate Investments.

At first glance, distributions of concrete occurring over a nine-month period, as alleged in this case, even though involving multiple incidences, would implicate a pattern too short in duration, whereby a court would be inclined to dismiss the claim had it been applying the federal "continuity" standard, unless there is some indication of a "threat" of future criminal activity.[11]  However, and in Metz, the District Court distinguished the NJRICO and federal RICO standards, illustrating that while "five or six" fraudulent communications over a short period of time would fail under the federal "continuity" standard, conversely, said communications would withstand a 12(b)(6) motion under the looser "relatedness" standard of NJRICO.   Metz, 61 F. Supp. 2d at 373.

On this basis, Edgewood makes a persuasive argument that there would have been a continuing threat of fraudulent activity under the federal standard, but for its discovery of the contamination which impeded the enterprise's flow. (Edgewood's Reply Brief, at 31).  Neither Ford, EQ, nor Alberici present a case to this Court showing that a requirement of "threat" of further criminal activity is necessary in cases involving racketeering incidents occurring over a period of less

---

[11] The Third Circuit held: "Thus, the length of time over which the predicate acts are alleged to have occurred is relevant, but the fact that the alleged predicates occurred over a short period is not dispositive. Even a closed-ended scheme of short duration, however, could involve a "distinct threat of long-term racketeering activity, either implicit or explicit."" Swistock, 884 F.2d at 757 (citations omitted).

than one year under NJRICO.  In its amended pleading, Edgewood also incorporated paragraphs 375-80, which identify the date, time, or place that the "adulterated" concrete was sold and to whom. (Edgewood's Consolidated Amended Claims, at ¶ 401).  Additionally, Edgewood alleges that it was sold contaminated concrete both under the First and Second Contracts, and that Ford and opposing parties knew about the condition of the concrete, and that EQ was responsible, in part, for its distribution. (Id. at ¶¶ 110-133, 377, 379, 387).  Requiring that Edgewood plead how the concrete morphed from a standard to "adulterated" condition would impose a burden not contemplated under notice pleading.  It would in effect place Edgewood in a position of drawing scientifically-based conclusions which only can be obtained through expert proof, which is not required at this stage in the litigation.

This Court finds that Edgewood's amended claim on this issue raises a right to relief above the speculative level.  Therefore, based on the aforementioned, this Court finds that Edgewood satisfactorily plead a violation of N.J.S.A. 2C:21-7(A)(d), based on the NJRICO standard, since the statute contemplates allegations of incidents over short periods of time. Ball, 141 N.J. at 169.

### 5. Edgewood Properly Pleaded Federal Mail and Wire Fraud Under 18 U.S.C. §§ 1341 and 1343, Respectively.

Ford, Alberici and EQ contend that Edgewood has failed to adequately plead a predicate act of mail or wire fraud under 18 U.S.C. §§ 1341 and 1343.  Pursuant to 18 U.S.C. §§ 1341 and 1343, the use of the mails and interstate wires for purposes of carrying out any scheme or artifice to defraud is prohibited.  "A scheme or artifice to defraud need not be fraudulent on its face, but must involve some sort of fraudulent misrepresentation or omission reasonably calculated to deceive persons of

31

ordinary prudence and comprehension." Lum, 361 F.3d at 233. (citations omitted).   Under the

heightened pleading standard of the rule, a plaintiff must plead "the 'circumstances' of the alleged

fraud in order to place the defendants on notice of the precise misconduct with which they are

charged, and to safeguard defendants against spurious charges of immoral and fraudulent behavior."

(Id. at 223-24).   The requirement may be satisfied by pleading the "date, time, or place" of the fraud,

or some "alternative means of injecting precision and some measure of substantiation into their

allegations of fraud." (Id. at 224).   A plaintiff "must also allege who made a misrepresentation to

whom and the general content of the misrepresentation." (Id.).

