# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

**FOR PUBLICATION**

```
-------------------------------------------------X
                                       :          Civil Action 06-1278 (HAA)
FORD MOTOR COMPANY, ET AL.             :
                                       :
              Plaintiffs/Counterclaim  :
              Defendants,              :
                                       :
                                       :          OPINION
       v.                              :
                                       :          May 18, 2009
                                       :
EDGEWOOD PROPERTIES, INC.              :
                                       :
                                       :
              Defendant/Counterclaimant. :
-------------------------------------------------X
```

**APPEARANCES**

**John McGahren**
**Todd R. Harrison**
**Stephanie R. Feingold**
PATTON BOGGS LLP
One Riverfront Plaza
6th Floor
Newark, NJ 07102
*Attorneys for Ford Motor Company and Ford Motor Land Development Corporation*

**Alan Wasserman**
**Chad B. Simon**
WILENTZ, GODLMAN & SPITZER, PA
90 Woodbridge Center Drive
Suite 900
Woodbridge, NJ 07095

**Brooke Gaede**
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue, NW
Washington, D.C. 20036
*Attorneys for Edgewood Properties, Inc.*

SALAS, UNITED STATES MAGISTRATE JUDGE:

## I.   INTRODUCTION

On April 3, 2009, this Court heard argument on various discovery disputes between

Plaintiff/Counterclaim Defendant Ford Motor Company[1] and Defendant/Counterclaimant

Edgewood Properties, Inc.  The Court reserved on all of the issues and informed the parties that

a written opinion would follow.

Before the Court are motions to compel by both Ford and Edgewood.  There are five

issues before the Court.  First, Ford seeks to compel an affidavit from Edgewood of an employee

of a former party to this case (which has settled), J&L Management. Second, Edgewood seeks

confidential settlement communications between the New Jersey Department of Environmental

Protection ("NJDEP") and Ford in a separate but related administrative proceeding.  Third,

Edgewood seeks that Ford's entire ESI production be re-produced in native format, as opposed

to the format in which Ford produced the documents (TIFF).  Fourth, Edgewood seeks to

"confirm the adequacy of Ford's manual document collection process" [Dkt. 249] by using a

third-party vendor to perform keyword searches on documents *not* in the existing repository of

ESI, but instead, documents within the possession of certain Ford custodians.  Finally,

Edgewood seeks to compel a joint defense agreement between Ford and other parties in this

litigation.

For the reasons set forth below, this Court holds that (1) Edgewood must produce the

affidavit it has obtained from the former J&L employee; (2) the confidential settlement

negotiations between Ford and NJDEP need not be disclosed because they are beyond the scope

---

[1] Ford Motor Land Development Corporation is also a party to this action, but for ease of reference the parties will collectively be referred to as "Ford."

of relevance as provided by Fed. R. Civ. P. 26; (3) Edgewood is not entitled to an entire re-production of Ford's ESI in native format because the argument that Ford's production to date has been deficient has been waived; (4) Edgewood is not entitled to a newly constituted search of ESI from certain custodians it has identified; and (5) Ford need not disclose the joint defense agreement, but is ordered to disclose the parties to that agreement.

Accordingly, the motions to compel are granted in part, and denied in part.

## II.   BACKGROUND

The factual background underlying this litigation is well known to all the parties, is set forth in various opinions by the Honorable Harold A. Ackerman, U.S.D.J. and this Court, and need not be repeated here at length. *See Ford Motor Co. v. Edgewood Properties, Inc.*, No. 06-1278, 2007 WL 4526594 (D.N.J. Dec. 18, 2007) (Ackerman, J.); 2008 WL 4559770 (D.N.J. Oct. 8, 2008) (Ackerman, J.); 2009 WL 150951 (D.N.J. Jan. 20, 2009) (Salas, J.).