Improper use of the federal mail and wires are predicate offenses under federal RICO, 18

U.S.C. § 1961(1), and NJRICO, N.J.S.A. 2C:41-1(a)(2) (incorporating by reference federal list of

racketeering activities).   To allege mail or wire fraud, a plaintiff must describe: (1) the existence of

a scheme to defraud, (2) the use of the mails or wires in furtherance of the fraudulent scheme, and

(3) culpable participation by the defendants. Emcore Corp., 102 F. Supp. 2d at 245 (citing U.S. v.

Pearlstein, 576 F.2d 531, 534 (3d Cir. 1978) (other citations omitted). "To be part of the execution

of [mail] fraud…the use of the mails need not be an essential element of the scheme.   It is sufficient

for the mailing to be 'incident to an essential part of the scheme,' or 'a step in [the] plot.'" (Id.

quoting Schmuck, 489 U.S. 705, 710-11) (quotations omitted).   Further, even "completely 'innocent'

mailings" (those that contain no false information) can satisfy the mailing element. (Id. citing Kehr

Packages, Inc. v. Fidelcor, Inc., 926 F.2d 1406, 1415 (3d Cir. 1991)) (other citations omitted).

Therefore, "[a] scheme or artifice to defraud 'need not be fraudulent on its face, but must involve

some sort of fraudulent misrepresentations or omissions reasonably calculated to deceive persons of ordinary prudence and comprehension.'" (Id. quoting Kehr Packages, 926 F.2d at 1415) (quotations and other citations omitted).

Here, Edgewood contends that it has sufficiently pleaded, pursuant to the heightened 9(b) standard, that the enterprise participated in a predicate act through the use of the mails and wires, including but not limited to, at least fifteen examples of communications allegedly made in furtherance of the fraud. While Ford admits that at least two of those fifteen communications may contain fraudulent statements, (Edgewood's Consolidated Amended Claims, at 274 (8, 10)), they contend that the totality of the communications do not describe fraudulent activity. (Ford's Opposition Brief, at 20). Instead, they argue that the communications concern the process of simply deconstructing the plant. (Id.). Discovery may well prove Ford correct. At this juncture, however, the Court only will endeavor to evaluate whether Edgewood's amendment would be futile. It is not.

To buttress this Court's position, the Third Circuit in Seville interpreted Rule 9(b) as requiring plaintiffs to plead with particularity the "circumstances" of the fraud so as to notify the defendants of their alleged misconduct. Seville Industrial Machinery Corp. v. Southmost Machinery Corp., 742 F.2d 786, 791 (3d Cir. 1984). The court explained that: "[i]t is certainly true that allegations of "date, place, or time" fulfill these functions, but nothing in the rule requires them. Id. Plaintiffs are free to use alternative means of injecting precision and some measure of substantiation into their allegations of fraud." Id. The court further held that when applying Rule 9(b): "focusing

exclusively on its 'particularity' language' is too narrow an approach and fails to take account of the general simplicity and flexibility contemplated by the rules." Id.

Here, Edgewood has sufficiently pleaded the elements of use of the mails and wires in furtherance of the fraud. It alleged that the opposing parties formed an enterprise through the wires and mails, with the "intent to distribute contaminated concrete that they knew was contaminated" so as to avoid incurring costs of legally disposing of the concrete. (Edgewood's Consolidated Amended Claims, at ¶¶ 219; 351). Thus, this Court finds that Edgewood has sufficiently plead the existence of a scheme to defraud.

This brings the analysis to the heart of the controversy which surrounds Edgewood's allegations that several of the alleged enterprise's communications, approximately fifteen of them, were used in the ordinary course of business with the purpose of advancing and perpetuating the scheme to defraud Edgewood.[12] In Kronfled, the court decided that mail and wire fraud were adequately pleaded, despite the fact the pleading did not recount specific mailings or other communications.[13] Kronfeld, 638 F. Supp. at 1471. Here, the proposed amendments falls within