Suffice it is to say that this case arises out of the demolition of a Ford assembly plant in Edison, New Jersey, and the distribution of contaminated concrete therefrom.  Ford and Edgewood entered into a contract whereby Ford agreed to provide 50,000 cubic yards of concrete to Edgewood in exchange for Edgewood hauling it off the site.  The concrete turned out to be contaminated, and so began this litigation, with Ford bringing the instant action against Edgewood asserting claims under the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended, 42 U.S.C. § 9601 *et seq*. ("CERCLA") and Section 58:10-23, 11f (a)(2) of the New Jersey Spill Act for contribution and indemnification for all costs as provided under the contract.  Edgewood, in turn, counterclaimed against Ford, asserting breach of warranty, common law fraud, unjust enrichment, violation of the New Jersey Consumer Fraud Act, contractual indemnification and violations of the Spill Act.  Edgewood

sought to file an amended complaint, a motion which this Court granted in part and denied in part and is now the subject of a motion for reconsideration by Edgewood.

Turning to the matters at hand, in January 2009 the parties brought to this Court's attention various discovery disputes brewing between them. The parties worked diligently in paring down the disputes for this Court's consideration and for that the Court commends them. The five issues that remain will be discussed in turn.

### III.    ANALYSIS

### A.    THE J&L AFFIDAVIT

The affidavit at issue contains testimony from Marvin L. Huffman, a J&L employee. It was procured by Edgewood and Ford seeks to compel its disclosure. Ford argues that the work product doctrine does not protect the affidavit from disclosure. It argues that recent cases have held that affidavits from third-party witnesses are not work product and must be disclosed. "[W]ithholding a third party affidavit as work product is at odds with the underlying aims of the work product doctrine itself . . ." (Joint Submission ("JS") at 5).

Edgewood responds that the affidavit is fact work product that was prepared in anticipation of litigation. Edgewood made a bit of a leap at the hearing and argued that because in preparing the affidavit counsel made strategic decisions and "cherry-picked" certain areas in which the affiant would testify, this reflected the mental impressions of counsel.[2] For the reasons stated below, the Court holds that the affidavit is purely factual in nature, and accepting Edgewood's argument would subvert the underlying purpose of the attorney work product

_____

[2]MR. WASSERMAN [Edgewood]:  The distinction is, if counsel cherry picks certain facts that the witness has that they want, for the purposes of some trial strategy, it's the disclosure of those facts, you now know what the cherry picking was, where our mind set was and, therefore, under infrastructure, if we revealed the mental impressions of counsel, that is protected.  (Apr. 3, 2009 Hr'ng Tr. at 15) ("Tr.")

doctrine.

Work product enjoys qualified immunity from discovery.  Pursuant to Federal Rule of Civil Procedure 26(b)(3), work product includes: (1) "documents and tangible things," (2) "prepared in anticipation of litigation or for trial," (3) "by or for another party or by or for that other party's representative."  The mental impressions, conclusions, or legal theories of a party's attorney enjoy absolute protection and disclosure cannot be compelled upon a showing of undue hardship.  *In re Cendant Corp. Litig.*, 343 F.3d 658, 662-63 (3d Cir. 2003).  Underlying facts are not protected by the work product doctrine.  *See Stern v. O'Quinn*, 253 F.R.D. 663, 686-87 (S.D. Fla. 2008).  Of course, this does not mean that parties are generally entitled to documents which would ordinarily be considered work product that also happen to contain facts.  *Id.* at 687.

The case of third-party affidavits made in anticipation of litigation or for trial presents a peculiar situation for courts because even though testimony is that of the affiant's, attorneys individually have a role in preparing affidavits of laypersons.  This fact in itself does not suffice to convert what is otherwise purely factual testimony by an affiant into work product.  Caselaw, the nature of testimony itself, and the underlying purposes of the work product doctrine compel this conclusion.

In *Walker v. George Koch Sons, Inc.*, No. 07-274, 2008 U.S. Dist. LEXIS 81919 (S.D. Miss. Sept. 18, 2008), the court canvassed the caselaw with respect to the protection (but mostly, the lack thereof) of third-party witness affidavits under the work product doctrine.  The court noted that the basis for plaintiff's assertion of privilege there was that counsel met with the affiants and then later drafted the affidavits for the witnesses, which they reviewed for accuracy, and signed them.  "The Affidavits merely recite relevant facts within the affiants' personal knowledge rather than revealing an attorney's mental impressions or legal strategy."  *Id.* at *17.