---

[12] The Third Circuit provided the following example: "[Defendants] represented to Seville that if the industrial machinery listed in Exhibits A and C were shipped on consignment to either Southmost, Tri-State, Gellman or Alfieri, that the industrial machinery would be resold, and that the purchase price paid by Seville for this equipment along with a 50% pro rata share of the profits resulting from resale would be distributed and paid back to Seville . . . The district court also found that Seville's allegation that defendants had violated 18 U.S.C. §§ 2314 & 2315 (1982), prohibiting the interstate transportation and sale of stolen or fraudulently obtained goods worth more than $5,000, insufficient because although Seville alleged total damages amounting to $759,039, it failed to allege that the goods in question were worth more than $5,000. " *Seville Industrial Machinery Corp.,* 742 F.2d 786 at n6. The court in *Seville* further explained that while it would have behooved the plaintiff to plead the $5,000.00 requirement with greater specificity, the district court read the allegation "too strictly." (*Id.*).

[13] The court in Kronfled opined: "Regarding the second element of mail and wire fraud, the complaint initially alleges: "In connection with the acts, conduct, combination and conspiracy alleged in this amended complaint,

the same category, with the exception of two amendments which mention "false statements." This Court finds that taken together these communications place the defendants on notice that they were aware that the concrete was contaminated, that it needed to be properly disposed, and that third parties would become involved.

Hence, it is plausible to this Court to conclude that these communications, albeit for the most part could be prima facie benign, in context of the rest of the complaint, plead the "circumstances" of the fraud.  The communications constitute the means by which the members of the enterprise informed each other as to the condition of the concrete, and are in fact alleged to be a "step in the plot to defraud."  It will be up to Edgewood to prove at trial that these communications amount to something more than simply a process to decommission. Darrick Enters. v. Mitsubishi Motors Corp., No. 05-4359(NLH), 2007 U.S. Dist. LEXIS 72956 at * 71 (Sept. 28, 2007).  (citing Seville: "It is the function of discovery to fill in the details, and of trial to establish fully each element of the cause of action.")

Furthermore, as stated above, the allegations of the communications need not contain any misrepresentations under the heightened pleading standard. Kehr Packages, 926 F.2d 1406 at 1415. "Rather, 'innocent' mailings—ones that contain no false information—may supply the mailing element." Id.  Here, while only two of the alleged communications reference "false statements," this

---

defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including telephone communications and the mails." (Amended Complaint para. 3). While no specifics are alleged about individual telephone or mail communications, the complaint sufficiently apprises defendants of the predicate offenses which form the basis of the civil RICO claim and satisfies the liberal pleading requirements of civil actions. Kronfeld, 638 F. Supp. at 1471.

Court finds that at minimum, the totality of the communications are plead as "incident" to an essential part of the fraudulent scheme. <u>Schmuck</u>, 489 U.S. at 711.  In paragraph 408, Edgewood alleges that the:

> [C]onduct, acts and omissions of Ford, EQ, Alberici, J&L, Golder and Arcadis were an integral part of the overall pattern and practices described herein, including using the mails and wires of the United States in interstate commerce to profit from their scheme to defraud and to avoid the significant expenses of properly and lawfully handling, testing and/or disposing of the contaminated concrete.

(Edgewood's Consolidated Amended Claims, at ¶ 408).  This portion of the pleading asserts the culpable participation of the defendants, thus placing them on notice of the alleged offenses. Therefore, this court finds that Edgewood sufficiently pleaded a predicate act of wire and mail fraud under Rule 9(b), and leave to amend is hereby granted.  With respect to claim 247 (7), leave is granted to Edgewood to correct any inaccuracy as to the proper recipient of a "fax."

### III.    CONCLUSION

For the foregoing reasons, Edgewood's motion to amend is **GRANTED** with respect to its negligent misrepresentation against Ford, Ford Land, and EQ; its strict liability claim against Ford, and Ford Land, its civil conspiracy claim against EQ and Alberici; and in part, against Ford, Ford Land, Alberici and EQ on its NJRICO claim.  The motion is **DENIED** with respect to the breach of contract and contribution claims.


S/Esther Salas
THE HONORABLE ESTHER SALAS, U.S.M.J.