-5-

The fact that counsel prepared the affidavits, the court held, did not make them immune from disclosure.  "An affidavit, after all, <u>purports to be a statement of facts within the personal knowledge of the witness</u>, and not an expression of the opinion of counsel."  *Id.* at *18 (quoting *Infosystems, Inc. v. Ceridian Corp.*, 197 F.R.D. 303, 306-07 (E.D. Mich. 2000)) (emphasis added).  Indeed, to demonstrate further why the J&L affidavit is not protected, the *Infosystems* court went even held that *draft* affidavits are not protected under the work product doctrine.  *Id.* at 306.

One need not go as far as the *Infosystems* court's holding to conclude that the affidavit at issue here is not protected.  After an *in camera* review of the affidavit, the court concludes that the affidavit contains a recitation of facts within the ken of the witness and does not contain the mental impressions or legal theories of counsel. *Cf. Murphy v. Kmart Corp.*, No. 07-5080, 2009 WL 89687, at *9 (D.S.D. Jan. 9, 2009) (third-party witness statements did not reflect the legal strategies of counsel).

As to Edgewood's "cherry-picking" argument, the Court finds that this would amount to a wholesale expansion of the work-product doctrine that would subvert the underlying purposes of affording documents protection.  Attorneys frequently work with witnesses to prepare their statements, and an attorney's choice to confine testimony to certain areas is inherent in their preparation.  Expanding the doctrine in this area would render otherwise discoverable statements protected by the doctrine, the primary purpose of which is to protect counsel's trial strategies and mental impressions, not its choice as to an affiant's testimony of underlying facts.  As one court has wisely held:

> Granted, [Defendant] secured those statements in anticipation of litigation. However, if it now suggests that it may interpose the work product doctrine because it then put words in the mouths of

-6-

> those third-party affiants as part of its litigation strategy, it
> misperceives the nature of the doctrine. [Plaintiff] seeks no more
> than factual statements of these non-party witnesses. It should not
> be frustrated in its ability to test the perception and credibility of
> these persons.

*Milwaukee Concrete Studios, Ltd. v. Greeley Ornamental Concrete Products, Inc.*, 140 F.R.D.

373, 379 (E.D. Wis. 1991).

Accordingly, Ford's motion to compel on this point is granted and Edgewood is ordered to

disclose the affidavit.

### B. SETTLEMENT NEGOTIATIONS BETWEEN FORD AND THE NJDEP

Edgewood has requested that Ford produce "[a]ny and all communications between [Ford]

and the New Jersey DEP regarding crushed concrete provided to Edgewood from the Edison

Plant." (JA Ex. 4). Ford has withheld twenty-six documents on the basis that they contain

confidential settlement communications between Ford and NJDEP. Ford has also

concomitantly asserted work product privilege for seven documents.

Acknowledging that the Third Circuit does not recognize a settlement privilege, Ford

couches its argument in relevance terms, arguing that the communications between it and NJDEP

are irrelevant under Fed. R. Civ. P. 26(b)(2). Parties seeking to discover such communications

must make a heightened, more particularized showing of relevance. *See Lesal Interiors v.*

*Resolution Trust Corp.*, 154 F.R.D. 552 (D.N.J. 1994). In *Lesal*, Judge Rosen recognized the

inherent tension between Fed. R. Evid. 408, which prohibits the use of settlement discussions to

prove liability, and Rule 26, which permits liberal discovery. Judge Rosen harmonized the two

competing rationales behind the rules by requiring the moving party to make a "particularized

showing that the evidence sought is relevant and calculated to lead to the discovery of admissible

evidence." *Id.* at 562.

After fully considering the parties' arguments, and in particular, after a thorough *in camera* review of the documents, the Court concludes that Edgewood has failed to make such a particularized showing that the propounded discovery will lead to the discovery of admissible evidence.  The bulk of the documents withheld by Ford contain negotiation of language that ultimately resulted in a final administrative consent order (ACO) between Ford and NJDEP on February 23, 2009.  Of course the documents are inadmissible to prove liability under Fed. R. Evid. 408, as Edgewood recognizes.  (JS at 11 n. 3).  Moreover, the documents will not lead to the discovery of admissible evidence.

In *Steele v. Lincoln Financial Group*, No. 05-7163, 2007 WL 1052495 (N.D. Ill. Apr. 3, 2007), the court considered whether settlement negotiation documents between the defendant and the EEOC were discoverable by the plaintiff.  The court held they were not.  *Id.* at *4-5. "[D]iscovery which can only lead to inadmissible evidence is prohibited by the plain language of Rule 26 and would violate the command of Rule 1 of the Federal Rules of Civil Procedure, which requires that the Rules be construed and administered to secure the just, speedy, and inexpensive determination of every action."  *Id.* at *4.  Here, as in *Steele*, Edgewood has not made the requisite showing that the discovery will lead to the discovery of admissible evidence.  Of course, the Court recognizes that Edgewood is at a disadvantage to make such a showing because it has not seen the documents.  But this Court has, and is convinced that the negotiation of language between the parties goes solely to the resolution of the administrative proceeding against Ford itself and such fine-tuning of the settlement language between the parties will not yield

admissible evidence.

Animating the *Steele* court's finding of irrelevance was the fact that mere "interest" in the documents is not enough.  *Id.* at *4.  The plaintiff in *Steele* did not articulate "any valid policy reason why [the communications] should be discoverable in this case."  *Id.*  So too here.  The *Steele* court found it improvident to decide the question of whether or not a settlement privilege exists, and this Court does as well, especially without guidance or an affirmative holding from the Third Circuit on this issue.  Nevertheless, the Court notes that the disclosure of such negotiations in cases such as this that are brought under the environmental recovery statutes – CERLCA and the Spill Act – could tend to have a chilling effect on negotiations between government entities, be they federal or state, and potentially responsible parties.

The government frequently interposes itself in environmental cases whether it be in administrative proceedings or actual litigation, and the incentive for private parties to resolve possible liability with the government is great.  Such resolution of liability could tend to clarify and focus the issues in other litigation, facilitating judicial expediency, economy, and ultimately a more accurate allocation of liability.  After all, the government plays an important role in environmental cleanup.  *See U.S. v. Bestfoods*, 524 U.S. 51, 55 (1998) ("the United States may, for instance, use the Hazardous Substance Superfund to finance cleanup efforts . . . which it may then replenish by suits brought under [CERLCA]") (citations omitted).  Hindrance of that salutary purpose should not be taken lightly by courts.

Edgewood's motion to compel these documents is denied.[3]

_____

[3] Because the relevance inquiry is dispositive, this Court need not decide whether or not certain of the withheld documents are protected work product.

### C.   EDGEWOOD'S REQUEST FOR FORD'S ESI PRODUCTION IN NATIVE FORMAT

Edgewood demanded in its initial document request that Ford produce documents in native format (or documents containing metadata), as it was entitled to ask it to do under Fed. R. Civ. P. 34.  (Joint Appendix ("JA") Ex. 9).  The heart of the problem is that in Ford's response (JA Ex. 4), it wrote that "Ford and Ford Land will produce such electronically stored information in Tagged Image File Format ("TIFF") with accompanying searchable text."  The dueling declarations of Brooke Gaede on behalf of Edgewood, and John McGahren on behalf of Ford, suggest that the parties never came to an agreement as to how documents would be produced, so Ford unilaterally adopted its own objection and produced them in TIFF format.  The Court will need not wade into the murky waters of whether or not Edgewood *affirmatively* assented to Ford's document production, for Edgewood's passivity to Ford's production and its timely failure to object to it renders its objection waived.

The Sedona Principles and Sedona commentaries thereto are the leading authorities on electronic document retrieval and production.  *William A. Gross Const. Assc., Inc. v. American Mfrs. Mut. Ins. Co.*, 256 F.R.D. 134, 136 (S.D.N.Y. 2009) ("[t]his Court strongly endorses *The Sedona Conference Cooperation Proclamation*"); *John B. v. Goetz*, 531 F.3d 448 (6th Cir. 2008) (following principles); *Aguilar v. Immigration and Customs Enforc. Div. of U.S. Dep't of Homeland Sec.*, 255 F.R.D. 350 (S.D.N.Y. 2008) (same).  Relying on the principles and on the Federal Rules, *Aguilar* explicated the procedure by which parties are to propound electronic discovery requests upon each other, and the parties' concomitant obligations thereto.

*Aguilar* explained that under Rule 34, a party may request the form of production as

metadata.  "The responding party then must either produce ESI in the form specified or object."

Here, Ford objected to the production of metadata.  "If the responding party objects . . . the

responding party must state "the form or forms it intends to use for its production of ESI."  *Id.*

(quoting Fed. R. Civ. P. 34(b)(2)(D)).  If the requesting party further objects and states an

alternative form, the parties must meet and confer in an effort to solve the dispute before filing a

motion to compel.  *Aguilar*, 255 F.R.D. at 355.  Here, crucially, Edgewood did not object to

Ford's production within a reasonable period of time, as will be fleshed out in detail below.

The squabble between the parties about the appropriate mode of production certainly is

not indigenous to this case, and to that end, the Court does not write on a clean slate.  For the

courts and in particular the Sedona Principles specifically have addressed the production of

metadata absent an agreement by the parties on the mode of production.  Specifically, Principle

12 of the Sedona Principles states that:

> Absent party agreement or court order specifying the form or forms
> of production, production should be made in the form or forms in
> which the information is ordinarily maintained or in a reasonably
> usable form, <u>taking into account the need to produce reasonably
> accessible metadata that will enable the receiving party to have the
> same ability to access, search, and display</u> the information as the
> producing party where appropriate or necessary in light of the
> nature of the information and the needs of the case

*Id.* at 356 (emphasis added).  Thus, the producing party ordinarily must take into account the need

for metadata to make otherwise unintelligible documents understandable.  This Principle, of

course would be better applied  in a case where production had not yet commenced.

Indeed, *Aguilar* observed that "[c]ourts generally have ordered the production of metadata

when it is sought in the initial document request and the producing party has not yet produced the

documents in any form." *Id.* at 357.  Such is not the case here, as Ford's production is complete.

Colloquies between this Court and counsel at the hearing revealed the dates of Ford's production

and the time period in which Edgewood made its objection:

> MS. FEINGOLD [Ford]: Absolutely.  Ford's first electronic production was done on March 26, 2008.  The certification and the other information that counsel for Edgewood has provided to us identifying some of these what they're describing as problematic documents, some of those documents come from that very first production.
>
> THE COURT: So, March 26, 2008 was the first production.
>
> MS. FEINGOLD: Correct.
>
> THE COURT: And there were subsequent productions. Do you have those dates?
>
> MS. FEINGOLD: I do. One was, I believe, in July or -- August 4, 2008 was the second.  And then our third electronic production was November 21, 2008.  And that was, by far, the smallest of the three productions.
>
> THE COURT: Okay. So, Edgewood could have looked at the first production in March of 2 -- 26th, 2008 and then could have raised a formal objection with you all requiring a subsequent meet and confer, pursuant to our rule, as well as then either bringing the issue to the forefront with the Court in 2008.
>
> MS. FEINGOLD: Correct.
>
> *      *      *
>
> THE COURT: When did you lodge your first objection to the [TIFF] format?
>
> MR. WASSERMAN [Edgewood]: I'd have to bow down to Ms. Gaede's memory, but I know that after -- when the rolling took place -- the last roll was --

-12-

THE COURT: I know the last. I know the last, but --

MR. WASSERMAN: And if I re --

THE COURT: -- we're talking about the first. You had -- it was -- was it not the largest production, the first production, was the first production the largest production or was it the second and --

MR. WASSERMAN: I may be able to shortcut that one, Your Honor. I understand, in the first production some of these documents existed. I mean, I think you want to -- I think that's where you're going.

THE COURT: But I'm asking why we raised this after ESI production was complete.

MR. WASSERMAN: Understand that we didn't --

*        *        *

MR. WASSERMAN: Well, first of all, Your Honor, with all due respect, it was probably within eight months that we formally requested the problem. When we -- the last time we were before Your Honor, we on the record raised the issue. So, --

THE COURT: What was that date?

MR. McGAHREN [Ford]: January 12th [2009], Your Honor.

(Tr. at 65-66; 74-75) (emphases added).

The foregoing conclusively demonstrates that Edgewood waited from the end of March 2008 to November 2008 to object to Ford's production. And even then it waited two months to bring the problem to this Court's attention. This is by no means to suggest that parties seek court intervention every time there is a whiff of a dispute between them. Meet and confers between the parties are integral to the discovery process.

-13-

But the delay in this case on the part of Edgewood is patently unreasonable.  One need not have expected Edgewood to object in March, or even April, to a March 26 production.  But the problem here is that Ford's next production of documents was five months later, in August.  One may reasonably expect that if document production is proceeding on a rolling basis where the temporal gap in production is almost half a year apart, a receiving party will have reviewed the first production for adequacy and compliance issues for a reason as obvious as to ensure that the next production of documents will be in conformity with the first production or need to be altered. It was incumbent on Edgewood to review the adequacy of the first production so as to preserve any objections.  The Court is not dictating a rigid formulation as to when a party must object to a document production.  Reasonableness is the touchstone principle, as it is with most discovery obligations.  The  simple holding here is that it was unreasonable to wait eight months after which production was virtually complete.

In short, Edgewood was required to object to Ford's proposed mode of production and if the parties could not reach agreement, it was required to alert the Court within a reasonable period of time.  This it did not do.  Ford's and Edgewood's lack of agreement here inheres to the detriment of Edgewood, but a contrary holding does not find support in the caselaw, and would also lead to inequitable results.  *Aguilar* itself highlights the problem with a dilatory objection as to an electronic production, and emphasizes the importance in such an objection being timely.  *Id.* at 368.  Other cases have held that an untimely objection may constitute waiver.  *See, e.g.*, *Autotech Tech. Ltd. Partnership v. Automationdirect.com, Inc.*, 248 F.R.D. 556, 559 (N.D. Ill. 2008) ("[i]t seems a little late to ask for metadata after documents responsive to a request have been produced

in both paper and electronic format").

The Court finds Edgewood's objection to be out of time.  It is beyond cavil that this entire problem could have been avoided had there been an *explicit* agreement between the parties as to production, but as that ship has sailed, it is without question unduly burdensome to a party months after production to require that party to reconstitute their *entire* production to appease a late objection.  The advent of E-Discovery does not serve to destroy parties' discovery obligations that would exist in the ordinary course were other media involved.  Parties would be best to heed the admonition of a recent court that "the best solution in the entire area of electronic discovery is cooperation among counsel."  *William A. Gross*, *supra*, 256 F.R.D at 136l.

Accordingly, Edgewood's motion to compel the native documents is denied.

### D.   FORD'S DOCUMENT COLLECTION PROCESS

Edgewood has mounted a complaint against Ford's document collection process.  The crux of Ford's complaint is that there "is a noticeable absence of documents in Ford's production related to key decisions regarding contaminated concrete at the Ford Edison Plant . . ."  (JS at 25).  Edgewood argues that the document collection method employed by Ford was flawed.  The relief it seeks is broad.  In response to this Court's request for clarification, Edgewood responded that it

> is seeking to confirm the adequacy of Ford's manual document collection process using a limited, least cost, least burdensome test.  This test involves using a vendor to perform a narrowly tailored key word search of electronically-stored records from a limited time period associated with certain custodians . . . for the purpose of determining whether Ford failed to collect responsive documents.  The search would be performed on Ford's electronically-stored as such records are stored in their original location (e.g., a custodian's laptop, Ford servers, etc.).

-15-

Dkt. 249 at 3 (emphasis added).  In essence, then, even though it disavows the term "entire reconstitution of the document collection process," the remedy proposed by Edgewood does, in fact, seek at least a substantial reconstitution of the document collection process by trying to *add* to the existing repository of ESI that Ford collected over a year ago.

In *The Sedona Conference Best Practices Commentary on the Use of Search and Information Retrieval Methods in E-Discovery*, Practice Point 1 states that "[i]n many settings involving electronically stored information, reliance solely on a manual search process for the purpose of finding responsive documents may be infeasible or unwarranted.  In such cases, the use of automated search methods should be viewed as reasonable, valuable, and even necessary." (emphasis added).  Once again, the Court confronts this peculiar situation insofar as Edgewood has a point that the document collection method used by Ford is not necessarily contemplated under the Sedona Principles, but that agreement by the parties at the outset as to the mode of collection would have been the proper and efficacious course of action.  However, "[a]bsen[t] agreement, a [responding] party has the presumption, under Sedona Principle 6, that it is in the best position to choose an appropriate method of searching and culling data."  *The Sedona Conference Best Practices Commentary on the Use of Search and Information Retrieval Methods in E-Discovery.*  Once again, the lack of agreement here inheres to the detriment of Edgewood.

The Sedona Principles wisely state that it is, in fact, the producing party who is the best position to determine the method by which they will collect documents.  The producing party responding to a document request has the best knowledge as to how documents have been preserved and maintained.  That being said, the producing party under the Sedona Principles

doesn't have carte blanche to specify the mode of collection and it is clear that manual collection is sometimes even disfavored.  However, absent an agreement or timely objection, the choice is clearly within the producing party's sound discretion.

      The Court finds that reinventing the wheel here would be unduly burdensome to Ford.  *See* Fed R. Civ. P. 26(b)(2)(C)(i).  The gravamen of Edgewood's complaint is that it suspects it has not received all of the documents to which it is entitled.  But such a conclusory allegation premised on nefarious speculation has not moved several courts, nor will it move this one, to grant burdensome discovery requests late in the game.  *See, e.g.*, *Margel v. E.G.L. Gem Lab Ltd.*, No. 04-1514, 2008 WL 2224288, at *3 (S.D.N.Y. May 29, 2008) ("[u]nder ordinary circumstances, a party's good faith averment that the items sought simply do not exist, or are not in his possession, custody or control, should resolve the issue of failure of production . . .") (quoting *Zervos v. S.S. Sam Houston*, 79 F.R.D. 593, 595 (S.D.N.Y. 1978)); *Golden Trade S.r.L. v. Lee Apparel Co.*, 143 F.R.D. 514, 525 n. 7 (S.D.N.Y. 1992) ("[i]n the face of a denial by a party that it has possession, custody or control of documents, the discovering party must make an adequate showing to overcome this assertion"); *see also U.S. v. O'Keefe*, 537 F. Supp. 2d 14, 22 (D.D.C. 2008) (noting that in the face of a protest of "inexplicable deficiencies" in a party's production, vague and speculative notions that there, in essence, *should be more*, are insufficient to compel judicial action).

      Here, Edgewood has not made a colorable showing that Ford is purposefully (or even negligently) withholding documents.  The notion that a document production is insufficient based on a belief that documents must exist simply is not enough to grant a motion to compel that would require Ford to go back to square one and begin its document collection efforts anew.  It would be

improvident at this juncture to grant Edgewood the relief it seeks when it has not shown any indicia of bad faith on the part of Ford.  To countenance such a holding would unreasonably put the shoe on the other foot and require a producing party to go to herculean and costly lengths (especially in a document-heavy case such as this) in the face of mere accusation to rebut a claim of withholding. This scenario is not contemplated by the Federal Rules.

Edgewood, of course, has other avenues of recourse if it truly believes that it is not getting what it is entitled to.  The Court notes that no depositions have yet taken place in this litigation.  If Edgewood wishes to press its argument that correspondence or other documentation in the realms in which it is concerned about *must* exist, it can take that up in depositions with fact witnesses who have knowledge in these areas.  If relevant, unproduced documents appear or are even referenced in these depositions, Edgewood can move for the appropriate relief before this Court at that time, whether it be via another motion to compel documents, or for sanctions.  For now, however, Edgewood's motion to compel on this point is denied.

### E.   THE JOINT DEFENSE AGREEMENT

Ford has refused to produce a joint defense agreement it has with other parties, to Edgewood.  Ford has cataloged the agreement on its privilege log, but importantly, has not disclosed the parties to it.

*Warren Distrib. Co. v. InBev USA L.L.C.*, No. 07-1053, 2008 WL 4371763 (D.N.J. Sept. 18, 2008) is instructive.  There, Judge Schneider denied plaintiff's motion to compel a joint defense agreement.  Judge Schneider considered whether the information was *discoverable*, not whether it was protected by privilege or not.  "The relevancy of a joint defense agreement depends on the

language of the agreement," held the court, and thus an *in camera* review of the document was necessary. *Id.* at *3. Judge Schneider held that the agreement was not discoverable because the agreement did not contain any substantive business information, and because the agreement "merely contains language that parties typically include in joint defense agreements to protect from discovery privileged information revealed to a third party." *Id.*

After an *in camera* review of the document, the Court finds that the agreement contains standard and boilerplate language that is not discoverable because it is not relevant to any claim or defense in this case. Like the agreement in *Warren*, it "contains language that parties typically include in joint defense agreements to protect from discovery privileged information revealed to a third party." *Id.*

That being said, however, the parties to the agreement, as Judge Schneider found, are relevant. Edgewood has a right to know which parties are maintaining a common defense against it. Crucial to the court in *Warren* was that the complaining party knew who entered into the agreement. *Id.* ("[a]fter its detailed review, the Court finds the only arguably relevant information in the Agreement has been disclosed"). Such disclosure has not yet taken place here, but the Court holds that it must.

Other courts are in accord with *Warren*. *See, e.g.*, *Broessel v. Triad Guar. Ins. Corp.*, 238 F.R.D. 215, 217 (W.D. Ky. 2006) (joint defense agreements are "not relevant to the claim or defense of any party") (quoting Fed. R. Civ. P. 26(b)(1)).

Edgewood cites *Jeld-Wen, Inc. v. Nebula Glasslam Int'l, Inc.*, No. 07-22326, 2008 WL 756455 (S.D. Fla. Mar. 11, 2008) in support of its position, but that case is, at once, both

distinguishable and harmful to its argument.  There, two parties who originally were on opposite sides of a litigation entered into what they styled as a joint defense and indemnity agreement.  *Id.* at *5.  The court held that the joint defense portion of the agreement was relevant because it beared upon "trial strategies," but after an *in camera* review this Court concludes that there are no trial strategies reflected in the agreement.  And even assuming, *arguendo*, that there were, as in *Jeld-Wen*, this would constitute opinion work product, absolutely protected in this circuit. *In re Cendant Corp, supra*, 343 F.3d at 662-63 (3d Cir. 2003).

Edgewood argues that "other aspects of the Agreement may demonstrate bias or prejudgment, or may lead to the discovery of other admissible evidence, making the Agreement relevant and discoverable."  (JS at 56).  Edgewood could forge down that path, but the knowledge of the parties to the agreement suffices for it to wage that battle.  Moreover, the mere fact that there *is* an agreement between certain parties could allow Edgewood to explore through depositions or interrogatories if there is any indicia of witness bias.

Finally, a review of the agreement leads this Court to hold that it will not lead to the discovery of other admissible evidence because of its generic, boilerplate language.  Accordingly, while the agreement itself need not be disclosed, Ford is ordered to disclose the parties to it..

## IV.   CONCLUSION

For the foregoing reasons, the motions to compel are granted in part, and denied in part.  A separate order shall issue.

/s Esther Salas
**HON. ESTHER SALAS, U.S.M.J.**

-20-