NOT FOR PUBLICATION

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

|  |  |  |
|---|---|---|
| **FORD MOTOR COMPANY,** | : | **Civil Action No.: 06-1278 (ES)** |
| **Plaintiff-Counterclaim Defendant,** | : | *Consolidated with* |
|  | : | **Civil Action No. 06-4266 and** |
| **v.** | : | **Civil Action No. 08-774** |
| **EDGEWOOD PROPERTIES, INC.,** | : |  |
|  | : | **OPINION** |
| **Defendant-Counterclaimant.** | : |  |

**EDGEWOOD PROPERTIES, INC.,**

**Third-Party Plaintiff,**

**v.**

**FORD MOTOR LAND**
**DEVELOPMENT CORPORATION,**
**MIG/ALBERICI, LLC,**
**EQ NORTHEAST, INC.,**

**Third-Party Defendants.**

**EDGEWOOD PROPERTIES, INC.,**

**Plaintiff,**

**v.**

**GOLDER ASSOCIATES, INC.,**
**ARCADIS, U.S., INC.**

**Defendant.**

SALAS, DISTRICT JUDGE

## I.    Introduction

Pending before this Court is Arcadis U.S., Inc.'s ("Arcadis") motion for summary judgment.  (D.E. 557).  The Court has reviewed Arcadis' motion, ("Arcadis Moving Br."), MIG/ALBERICI, LLC's ("MA") opposition, (D.E. 580, "MA Opp. Br."), Golder Associates, Inc.'s ("Golder") opposition, (D.E. 575, "Golder Opp. Br."), Edgewood Properties, Inc.'s ("Edgewood") opposition, (D.E. 576, "Edgewood Opp. Br."), and Arcadis' reply, (D.E. 585, "Arcadis Reply Br.").[1]  Additionally, the Court has considered the entire summary judgment record, and all submissions, certifications, and declarations in connection with Arcadis' statement of material facts, (D.E. 557-1, "Arcadis Moving SMF"), MA's counter-statement of facts, (D.E. 574-1, "MA Opp. SMF"), Edgewood's counter-statement of material facts, (D.E. 576-1, "Edgewood Opp. SMF"), Arcadis' reply to MA's Opp. SMF, (D.E. 585-2, "Arcadis-MA Reply SMF"), and Arcadis' reply to Edgewood's Opp. SMF, (D.E. 585-1, "Arcadis Reply SMF").  The Court decides the motion on the papers without oral argument under Fed. R. Civ. P. 78(b).

The key finding in the following Opinion is that genuine issues of material fact exist, precluding judgment as a matter of law.  At bottom, the Court's decision comes down to this: It is unclear to what extent Arcadis was involved in the supervision of off-site distribution of contaminated concrete; the extent to which Arcadis participated in the daily site meetings in which potential recipients—including Edgewood—were discussed; the extent to which Arcadis was involved in walking and talking with prospective recipients on the Edison Site when

---

[1] Ford Motor Company ("Ford"), Ford Motor Land Development Corporation ("Ford Land"), and EQ Northeast, Inc. ("EQ") did not oppose Arcadis' motion.  Accordingly, Edgewood, Alberici, and Golder, are the only parties to oppose the motion.  The Court focuses primarily on Edgewood's arguments in opposition and refers explicitly to Golder's and Alberici's briefs and accompanying submissions, when addressed.

suitability was discussed; and the extent to which Arcadis knowingly or purposefully enabled the off-site distribution of contaminated concrete to parties like Edgewood who wanted concrete in compliance with the standards set forth by the New Jersey Department of Environmental Protection ("NJDEP").  What is clear is that Edgewood and its fellow opponents have satisfied their burden on summary judgment of raising genuine disputes of material fact as to each of these issues, pointing to specific facts in the voluminous summary judgment record for support.  Accordingly, the Court denies Arcadis' summary judgment motion.

## II.     Background

This action arises out of the demolition of a Ford assembly plant in Edison, New Jersey (the "Edison Site"), and the distribution of contaminated concrete from the site.  Ford and Edgewood entered into a contract whereby Ford agreed to provide 50,000 cubic yards of concrete to Edgewood in exchange for Edgewood's hauling it off the site.  Then, Edgewood brought the concrete to seven properties it was developing (the "Seven Properties").  The parties later determined that the concrete was contaminated.  As such, Ford brought claims against Edgewood, and Edgewood asserted cross-claims, counter-claims, and a third-party complaint, including claims against Arcadis, the company retained as Ford's Industrial Site Recovery Act ("ISRA") consultant.  Arcadis moves for summary judgment on the following claims: (1) Count I under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"); (2) Count III Negligence; (3) Count IV Civil Conspiracy; (4) Count V under New Jersey RICO ("NJ RICO"); and Count VII under the New Jersey Spill Act ("Spill Act").

### III.   Legal Standards

#### A.   Summary Judgment

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c); *Azur v. Chase Bank, USA, Nat'l Ass'n*, 601 F.3d 212, 216 (3d Cir. 2010).  A genuine issue of material fact exists for trial when—in viewing the record and all reasonable inferences drawn from it in the light most favorable to the non-movant—a reasonable finder of fact could return a verdict for the non-movant.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  "To be material, a fact must have the potential to alter the outcome of the case." *DeShields v. Int'l Resort Props.*, No. 11-2672, 2012 U.S. App. LEXIS 3580, at *5 (3d Cir. Feb. 23, 2012) (internal citation omitted).

The movant bears the burden of establishing that no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  If the movant meets this burden, the non-movant must set forth specific facts that demonstrate the existence of a genuine issue for trial. Rule 56(e); *Celotex*, 477 U.S. at 324; *Azur*, 601 F.3d at 216.  Rule 56(c) mandates the entry of summary judgment against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex*, 477 U.S. at 322.  A scintilla of evidence in support of the non-movant's position is insufficient to oppose a summary judgment motion successfully; instead, "there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson*, 477 U.S. at 252.  "Credibility determinations, the weighing of the evidence, and the

drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ruling on a motion for summary judgment . . . ." *Anderson*, 477 U.S. at 255.

## IV.    Discussion

Below, the Court first finds that the disputed issues of fact are genuine, and not, as Arcadis argues, "conjur[ed]."  (Arcadis Reply Br. at 1).  Second, the Court discusses how the genuine issues of fact are material to each of the claims for which Arcadis seeks summary judgment, precluding summary judgment on Counts I, III, IV, V, and VII.

### A.    Genuine Issues of Material Fact

The core factual dispute that drives the analysis in this Opinion relates to the parties' characterizations of Arcadis' role in this case.  Arcadis characterizes itself as an ISRA consultant only, without involvement in the off-site disposition of crushed concrete, the root of all the claims.  (Arcadis Moving Br. at 2 ("[T]he final disposition of crushed concrete not reused on the Edison site was not within Arcadis' scope of work.  Extensive discovery has revealed that Arcadis played no role in sampling the concrete, selection of the piles of concrete to be distributed, negotiation of the sales agreements, or even the decision to allow concrete to be reused instead of landfilled.  To the contrary, discovery has confirmed that Arcadis' role was limited to ISRA compliance issues.")).  In opposition, Edgewood argues that Arcadis played an important role in the decommissioning, demolition, and distribution of concrete off-site.  (Edgewood Opp. Br. at 1 ("Arcadis claims that its role at the [the Edison site] during the events of 2004-2005 relevant to this litigation was limited to one of an 'environmental consultant' merely assisting Ford with its obligations to investigate and remediate environmental contamination pursuant to the Industrial Site Recovery Act ('ISRA').  The evidence tells a different story.  While the investigation and remediation work was proceeding, tens of thousands

of tons of concrete were generated by Ford's decommissioning and demolition of the Edison Site.  Arcadis has acknowledged that there was an integral relationship between the investigation and remediation work and the decommissioning and demolition work.  Arcadis necessarily played an important role in both."); *see also* MA Opp. Br. 4-8; Golder Opp. Br. 2-4).  Although there are many areas of factual dispute, the Court focuses its factual analysis on the five most important ones in support of its finding that genuine issues of material fact exist.

### 1.      Variance Request

Ford Land hired Golder to assist in pre-decommissioning support services at the Edison Site, including formal preparation of a decommissioning project manual (the "Manual").  (Arcadis Moving SMF ¶¶ 32-35).   Under the Manual, MA was primarily responsible for managing demolition debris through recycling, disposal, or reuse pursuant to the Manual.  (*Id.* at ¶¶ 40-43). Generally, MA and Ford intended to use crushed concrete generated from the demolition of the buildings as backfill if the Manual and applicable regulations permitted.  (*Id.* ¶¶ 45, 64-65, 75).  Because the site was undergoing ISRA remediation, however, and the concrete did not meet the applicable technical requirements for backfill, Ford Land and Golder asked Arcadis to identify the ISRA regulatory requirements applicable to the reuse of crushed concrete on-site as backfill.  (*Id.* ¶ 74).  Arcadis advised that a variance from the technical requirements was necessary to use the crushed concrete on-site, (*id.* ¶¶ 77-83), because, from a regulatory standpoint, the use of crushed concrete as backfill was a gray area.  (*Id.* ¶¶ 77, 84-85).

Accordingly, Arcadis' Senior Manager John Messinger confirmed in an August 4, 2004 email that Arcadis would volunteer to "prepare and submit" the variance request to the NJDEP.  (Ex. 44 to Affidavit of Mark M. Tallmadge, Jan. 13, 2012, in Support of Arcadis' Motion for Summary Judgment, "Tallmadge Aff.," Ex. 44 ("ARCADIS can prepare and submit the variance

request.  Information regarding the proposed use of crushed concrete as backfill including quantity, location, crushing method, source materials, etc. will need to be included in the variance report.")).  In an August 10, 2004 email, Golder's Project Manager Andy Lewis stated that, for purposes of preparing the variance request, Arcadis would consider, "[a] description of the crushing operations (*i.e.*, method statement), description of the source material and expected volumes, description of how deleterious materials will be removed after crushing, size of crushed material, sampling and analysis plan, description of cleaning and inspection process, proof of permits . . . ."  (Ex. 44 to Tallmadge Aff. at 1-2).  Arcadis' draft set forth "a plan to use clean crushed concrete as general backfill at the Site," in addition to noting, "[c]oncrete that is not crushed and used as backfill will be segregated for off-site disposal."  (Ex. 50 to Tallmadge Aff. (attaching the draft variance request, ("Arcadis Draft Variance"), to a September 13, 2004 email from John Messinger to Golder's Resident Engineer Chris Hemingway)).  The draft also stated, "[o]nly clean concrete will be crushed and used as backfill. . . . [and] [c]oncrete that will not be crushed and used for on-site backfill is described below. . . . [including] [c]oncrete floor surfaces that have been determined to contain positive detections of PCBs."  (*Id.*).  MA was responsible for finalizing and submitting the variance request and for obtaining the variance from the NJDEP.  (*See*, *e.g.*, Tallmadge Aff. ¶ 51 ("Alberici is responsible for getting the variance and that they should utilize Arcadis as a resource.")).

The parties actively dispute how the above facts should be characterized and evaluated. For example, Arcadis argues that, because Arcadis did not have any involvement in the finalization or submission of the letter to the NJDEP, and because Arcadis' role was limited to ISRA compliance (which, in turn, was unrelated to the use of crushed concrete off-site), that "Arcadis [had] no responsibility or involvement in the removal of the concrete."  (Arcadis

Moving Br. at 8-9).  Additionally, Arcadis argues that the focus of the variance request was "the on-site reuse of crushed concrete as backfill," (Arcadis Reply Br. at 4), and that "when asked a question about backfill requirements 'for crushed concrete from on-site intended for sale and off-site reuse,' Arcadis expressly advised Ford and Golder that this issue was not applicable to ISRA or the technical requirements."  (*Id.* at 6 (citing Arcadis Moving SMF ¶¶ 81-84)).  In opposition, Edgewood argues that Arcadis' draft of the variance request demonstrates Arcadis' knowledge and facilitation of the use of crushed concrete off-site, despite the potential for contamination.  (Edgewood Opp. Br. at 6).

Arcadis carries its moving burden by pointing to Arcadis' statements that off-site reuse was outside the scope of Arcadis' ISRA responsibilities.  (Arcadis Moving SMF ¶¶ 81-84).  However, Edgewood also carries its opposing burden by pointing to portions of Ardadis' variance request contemplating the segregation of concrete into off-site reuse and its potential contaminants.  (Ex. 50 to Tallmadge Aff., Arcadis Draft Variance).  A determination of which side's characterization of the above evidence fits the facts more precisely is a job for the finder of fact at trial; not for the district court judge at the summary judgment stage.  Such determinations would involve weighing the evidence to determine the truth of the matter.  Accordingly, Arcadis' role in drafting the variance request, in addition to how that role relates to the claims at issue (discussed at length below) presents a genuine issue of material fact.  *See*, *e.g.*, *Massaro Ltd. P'ship (Park W. Two) v. Baker & Taylor Inc.*, 161 F. App'x 185, 186 (3d Cir. 2005) ("[T]he Court must draw all reasonable inferences from the evidence in favor of the nonmoving party and may not weigh the evidence or assess credibility."); *Am. Eagle Outfitters v. Lyle & Scott Ltd.,* 584 F.3d 575, 581 (3d Cir. 2009) ("In determining whether the dispute is genuine, the court's function is not to weigh the evidence or to determine the truth of the matter,

but only to determine whether the evidence of record is such that a reasonable jury could return a verdict for the nonmoving party.").

>       **2.       Sampling Plan**

NJDEP required that the variance request include information about the sampling plan that would be used to test the concrete to ensure it complied with the conditions of the variance, which included that the concrete could not test positive for PCBs.  (Arcadis Draft Variance; Arcadis Reply SMF ¶ 89).  To ensure compliance, the variance request—importantly, including Arcadis' draft—contained a sampling plan to determine when concrete was to be crushed and used as backfill and when, instead, it would "be segregated for off-site disposal."  (Arcadis Draft Variance).  MA finalized and submitted the final NJDEP variance request on September 14, 2004 to permit the use of crushed concrete as backfill in areas of the Edison Site.  (Arcadis Moving SMF ¶ 97).  The parties dispute Arcadis' involvement in the sampling plan.

Arcadis argues that it "was not involved in Alberici's development and Golder/Ford's approval of the Method Statement/Project Hazard Determination that ultimately governed the crushing and sampling of the concrete piles."  (Arcadis Reply Br. at 8-9 (citing Arcadis Reply SMF ¶ 117)).   Additionally, Arcadis challenges Edgewood's contention that "Arcadis was responsible for suggesting and designing the sampling methodology that was utilized to determine which crushed concrete would be sent off-site for reuse."  (*Id.* at 9 (citing Edgewood Opp. SMF ¶ 109)).  In opposition, Edgewood argues, "[i]n consultation with NJDEP, Arcadis developed the sampling plan described in the variance request, which included taking one sample in each of 23 areas of the plant.  (Edgewood Opp. Br. at 6 (citing Edgewood Opp. SMF ¶¶ 90, 106)).

The Court finds a genuine dispute of fact as to whether Arcadis developed the sampling plan.  Much like the variance request, discussed above, the summary judgment record reveals that Arcadis developed the first draft of the sampling plan, and then other parties were involved in finalizing it.  For example, in an August 10, 2004 email, Golder's Andy Lewis represented that Arcadis would contribute to establishing the sampling methodology.  (Ex. 44 to Tallmadge Aff. ("The crushed concrete must be sampled on a regular frequency to ensure it is not impacted.  The frequency is to be agreed upon by Arcadis/Ford Team and NJDEP.")).  Then, the September 13, 2004 Arcadis Draft Variance set forth the following sampling parameters:

> Concrete that is suitable for crushing and backfilling will be sampled to confirm that it does not contain constituents that could impact the environment.  As part of the decommissioning and demolition planning, [MA] has divided the plant building into 23 areas based on the former plan operations.  One concrete chip sample will be collected from each area prior to crushing.  The sampling locations will be biased toward areas that have the greatest potential for impacts.  The samples will be analyzed for Priority Pollutants (PP) Semi-Volatile Organic Compounds (SVOCs), PP Metals, and PP Polychlorinated Biphenyls (PCBs).

(*Id.*).  The draft contains details on dividing the plant into 23 areas, taking chip samples, and testing them for constituents of concern.  Additionally, in meeting notes dated October 20, 2004, an Arcadis employee wrote: "Sample Plan to be completed when?"; "Core samples for concrete becoming an issue.  Main issue on the plate b/c letter will be delayed"; and "ask about the crushed concrete being used as fill such as 2i, 2ii / Variance."  (Ex. 24 to Affidavit of Brooke Gaede in Support of Edgewood's Opposition, "Gaede Cert.," ARC 003996-9).  Finally, the parties hotly dispute the nature of Arcadis' involvement in a meeting on December 8, 2004.  Arcadis' reply statement of facts frames the dispute clearly:

> Arcadis disputes that the documents cited by Edgewood support that Arcadis participated in a meeting on December 8, 2004 in which it 'discussed and agreed upon a plan for crushing, handling and off-site disposal of concrete.'  Rather, as supported by the deposition testimony cited by Edgewood, Gabe Horn [Arcadis' on-site field representative responsible for overseeing the collection of soil

- 10 -

> samples pursuant to ISRA] participated in a meeting in which he raised and
> discussed the possibility of using the sampling criteria for soil to test the crushed
> concrete (in the absence of standards applicable to crushed concrete) to determine
> whether it could be reused on-site pursuant to the variance.

(Arcadis Reply SMF ¶ 115 (emphasis in the original)).   Accordingly, the Court finds that

Edgewood has raised a genuine issue of fact as to Arcadis' level of involvement in the

development of the sampling plan for the Edison site.

### 3.        Modified Sampling Plan and Site Meetings

In October 2004, while the variance request was pending, MA took of concrete core

samples, and found that the samples tested positive for PCBs.  (Edgewood Opp. Br. at 6 (citing

Arcadis Reply SMF ¶ 106)).  Such contaminated concrete could not be reused on-site pursuant to

the terms of the variance request and, according to that request, would be "disposed offsite."

(Edgewood Opp. SMF ¶ 97).  On November 9, 2004, NJDEP approved the variance request to

use concrete as backfill on the Edison Site, provided that it met certain conditions.  (Arcadis

Reply SMF ¶ 103).  In early December 2004, the parties agreed to proceed with the crushing of

concrete despite the sample results.  (Edgewood's Opp. SMF ¶¶ 115-116).  The parties hotly

dispute Arcadis' involvement in that decision and the extent to which Arcadis participated in the

sampling criteria modification that enabled that decision.  Upon its review of the summary

judgment record, the Court finds a genuine issues of fact.

At the root of all of these disputes is what transpired at the daily site meeting on

December 8, 2004, attended by Arcadis' field representative Gabriel Horn.  (Arcadis' Reply

SMF ¶ 115).  Arcadis argues that there is no support for Edgewood's contention that Arcadis was

responsible for suggesting and designing the sampling methodology that was utilized to

determine which crushed concrete would be sent off-site for reuse, (Arcadis Reply Br. at 9

(citing Edgewood's Opp. SMF ¶ 109)), and that "Edgewood mischaracterize[s]" Mr. Horn's

participation at the meeting as 'directing,' 'designing,' 'steering,' 'formulating,' overseeing,' 'approving' (and so on) the sampling methodology for the piles of crushed concrete." (*Id.* at 8). In opposition, Edgewood argues that Mr. Horn "proposed" a new sampling method that conflicted with the variance request, that "[t]he parties agreed upon the sampling plan proposed by Arcadis," that the "sampling plan agreed upon by Ford Land, Golder and Arcadis differed from the sampling plan identified in the variance request submitted to the NJDEP in September 2004 and approved by the NJDEP in November 2004," and that, despite the fact that "Arcadis knew and had previously informed Ford, Ford Land and Golder that [] the sampling frequency and parameters must be proposed in the variance request," "Ford Land, Arcadis and Golder changed the sampling frequency and parameters without notifying the NJDEP and permitted the crushing and off-site use of concrete known to contain PCBs in violation of the plain language of the variance approved by NJDEP." (Edgewood Opp. SMF ¶ 115).

Arcadis supports its view of the meeting with Mr. Horn's November 3, 2010 deposition testimony, demonstrating that Mr. Horn was merely present when sampling-related ideas were "thrown out" and that Mr. Horn only added input in the absence of any existing guidance. (Arcadis Moving SMF ¶ 115 (citing Ex. 167 to the Tallmadge Aff. at 35:11-18 ("Q: Do you recall being involved in discussions about the sampling method? / A: Yes / Q: What specifically do you recall? / A: It was thrown out during [sic] meeting trying to figure out how it should be sampled, how it could be sampled.  And the only information we had was how soil would be sampled."), 166:13-168:8 (responding to a question related to Mr. Horn's recall on discussing "Concrete Reuse," that "they're trying to figure out a way to sample the concrete and, since there was no guidance, what frequency would be sampled"))).  Later, Mr. Horn clarified his position by testifying that "the decision was not mine to make.  I gave my input."  (Arcadis Moving

SMF ¶ 115 (citing Ex. 167 to Tallmadge Aff. at 171:12-13)).  Edgewood supports its position

with additional portions of Mr. Horn's testimony.  (Ex. 167 to Tallmadge Aff. at 36:3-12 ("Q:

[W]ho came up . . . with the idea to use the soil guidelines as . . . an aid to determine what to

do. . . . / A: It was thrown out to both Golder and Arcadis at the time.  And we—I came up—or

I—I can't be sure if I came up with it; but it was mentioned and I agreed that, you know, for—

for soil sampling [one sample per every hundred cubic yards] is what we did.")).

Additionally, in a December 9, 2004 email, Golder's Chris Hemingway summarized his

"understanding of the Site meeting yesterday with [Ford Land's] Mike Powell, Arcadis, and

Golder," as follows:

> Samples will be collected and analyzed in 100 cubic yard sections, which is in
> accordance with the Tech. Reqs.  If sample results indicate positive detections, the
> concrete pile that it represents will be disposed off-site.  If sample results indicate
> no detections, the concrete pile will be used as clean backfill at the Site.  *Arcadis
> and Golder agreed that this was a reasonable, conservative approach and
> NJDEP will likely not have a problem with this methodology.*

(Ex. 88 to Tallmadge Aff.) (emphasis added).  Accordingly, the record supports a genuine

dispute as to Mr. Horn's and Arcadis' involvement in developing the "one sample per every

hundred cubic yards," sampling methodology, and signing off on whether the methodology was

"reasonable" in light of the fact that the sampling was different from the variance request.

Arcadis also argues that the sampling methodology discussed at the daily site meetings

was unrelated to "off-site . . . reuse," "off-site disposal of concrete," or "off-site distribution," the

concrete at issue for purposes of liability in this case.  (Arcadis Reply Br. at 9).  Arcadis' only

participation in discussions of sampling methodology was related to "determining whether the

piles could be reused on-site as backfill . . . ."  (*Id.* at 9 (citing Arcadis Reply SMF ¶ 115)).  In

the light most favorable to Edgewood, however, the Court's review of the summary judgment

record reveals much more than a mere scintilla of evidence that the sampling discussed during

- 13 -

daily site meetings related to the off-site disposal of contaminated concrete.  (*See* Ex. 167 to the Tallmadge Aff. at 40:5-11 ("Q: and do you recall discussion at the meetings about the sampling results? / A: . . . [Y]es, I do. . . . That the piles were—you know, had detections of PCB's."), 41:8-20 ("Q: Was there discussion about what was going to happen with the concrete? / A: Instead of being used on-site, it would have to be disposed of. / Q: [A]nd do you recall discussions during the site meetings about how to dispose of the concrete? / A: No. / [W]hat do you recall about what happened next with the contaminated concrete that couldn't be reused on-site? / A: I don't know.  *I know it was being disposed of*.") (emphasis added)).  Accordingly, the Court is unable to conclude from the record as a whole that sampling discussions were limited to on-site reuse, and a reasonable jury could find for Edgewood on this issue.

### 4.      Supervisory Role for Crushing, Stockpiling, Sampling, Marking, Reviewing, Distributing, and Compiling Concrete

Edgewood ties much of its argument for Arcadis' liability to whether Arcadis took a supervisory role with respect to crushing, stockpiling, sampling, and off-site disposition of concrete.  The Court finds that there is a genuine issue of fact as to whether Arcadis supervised these processes.  Arcadis argues that it "did not have any involvement in the off-site disposition of crushed concrete that could not be used on-site pursuant to the NJDEP's variance," and that Arcadis had no involvement with crushing, stockpiling, marking, sampling, or stockpiling concrete at the Edison Site.  (Arcadis Reply Br. at 13 (citing Arcadis Reply SMF ¶¶ 118-122, 128-136)).  In opposition, citing many of the same factual assertions in the statements of material fact with which Arcadis supports its arguments, Edgewood argues that "Representatives of MA testified that Arcadis, along with Golder, were in supervisory roles and decided the level of contaminated concrete that could be used as backfill on the Edison Site, the sampling

methodology for the crushed concrete, and how and when to label and consolidate piles of crushed concrete."  (Edgewood Opp. Br. at 7 (citing Edgewood Opp. SMF ¶¶ 118-123)).

The Court finds that Arcadis has satisfied its moving burden of showing Arcadis had no supervisory role in: crushing or stockpiling concrete;

- Ex. 183 to Tallmadge Aff. at 269:4-10 (October 15, 2010 deposition testimony of Todd Walton, stating that he had "no knowledge" of Arcadis' involvement "with respect to the crushed concrete stockpiles and the eventual disposal of crushed concrete off-site from the Edison Plant");

that Arcadis had no role in sampling and marking concrete;

- Ex. 161 to Tallmadge Aff. at 210:23-211:7 (Golder's Senior Project Manager Michael Flanagan's deposition testimony, stating, "I do not recall Arcadis being involved in it, no" in response to question, "[i]s it fair to say that Arcadis . . . had no role in the marking and sampling of . . . the crushed concrete piles");

- Ex. 29 to Tallmadge Aff. at Response to Interrogatory # 7 ("Pursuant to [MA's] Project Hazard Development dated December 15, 2004, the crushed concrete was segregated into 100 cubic yard stockpiles and managed and sampled by Kevin Baumann of [MA]."  Mr. Baumann managed and sampled the crushed concrete stockpiles pursuant to a labeling system that Mr. Baumann and/or [MA] had developed.");

that Arcadis had no role in reviewing, distributing, and/or compiling the crushed concrete sampling results;

- Ex. 155 to Tallmadge Aff. at 364:18-365:5 (Kevin Baumann's March 31, 2011 deposition testimony, stating, "I don't recall ever transmitting to Arcadis," in response to question, "You did not provide the crushed concrete pile sample results to Arcadis; did you?"));

and that Arcadis had no role in staging or stockpiling the concrete;

- Ex. 154 to Tallmadge Aff. at 201:13-19 (Kevin Baumann's March 24, 2011 deposition testimony, stating, "[t]here was a meeting with Golder, [MA] and Ford prior to combining piles of how we were going to combine piles," in response to question, "[d]o you know who it was that decided that as set forth in note 1 certain piles should be combined into a stockpile?");

- Ex. 169 to Tallmadge Aff. at 30:21-31:3 (Arcadis Project Manager Andrew Lewis' January 10, 2007 deposition testimony, stating, "From my recollection of discussions with [Arcadis'] John [Messinger], Arcadis . . . understood that their role was to assist

Ford with the ISRA closure, and Arcadis did not weigh in . . . on disposal issues. . . . . My understanding is they thought that wasn't their role.").

However, the Court also finds that Edgewood satisfies its opposing burden by pointing to evidence that shows: that Arcadis did have a role in sampling concrete and advising the assessment of alternatives available in the absence of specific NJDEP regulations or guidance on concrete reuse;

- Ex. 167 to Tallmadge Aff. at 34:16-36:22 (demonstrating that, at the December 8, 2004 meeting, Arcadis' Gabriel Horn was present and "[t]hat it would seem—you know, I had brought up the sampling requirements for characterizing soil, yes.");

- Ex. A to Declaration of Margaret Raymond-Flood in Opposition to Arcadis' Motion for Summary Judgment, "Raymond-Flood Decl.," at 118:4-15 (November 3, 2010 Deposition of Arcadis' Gabriel Horn: "Q: Are you aware of any instances in which Arcadis assisted Ford Land and Golder in addressing non-ISRA-related issues? / A: Yes. / Q" And what instances is that? / A: With the conversation about the sampling of the crushed concrete that we discussed earlier. / Q: Okay. And how is that a non-ISRA-related issue? / A: Because crushed concrete—the crushed concrete from the building was not ISRA-related.");

that Arcadis was involved in inspecting stockpiled concrete scheduled for crushing;

- Ex. 31 to Gaede Cert. (October 28, 2004 memo from Arcadis' Gabriel Horn to Ford Land's Mike Powell: "ARCADIS has inspected the stockpiles of the concrete scheduled for crushing and use as backfill pending approval of the variance request from the NJDEP. The bulk of the concrete is being stockpiled in windows running the length of the Area 23. There is a separate stockpile on the edge of the former truck marshaling area that seems to be a working stockpile from various areas around the site. . . . If the 'bulk' concrete stockpile is indeed a working stockpile then the continued segregation and separation is expected and advised for compliance with the wording put forth in the variance request by Alberici, Inc."));

- Ex. A to Certification of John P. Lacey in Support of Golder's Opp. Br., "Lacey Cert.," at 133:8-15 ("Q: Do you recall if Arcadis was ever asked . . . to inspect concrete stockpiles? / A: Yes. / Q: What do you recall about that? / A: I recall observing one pile to see whether or not it would be a candidate for reuse."); 140:17-141:12;

that Arcadis was involved in analyzing samples and reporting the results;

- Ex. F to Raymond-Flood Decl. (Golder's Chris Hemingway's August 3, 2004 email to Ford's Michael Powell and others, copying Arcadis' John Messinger, stating, "Based on my discussion with John Messinger today, systems for project communication have been

re-confirmed as follows: 1)  - With respect to environmental investigation excavations, ARCADIS will provide to Mike Powell, in the form of a signed, written submittal: A) authorization to backfill these excavations based on ARCADIS'[] interpretation of preliminary analytical results from post-excavation samples (i.e. is further investigative work required or not). B) authorization (based on their sampling results and NJDEP requirements) as to whether or not the stockpiles from these investigations can be re-used on-site or if they must be shipped off-site for proper disposal. 2) - With respect to preliminary analytical data, ARCADIS will supply site personnel with the preliminary data, in the form of written and electronic copies as it is received from the laboratory such that these data can be easily worked with and summarized by site personnel as needed.");

that Arcadis was involved in changing Golder's sampling method;

- Ex. 34 to Gaede Cert. at 354:22-355:6 (March 31, 2011 deposition testimony of Alberici Project Manager Kevin Baumann, stating, "I changed the method of sampling from composite sample of the pile to a grab sample based on information [Golder's] Chris Hemingway and I received from Gabriel Horn of Arcadis"));

that Arcadis, along with Golder, had a supervisory role in deciding what levels of contaminated concrete would be used as backfill, the corresponding sampling methodology, and how the samples and piles would be labeled;

- Ex. 47 to Gaede Cert. ¶ 3, Declaration of Kevin Baumann Made in Support of MIG/Alberici's Motion for Leave to File Fourth-Party Complaint, "Baumann Decl.," (addressing "(a) what level of contaminated concrete could/would be used as backfill on the Ford Plant, (b) how to sample the crushed concrete for the existence and levels of PCBs, and (c) how and when to label and consolidate the piles of crushed concrete");

- Exs. 100-101 to Tallmadge Aff., Arcadis' John Messinger's January 27, 2005 email to Golder's Andy Lewis and others proposing changes to a draft letter to the NJDEP requesting a modification to the November 2004 variance approval, adjusting language including, "with PCB detections greater than the unrestricted use standard";

Despite Arcadis' citations to evidence that it did not have supervisory authority or control over aspects of the off-site decommissioning process, Edgewood has countered much of the evidence with its own evidence.  Notably, to carry its burden of raising genuine disputes of material fact, Edgewood "'need not match, item for item, each piece of evidence proffered by the movant,' but simply must exceed the 'mere scintilla' standard." *Prudential Ins. Co. of Am. v.*

*U.S. Gypsum Co.*, 146 F. Supp. 2d 643, 649 (D.N.J. 2001) (quoting *Petruzzi's IGA v. Darling-Del.*, 998 F.2d 1224, 1230 (3rd Cir. 1993)).  Here, Edgewood has exceeded the mere scintilla standard by pointing to evidence showing that, if viewed in the light most favorable to Edgewood, Arcadis was in a supervisory role for crushing, stockpiling, sampling, marking, reviewing, distributing, and compiling concrete.

### 5.       Off-Site Disposition and Zero Dollar Sales Agreements

The Court finds a genuine issue of fact as to whether and how Arcadis was involved in the off-site disposition of crushed concrete.  Arcadis argues, that it "was not involved in the off-site disposition of crushed concrete that could not be used on-site pursuant to the NJDEP's variance."  (Arcadis Moving SMF ¶ 128).   In opposition, Edgewood argues, "Arcadis was involved in discussions, meetings, and decision-making related to the off-site disposition of concrete."  (Edgewood Opp. SMF ¶ 128).

The Court finds that Arcadis meets its moving burden of demonstrating that Arcadis was not involved, by pointing, *e.g.*, to the following aspects of the summary judgment record:

- A January 2005 email chain among Chris Hemingway, Michael Flanagan, and others—all from Golder—demonstrating that Golder was looking for an off-site recipient (Ex. 103 to Tallmadge Aff. ("The contractor is letting Ford down in not trying to find a potential place to dispose of this crushed concrete . . . . As such, the Ford Project Manager asked for me to see if there were any Superfund Sites we were working on or landfill connections we may have where this material could be used—because the contractor failed to obtain a Class B recycler permit, they cannot sell the stuff anyway—he simply wants to truck it somewhere for free and not pay to dispose of it as landfill fill"));

- Golder's response # 15 to Edgewood's first set of interrogatories, (Ex. 29 to Tallmadge Aff. ("To the best of Golder's understanding, Ford's decision to allow contractors, including Edgewood, to take crushed concrete from the Ford Edison Site arose out of Ford's discussions with [MA]. . . ."));

- June 27, 2006 deposition testimony of Alberici Project Manager William Robb, (Ex. 179 to Tallmadge Aff. at 27:9-17 ("[Q:] In terms of how the piles of crushed concrete were to be handled whether material was to be sent off-site, whether it was to be handled as

backfill on-site, whether it was to be handled in some other way, who made the final decision on that, was it your company and you or someone in your company, was it one of the subs or was it someone from Ford? / [A:] It was someone at Ford.")).

- June 10, 2010 deposition testimony of Mr. Messinger, (Ex 173 to Tallmadge Aff. 77:20-78:13 ("Q: What about the possibility of having more concrete than could be used on-site and needing to send that concrete somewhere else; did you provide any advice with respects to that? . . . . / A: No."));

- November 3, 2010 deposition testimony of Arcadis' Gabriel Horn, (Ex. 167 to Tallmadge Aff. at 107:2-10 ("Q: Do you recall ever having any discussions with [Arcadis' Senior Project Manager John] Messinger related to crushed concrete from on-site intended for sale and off-site reuse? / A: No, I do not. / Do you recall having discussions with anyone on the Ford Edison site related to that particular topic? / A: No, I do not."));

The Court also finds that Edgewood meets its opposing burden of demonstrating that Arcadis was involved in the off-site disposition of concrete by pointing, *e.g.*, to the following aspects of the summary judgment record:

- Arcadis' Thomas Connors' July 20, 2004 email to Ford Land Project Manager Eric Pearson that, "[i]f there is a question about the concrete being clean then it should be sampled or disposed off-site," (Ex. 49 to Gaede Cert.);

- Ford Land's Eric Pearson's August 31, 2004 email to Arcadis' John Messinger and others regarding off-site distribution, (Ex. 64 to Gaede Cert. ("By copy of this note, Golder and Arcadis should verify that MIG can send any excess 'crushed' material to Clayton. I imagine that it should not be a problem, since I understand that Clayton is a permitted recycler"));

- Golder's Mike Flanagan's field notes dated January 13, 2005, noting that EQ located a prospective off-site recipient of concrete, (Ex. 41 to Gaede Cert. ("11:30—discussion about the reuse [sic] concrete piles and where the material can be disposed of. EQ indicates they have a prospective buyer. All at the 11:00 meeting agree that piles below residential limit can go to the prospective buyer, so long as there is no selling involved"));

- Arcadis' Bill Wittek's March 23, 2005 email to Arcadis' John Messinger regarding concrete use based on sampling results, including a category for "re-use," (Ex. 57 to Gaede Cert. ("[I]f it doesn't pass—must be disposed of properly. Note: in today's teleconference call, we discussed four (4) classifications: On-site: no detections, Re-use: detected but below residential[,] Restricted: detected between residential and commercial levels[,] No use: if above restricted use limits"));

- Arcadis' Bill Wittek's participation in an April 12, 2005 conference call regarding off-site distribution, (Ex. 61 to Gaede Cert. ("Next steps to obtain approval to use Clean Earth Catelis as a beneficial reuse site to receive asphalt and related materials from Edison site"));

- Bill Wittek's email to John Messinger copying Gabriel Horn indicating Wittek's attendance at an April 20, 2005 meeting in which Edgewood was discussed as a potential recipient for concrete shipped off-site, (Ex. 68 at 1 to Gaede Cert. (noting under the heading "Concrete," that "Zero Sales agreement fell through.  Lining up another vendor—*Edgewood has a property that needs fill*.  Powell and Walton will work out,") (emphasis added));

- Ford's Todd Walton's May 24, 2005 email to Ford Land contractor Michael Powell discussing the separation into on- and off-site piles, (Ex 36 to Gaede Cert. ("I talked to [Arcadis'] John Messinger.  He agreed that testing the DIRT for PCBs was adequate. *100 CY piles and then above unrestricted goes offsite* and below unrestricted stays") (emphasis added));

- Arcadis' John Messinger's knowledge that concrete would be provided to a recipient, (Ex. 173 to Tallmadge Aff. at 166:3-22 (John Messinger's June 10, 2010 deposition testimony: "Q: At some point did you learn that some of the concrete was not going to a landfill and it was being given away to developers? . . . . / A: [Arcadis'] Gabe [Horn] had mentioned to me that, you know, Ford had found somebody to take the material."));

- Arcadis' Gabriel Horn's November 3, 2010 deposition testimony regarding daily site meetings that Ford Land's Mike Powell was upset based on the detection of PCBs, that "[i]nstead of being used on-site, [contaminated concrete] would have to be disposed of" that Mr. Horn "kn[e]w [contaminated concrete] was being disposed of," but that Mr. Horn did not recall "discussions during the site meetings about how to dispose of the concrete" and that he "was not present for all of those discussions," (Ex. 43 to Gaede Cert. at 40:10-41:25);

The Court also finds that Edgewood has satisfied its burden in demonstrating a genuine dispute of material fact as to whether Arcadis was involved with the zero dollar sales agreements between Ford and recipients who took concrete off-site without payment.[2]

- Golder's Michael Flanagan's June 18, 2010 deposition testimony discussing his November 29, 2004 meeting notes, stating that Arcadis' Gabriel Horn was present at the November 29 meeting, and that Mr. Flanagan noted, "*Writing zero dollar sales*

---

[2] Notably, Arcadis concedes that "[t]here has been testimony that Arcadis may have seen one of the Edgewood zero dollar sales agreements," but that the party in question was Arcadis' Gabriel Horn who "didn't know anything about it and looked at it.  And it—you know, it was just a document to me."  (Arcadis Moving SMF ¶ 135 (citing Ex. 167 to Tallmadge Aff.)).

*agreement, then not Ford's problem*," (Ex. 59 to Gaede Cert. at 222:22-23, 223:3-4, 225:24-25) (emphasis added);

- Arcadis' Gabriel Horn's authority to meet with third parties interested in taking crushed concrete from the Edison Site, (Ex. 74 to Gaede Cert. at 349:16-352:5);

- Horn's comment to Arcadis' John Messinger that Ford had found someone to take concrete that was not being used on site or being sent to a landfill, (Ex. 73 to Gaede Cert. at 166:3-16);

- Undated deposition testimony of Ford Land's Michael Powell, stating that when prospective concrete recipients came to the Edison Site they would speak with Michael Powell and whomever was "reviewing" samples of concrete from "either Golder & Associates, or ARCADIS," and that the receiving party would state "what kind of volume [the recipient wanted], where the material would be going," that the recipient "would answer those questions . . . [and] would leave with the sampling criteria, along with a blank copy of the zero sales agreement," and that the recipient would be "*asked if they were a development sort of company*," (Ex. 44 to Gaede Cert. at 349:14-353:16) (emphasis added);

- Golder's Michael Flanagan's handwritten daily sight meeting notes for January 13, 2005, including an 11:00AM entry that Arcadis' John Messinger was present, an 11:30AM entry that there was a "discussion about the re-use [of] concrete piles and where the material can be disposed of.  EQ indicates they have a prospective buyer.  All at the . . . meeting agree that piles below the residential limit can go to the prospective buyer so long as there is no selling involved in the product," and a 12:10PM entry that "Mike Powell [is] producing a zero dollar sales agreement for the reuse [of] concrete with details below the residential levels," (Ex. 41 to Gaede Cert.);

- Ford's entry into zero dollar sales agreements with North Creek (January 13, 2005) and North East (January 25, 2005), (Arcadis' Moving SMF ¶ 129 (citing Ex. 107 to Tallmadge Aff.)).

In its reply statement of facts, Arcadis seeks to characterize and explain each piece of evidence that Edgewood uses to support assertions of genuine disputes of fact.  (*See*, *e.g.*, Arcadis' Reply SMF ¶¶ 119-128, 145).  Weighing, balancing, and characterizing the evidence in this manner strengthens Edgewood's argument that the disputes are genuine, and that, viewed in the light most favorable to Edgewood, the evidence demonstrates that Arcadis was involved in the off-site disposition of contaminated concrete and the zero dollar sales agreements.

The Court now addresses whether the genuine disputes of fact are material to the claims on which Arcadis moves for summary judgment.[3]

**B.        Count I: CERCLA Cost Recovery**

In Count I of its Amended Complaint, ("AC," D.E. 387), Edgewood asserts a claim for cost recovery against Arcadis under CERCLA § 107, 42 U.S.C. § 9601, *et seq*.  Edgewood's CERCLA claim is based on the allegation that Arcadis "arranged for disposal or treatment of hazardous substances, PCB contaminated concrete, at the Seven Properties."  (AC ¶ 390). Pursuant to § 107(a)(3) of CERCLA, "arranger liability" applies to "any person who by contract, agreement, or otherwise arranged for disposal or treatment of . . . hazardous substances . . . at any facility."

The Third Circuit has held:

> [T]he most important factors in determining "arranger liability" are: (1) ownership or possession; and (2) knowledge; or (3) control.  Ownership or possession of the hazardous substance must be demonstrated, but this factor alone will not suffice to establish liability.  A plaintiff must also demonstrate either control over the process that results in a release of hazardous waste or knowledge that such a release will occur during the process.  We note, too, that in conducting this analysis a court should not lose sight of the ultimate purpose of [§] 113, which is to determine whether a defendant was sufficiently responsible for hazardous-waste contamination so that it can fairly be forced to contribute to the costs of cleanup.

*Morton Int'l, Inc. v. A.E. Staley Mfg. Co.*, 343 F.3d 669, 677-78 (3d Cir. 2003).  The Supreme Court has interpreted the intent prong of CERCLA's "arranger" liability provision.  *Burlington N. & Santa Fe Ry. Co. v. United States*, 556 U.S. 599, 611-12 (2009).  "In common parlance, the word 'arrange' implies action directed to a specific purpose," which is to say that "arrange"

---

[3] At the outset of its claim-by-claim analysis, the Court also notes that both Golder and MA argue that the Court should deny Arcadis' summary judgment motion because it is not yet ripe, based on incomplete discovery.  (Golder Opp. Br. at 1; MA Opp. Br. at 10).  The Court does not address this argument because the Court's review of the already-voluminous summary judgment record provides ample evidence upon which to rule for purposes of this motion.

means "to make preparations for: plan[;] . . . to bring about an agreement or understanding concerning." *Id.* at 611 (quoting Merriam-Webster's Collegiate Dictionary 64 (10th ed. 1993)). "Consequently, under the plain language of the statute, an entity may qualify as an arranger under § 9607(a)(3) when it takes intentional steps to dispose of a hazardous substance." *Id.* "[K]nowledge alone is insufficient to prove that an entity 'planned for' the disposal . . . ." *Id.* at 612; *United States v. Gen. Elec. Co.*, 670 F.3d 377, 383, 390 (1st Cir. 2012) (finding, under *Burlington*, "that mere knowledge of future disposal will not trigger arranger liability," but that a "well-documented history of purposeful inaction" demonstrated sufficient intent to render defendant liable for arranging for the disposal of a hazardous substance); *Celanese Corp. v. Martin K. Eby Const. Co., Inc.*, 620 F.3d 529, 533 (5th Cir. 2010) ("[T]he entity must 'take [ ] intentional steps' or 'plan[ ] for' the disposal of the hazardous substance." (citing *Burlington*, 556 U.S. at 612)); *Gov't of the United States V.I. v. Vulcan Materials Co.*, No. 2006-170, 2010 U.S. Dist. LEXIS 66104, at *22 (D.V.I. July 1, 2010) ("The Plaintiffs have not alleged that any of the Defendants sold a product 'with the intention' that at least a portion of [hazardous substance] be disposed of when [the substance] was transferred or equipment was operated.  The Plaintiffs' mere allegations that the Defendants failed to prevent disposal of [the substance] or that they knew or had reason to know that their acts or omissions with regard to their products were going to or were substantially certain to result in releases of contaminants is insufficient to qualify the Defendants as arrangers under *Burlington*.") (citation and quotations omitted); *Litgo N.J., Inc. v. Bob Martin*, No. 06-2891, 2010 WL 2400388, at *23 (D.N.J. June 10, 2010) ("[I]n order to be a responsible party a defendant must have had the intent, as opposed to mere knowledge, that at least a portion of the product be disposed of during the arranged for process.").[4]

---

[4] As Edgewood notes, "[d]istrict courts in this circuit have not specifically applied *Morton* in any cases considered

Arcadis argues that "Edgewood cannot prove ownership of the material since it is undisputed that Arcadis did not own the concrete." (Arcadis Moving Br. at 15 (citing *Edgewood Props., Inc. v. J&L Mgmt. Corp.*, No. 08-774 (consolidated with 06-1278), at *9 (D.N.J. Jan. 27, 2009), ("[I]t is undisputed that Arcadis did not own the concrete material. The question is whether Edgewood has sufficiently alleged that Arcadis possessed the material."))). Additionally, Arcadis argues that Edgewood cannot make the alternative showing that Arcadis had "dominion or control over a thing, either directly or through another person or persons," because "the undisputed facts of this case clearly indicate that Arcadis did not have the 'power and intention' to 'exercise dominion or control' over the concrete." (*Id.* (citing *United States v. Cartwright*, 359 F.3d 281, 290 n.6 (3d Cir. 2004))). Finally, "Edgewood's CERCLA claim must fail because Arcadis did not have the requisite intent to dispose of hazardous substances, which the United States Supreme Court has held is necessary to impose CERCLA arranger liability." (*Id.* at 16 (citing *Burlington*, 556 U.S. at 611)).

In opposition, Edgewood focuses primarily on the intent prong, arguing, "Arcadis'[] actions not only qualify it as an 'arranger' under the Third Circuit's test, but also constitute 'intentional steps to dispose of hazardous substances' under *Burlington*," based on "Arcadis' extensive communications with Ford about the need for NJDEP variance, development and approval of the sampling and categorization plans, oversight of the concrete operation, and direct involvement with both Ford and Golder regarding off-site distribution of concrete constitute more than enough evidence to establish a genuine issue as to Arcadis'[] intent." (Edgewood's

---

since *Burlington*." (Edgewood Opp. Br. at 43-44). The Court agrees, and therefore focuses on the parties' arguments under the knowledge prong of *Burlington*. Additionally, in the absence of guidance from the Third Circuit as to interpreting *Burlington*'s intent prong, the Court relies on the interpretations from other circuits as well as from other district courts within the Third Circuit.

Opp. Br. at 50 (citing *United States v. Atlas Lederer Co.*, No. 3:91-309, 2009 U.S. Dist. LEXIS 126350, at *22-23 (S.D. Ohio Sept. 1, 2009)).

As to the first prong of arranger liability—ownership and control—the Court finds that there is a genuine dispute of material fact as to whether Arcadis exhibited sufficient constructive possession over the contaminated concrete at the Edison Site.  "Constructive possession exists if an individual knowingly has both the power and the intention at a given time to exercise dominion or control over a thing, either directly or through another person or persons." *Cartwright*, 359 F.3d at 290 n.6 (quotation and citations omitted); *Agere Sys., Inc. v. Advanced Envtl. Tech. Corp.*, No. 02-3830, 2006 WL 3366167, at *4 (E.D. Pa. Nov. 20, 2006) ("In the CERCLA context, as in all other contexts, constructive possession of an item is established once a party exercises dominion or control other than by taking physical possession of it.") (citing *Cartwright*, 359 F.3d at 290).

The Court finds that the following genuinely disputed facts are material to a determination of whether Arcadis knowingly had both the power and intention to exercise dominion and control over contaminated concrete either directly or through others:

- Golder's Chris Hemingway's summary of the December 9, 2004 site meeting explaining that samples would be collected and analyzed under the "100 cubic yard" plan that Arcadis disputably developed; that if "sample results indicate positive detections, the concrete pile that it represents will be disposed off-site," and that "Arcadis and Golder agreed that this was a reasonable, conservative approach and NJDEP will likely not have a problem with this methodology," (Ex. 88 to Tallmadge Aff.);

- Arcadis' disputed supervisory role, along with Golder, as to deciding "(a) what level of contaminated concrete could/would be used as backfill on the Ford Plant, (b) how to sample the crushed concrete for the existence and levels of PCBs, and (c) how and when to label and consolidate the piles of crushed concrete," (Ex. 47 to Gaede Cert. ¶ 3, Baumann Decl.);

- Arcadis' disputed presence and involvement during site inspections of prospective concrete recipients during which recipients asked questions about the sampled

piles and left with a "copy of the zero sales agreement," (Ex. 44 to Gaede Cert. at 349:14-353:16);

- Arcadis' Gabriel Horn's disputed comment to Arcadis' John Messinger that Ford had found someone to take concrete that was not being used on site or being sent to a landfill, (Ex. 73 to Gaede Cert. at 166:3-16);

- Gabriel Horn's disputed authority to meet with third parties interested in taking crushed concrete from the Edison Site, (Ex. 74 to Gaede Cert. at 349:16-352:5).

Viewed in the light most favorable to Edgewood, these facts, in addition to other facts in the Court's extensive analysis above demonstrate that a reasonable jury could find that Arcadis knowingly had the power and intention to exercise dominion over sampled piles of contaminated concrete either directly or through others present in daily meetings and at site visits.

The Court also finds that genuinely disputed facts in the summary judgment record are material to a determination of whether Arcadis demonstrated the requisite intent for arranger liability under *Burlington*.  In that case, under a plain reading of the statute, the Supreme Court held that Shell Oil Company ("Shell") was not liable as an arranger for leaks that occurred as a result of its contracts with common carriers who shipped pesticides to Shell's customers. *Burlington*, 556 U.S. at 613.  The Supreme Court found that "Shell's mere knowledge that spills and leaks continued to occur [wa]s insufficient grounds for concluding that Shell 'arranged for' the disposal of D-D within the meaning of [§] 9607(a)(3)."  *Id.*  The Supreme Court was persuaded that "the evidence d[id] not support an inference that Shell intended such spills to occur," because Shell "took numerous steps to encourage its distributors to *reduce* the likelihood of such spills, providing them with detailed safety manuals, requiring them to maintain adequate storage facilities, and providing discounts for those that took safety precautions."  *Id.* at 612-13. In this case, Edgewood raises genuine disputes of fact as to Arcadis' active and intentional involvement in coordinating with prospective recipients of concrete in spite of Arcadis'

knowledge from daily site meetings that concrete shipped for off-site reuse could contain PCBs. Unlike the defendant in *Burlington*, Arcadis did not take steps to stop the offsite distribution.

In *United States v. General Electric Co.*, the First Circuit, applying *Burlington*, found that General Electric Co. ("GE") had sufficient intent to render it liable under CERCLA for arranging for the disposal of Pyranol, a scrap insulating material, because GE "purposefully entered into [an] arrangement with [the recipient] with the desire to be rid of scrap Pyranol." 670 F.3d at 391. Although "the initial arrangement (informal as it was) may not have, in express terms, *directed* [the recipient] to dispose of GE's scrap Pyranol, GE certainly understood this would be the result of its actions and took the conscious and intentional step of leaving [the recipient] to dispose of the materials." *Id.* Here, similarly, Edgewood raises genuine issues of material fact as to whether Arcadis took intentional steps to entice prospective recipients of contaminated concrete to enter into a zero dollar sales agreement with Ford, knowing that the result of the arrangement would be the off-site disposal of PCB-laden concrete in residential developments. *See Litgo*, 2010 WL 2400388, at *25 (finding that defendants were liable as arrangers under *Burlington* and § 107(a)(3) of CERCLA because, through contracts with hazardous waste disposal transporters, defendants intentionally "arranged for the disposal of the containers of hazardous wastes which ended up at the . . . Warehouse").

Arcadis forcefully argues that the Fifth Circuit's decision in *Celanese Corp. v. Martin K. Eby Construction Co. Inc.*, "took the [*Burlington* intent] analysis a step further, explicitly rejecting plaintiff's argument that a contractor's 'conscious disregard of its duty to investigate is tantamount to intentionally taking steps to dispose of' hazardous substances." (Arcadis Moving Br. at 18 (citing 620 F.3d 529, 532-33); *see also Team Enters., LLC v. W. Inv. Real Estate Trust*, 647 F.3d 901, 909 (9th Cir. 2011) (finding that defendant's "indifferen[ce] to the possibility" that

dry cleaning store operators would dispose of wastewater containing hazardous substances, based on the dry cleaning machine manufacturer's design, was insufficient for a showing of intent under *Burlington*).  In *Celanese* the Fifth Circuit found that defendant—whose employee unknowingly struck a methanol pipeline with a backhoe—was not liable for arranger liability because defendant "did not even know that it ha[d] struck a pipeline; it only knew that it had struck something with a backhoe."  *Celanese*, 620 F.3d at 533; *see also Bonnieview Homeowners Ass'n v. Woodmont Builders, L.L.C.*, 655 F. Supp. 2d 473, 492 (D.N.J. 2009) (finding insufficient intent under *Burlington* where defendant "was unaware of the contamination in the soils at the time it developed the Residential Lots").  Defendant's lack of knowledge in *Celanese* is readily distinguishable from the instant case in which Edgewood has raised genuine disputes of material fact as to Arcadis' knowledge that Ford was pursuing recipients of concrete to enter into zero dollar sales agreements, in addition to genuine disputes of fact as to Arcadis' involvement in arranging those contracts with visitors who viewed sample piles at the Edison Site.

Accordingly, in the light most favorable to Edgewood, and in connection with the case law interpreting *Burlington*, the Court finds that genuine issues of material fact exist precluding summary judgment on Edgewood's CERCLA claim under its arranger liability theory.

## C.    Count VII: NJ Spill Act

The NJ Spill Act provides that "any person who has discharged a hazardous substance, or is in any way responsible for any hazardous substance, shall be strictly liable, jointly and severally, without regard to fault, for all cleanup and removal costs no matter by whom incurred."   N.J.S.A. § 58:10-23.11g(c)1.   "The Spill Act is the New Jersey environmental protection act that resembles CERCLA in its purpose, although it sets forth a distinct strict

liability scheme." *N.J. Tpk. Auth. v. PPG Indus., Inc.*, 197 F.3d 96, 105 (3d Cir. 1999); *see also Morton*, 343 F.3d at 685 ("Because the Spill Act is the New Jersey analog to CERCLA, the standards for liability are the same.") (citation and quotation omitted).  "[A] party 'even remotely responsible for causing contamination will be deemed a responsible party under the Act.'"  *Id.* at 106 (citing *In re Kimber Petroleum Corp.*, 539 A.2d 1181, 1189 (N.J. 1988), and *State Dept. of Envtl. Prot. v. Ventron*, 468 A.2d 150, 165-66 (N.J. 1983)).  Although broad, the NJ Spill Act requires a "connection to the site on which that substance was deposited."  *Id.* at 106.  Incorporating its CERCLA analysis above, the Court finds that viewing the facts in the light most favorable to Edgewood demonstrates that Arcadis had a connection to the off-site recipients of contaminated concrete, and accordingly, the Court denies summary judgment on Edgewood's NJ Spill Act claim against Arcadis.

### D. Count III: Negligence

#### 1. Negligence

The Court finds that Arcadis owed a duty of care to Edgewood.[5]  In its AC, Edgewood alleges that, in "decommissioning the Edison Plant with knowledge that Ford and its agents would be transferring recycled concrete to third parties," Arcadis owed a duty of care to Edgewood "to comply with all federal, state, and local laws relating to the transfer and use of recycled concrete and to otherwise manage the crushing, handling, testing, stockpiling, transfer, and disposal of the concrete in a reasonable and safe manner."  (AC ¶ 411).  The briefs of both parties focus on whether Arcadis had a legal duty to Edgewood.  For example, in its motion for summary judgment, Arcadis argues that it "did not owe Edgewood a duty of care with respect to

---

[5] "In order to sustain a common law cause of action in negligence, a plaintiff must prove four core elements: (1) [a] duty of care, (2) [a] breach of [that] duty, (3) proximate cause, and (4) actual damages [.]"  *Polzo v. Cnty. of Essex*, 960 A.2d 375, 384 (N.J. 2008) (citation and quotations omitted).  In its motion for summary judgment, Arcadis focuses primarily on the duty of care element and requests that the Court decide this element as a matter of law.  Accordingly, the Court focuses its analysis on this element.

the transfer and use of recycled concrete and to otherwise manage the crushing, handling, testing, stockpiling, transfer, and disposal of concrete," because Arcadis' "involvement at the Edison Site was limited to the performance of environmental consulting services with respect to ISRA compliance," and "[t]he building demolition and handling of concrete were decommissioning/demolition activities that were being performed by others." (Arcadis Moving Br. at 21-22). At the core of its argument, as with its arguments in support of dismissing its other claims, is Arcadis' contention that it "was not involved with and was not responsible for the handling, testing, and/or off-site distribution of the concrete generated from demolition." (*Id.*).

In opposition, Edgewood argues that Arcadis is not entitled to summary judgment on the negligence claim and that Arcadis owed a duty to Edgewood, who advances three theories of this duty: (1) it was foreseeable that negligent sampling and handling would result in the distribution of contaminated concrete because Arcadis knew that Ford intended to distribute crushed concrete to third parties (such as Edgewood), (Edgewood Opp. Br. at 30 (citing *Carvalho v. Toll Bros. & Developers*, 675 A.2d 209, 212 (N.J. 1996))); (2) it was foreseeable that the illegal distribution of concrete would result in harm because Arcadis knew that Ford did not possess requisite NJDEP approvals to distribute concrete to third parties; and (3) under the Good Samaritan doctrine, Arcadis is liable for explicitly "undert[aking] . . . to render services to [Ford] which [it] should [have] recognize[d] as necessary for the protection of a third person or his things." (Edgewood Opp. Br. at 31 (citing *Sun Pipeline Co. v. Conti Constr. Co.*, No. 86-2011, 1989 WL 58679, at *3 (D.N.J. June 1, 1989)). Edgewood then argues that Arcadis breached its duty "by allowing contaminated concrete to be distributed to third parties and proposing an inadequate method for

sampling concrete." (Edgewood Opp. Br. at 31 (citing *Consol. Rail Corp. v. Gottshall*, 512 U.S. 532, 566 (1994)).[6]

"In New Jersey, the existence of a duty is a 'matter of law properly decided by the court.'" *Grand St. Artists v. Gen. Elec. Co.*, 19 F. Supp. 2d 242, 248 (D.N.J. 1998) (citing *Carvalho*, 675 A.2d at 212). The question of whether a duty exists is a question of fairness and policy, implicating many factors, including "the foreseeability of injury to others from defendant's conduct," which is the "most important." *Id.* But this "crucial" factor of foreseeability alone does not establish a duty. *Id.* "Once the foreseeability of an injured party is established . . . considerations of fairness and policy govern whether the imposition of a duty is warranted." *Id.* (citation and quotations omitted). Fairness and public policy are evaluated by "identify[ing], weigh[ing] and balance[ing] several factors," including "the relationship of the parties, the nature of the attendant risk, the opportunity and ability to exercise care, and the public interest in the proposed solution." *Id.*

As to foreseeability, the Court finds that it was foreseeable to Arcadis that Edgewood, as a prospective recipient, would have been harmed by contaminated concrete. For example, a reasonable jury could find that Arcadis knew that other contractors were relying on Arcadis' determination that the sampling methodology separating concrete to be used on- and off-site was "reasonable [and] conservative," (*e.g.*, Ex. 88 to Tallmadge Aff.; Ex. 34 to Gaede Cert. at 354:22-355:6); that Arcadis knew about Ford's plan to distribute contaminated concrete to third parties, (*e.g.*, Exs. 41-44 to Gaede Cert.); and Arcadis' knowledge that Ford was considering

---

[6] In its opposition brief, MA argues that Edgewood's negligence claim should survive in light of the law of the case established by Judge Ackerman in his December 17, 2007 Second Amended Opinion & Order, denying dismissal of Edgewood's negligence claim against Alberici (and others) because Alberici owed Edgewood a legal duty despite a lack of contractual privity, and rejecting Alberici's arguments under the economic loss doctrine. (MA Opp. Br. at 8-9 (citing Ex. J to Raymond-Flood Decl., Order and Opinion of the Hon. Harold A. Ackerman dated December 18, 2007)). Because the procedural posture (motion to dismiss, not summary judgment) and the parties (Alberici and others, not Arcadis) were different in Judge Ackerman's Opinion, the Court performs its analysis anew, leading to findings consistent with the law of the case.

Edgewood as a potential recipient of contaminated concrete through a zero dollar sales agreement once another recipient fell through, (Ex. 68 at 1 to Gaede Cert. ¶ 71).

As to the relationship of the parties, the record contains evidence that the objective purpose of Arcadis' consulting services extended to third parties such as Edgewood. Where consultants are concerned, "the Court must focus on the 'objective purpose' of the consultant's services to determine if the duty should extend to third parties." *Bonnieview Homeowners Ass'n, LLC v. Woodmont Builders*, LLC, No. 03-4317, 2006 WL 1982882, at *6 (D.N.J. July 13, 2006) (citation omitted). "It is well settled that although an environmental consultant must conform to a standard of care possessed by members of the profession in good standing, [the consultant] only owes a duty to those persons who fall normally and generally within a zone of risk created by the tortious conduct and is therefore foreseeable." *Id.* (citing *Sykes v. Propane Power Corp.*, 541 A.2d 271 (N.J. Sup. Ct. App. Div. 1988)). Finding a legal duty "does not 'require a specific forecasting of particularly identifiable victims . . . .'" *Id.* (quoting *Sykes*, 541 A.2d 274). Whether "a plaintiff may be found within a range of harm emanating from [the] tortfeasor's activities is more significant than whether the parties stand in a direct contractual relationship." *Id.* (citation and quotations omitted). Accordingly, "[l]ack of privity is no bar to recovery." *Id.*

Edgewood was within the range of harm emanating from Arcadis' activities because the summary judgment record contains evidence that the objective purpose of Arcadis' services moved past ISRA compliance into areas of crushing, stockpiling, sampling, marking, reviewing, distributing, and compiling concrete for purposes of enabling off-site disposition through zero dollar sales agreements, as discussed at length in Part IV.A of this Opinion. As a recipient of contaminated concrete—indeed, a *particular* recipient of whose needs Arcadis disputably was aware—Edgewood was in the range of harm emanating from Arcadis' activities. Because

Arcadis helped develop the mechanism that divided concrete for on- and off-site use—*e.g.*, by playing a role in setting forth the sampling methodology in the variance request, (Ex. 44 to Tallmadge Aff.), later modifying it, (Ex. 167 to Tallmadge Aff. at 36:3-12; Ex. 100-101 to Tallmadge Aff. (demonstrating Arcadis' John Messinger's proposed changes to a draft letter requesting a modification to the November 2004 variance approval, adjusting language including, "with PCB detections greater than the unrestricted use standard")), and deciding how to label the piles, (Ex. 47 to Gaede Cert. ¶ 3)—the nature and potential for the risk of harm extended to concrete kept on-site as well as to concrete shipped off-site to parties like Edgewood.

In *Grand Street Artists v. General Electric Co.*, the court rejected an argument similar to the one Arcadis advances in this case. *See* 19 F. Supp. 2d at 247-48. In *Grand Street Artists*, an environmental consultant argued that it merely provided assistance with the cessation of mercury-related manufacturing operations under ECRA (the statutory predecessor to ISRA), and therefore, did not owe a duty to prospective third-party purchasers of the site. *Id.* To the contrary, the court held that the defendant consultant who assisted the site owner with ECRA compliance owed a duty to third party purchasers like the plaintiff who relied on the owner's ECRA submissions in making a purchasing decision. *Id.* at 248. The court's finding of foreseeability was based, in part, on the fact that there was—as in the present case—"some indication that [the consultant] knew that the premises would be sold once the ECRA process was completed." *Id.* at 250. In *Grand Street Artists*, the court found that "[i]t was not necessary for [consultant] Jenny to know of an actual sale or that the premises would be converted for residential use." It was enough that "it was foreseeable that [site owner] Quality would eventually sell the premises and that Jenny's services would be used for that purpose." *Id.* The instant case presents an even stronger finding on foreseeability than in *Grand Street Artists*—

where the Court found a duty despite the fact that "there [wa]s nothing in the record which indicates that Quality informed Jenny that it intended on selling the premises." *Id.* Here, a genuine dispute of material fact in the summary judgment record exists as to whether Arcadis knew that Ford would be sending contaminated concrete to off-site recipients; indeed, there is evidence that Ford was considering entering a zero dollar sales agreement with Edgewood specifically.

In *Sun Pipe Line Co. v. Conti Construction*, the court denied summary judgment to a party (PRC Engineering, "PRC") hired by the New Jersey Department of Building and Construction to perform architectural and engineering oversight related to dredging work that caused damage to a petroleum pipeline installed by plaintiff Sun Pipe Line Company, ("Sun Pipe"). No. 86-2011, 1989 WL 58679, at *1, *6 (D.N.J. June 1, 1989). The court found that PRC owed a duty to Sun Pipe with whom PRC had not entered any agreement, and despite the fact that PRC "merely monitored [the dredging company's] work." *Id.* at *2. Restatement (Second) of Torts § 324A guided the court's foreseeability analysis,[7] and in finding that PRC owed a duty to Sun Pipe with whom PRC had no contract, the court reasoned, "it is clear that if a

_____

[7] Other courts in the District of New Jersey also have looked to Restatement (Second) of Torts § 324A for guidance on foreseeability analysis. *See, e.g., Diaz v. Johnson Matthey, Inc.*, 869 F. Supp. 1155, 1167 (D.N.J. 1994). The section provides:

> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if
>
> (a) his failure to exercise reasonable care increases the risk of such harm, or
>
> (b) he has undertaken to perform a duty owed by the other to the third person, or
>
> (c) the harm is suffered because of reliance of the other or the third person upon the undertaking.

Restatement (Second) of Torts § 324A. "The scope of this rule, known as the 'good samaritan doctrine,' is measured by the scope of the defendant's undertaking. Even if a particular injury is foreseeable a defendant must still have a specific duty to prevent the injury . . . ." *Sheridan v. NGK Metals Corp.*, 609 F.3d 239, 263 (3d Cir. 2010).

contractor does something affirmative in a negligent manner which causes damage to a third party, he is liable for the resulting damage." *Id.* at *3. The court found that PRC's contract with the state entity to "make frequent visits" and perform "on-site inspections" created a duty to third party Sun Pipe, especially because it was "sharply disputed whether the haul road was within the scope of PRC's contract" with the construction contractor defendant. *See id.* at *1, *6.

Similarly, in the present case, the summary judgment record contains evidence that Arcadis took affirmative steps toward crushing, stockpiling, sampling, marking, reviewing, distributing, and compiling concrete for purposes of off-site disposition through zero dollar sales agreements without reasonable care, increasing the risk of harm that companies like Edgewood would receive contaminated concrete. *See* Restatement (Second) of Torts § 324A(a), (b). Arcadis had an expertise in environmental compliance issues, and although it was originally tasked with ISRA compliance alone, Arcadis moved into areas outside the scope of ISRA compliance. For example, during decommissioning "the problem w/Gab[riel Horn]" was that he was engaged in "too much directing, sharing advice with Golder." (Ex. 36 to Tallmadge Aff. (June 14, 2004 site meeting notes)). Arcadis' movement toward non-ISRA-related issues led to a September 14, 2004 clarification of the scope of Arcadis' work, (Ex. B to Raymond-Flood Decl. at 45:7-46:22), which stated, "ARCADIS will continue to be present in the field during decommissioning to assist Ford Land and/or Golder with the decommissioning work on an as-needed/as-required basis," and that "ARCADIS will assist Ford Land and Golder in addressing non-ISRA related [sic] such issues where appropriate and requested."[8]  (Ex. 62 to Tallmadge Aff.). Most importantly, the summary judgment record contains evidence that Arcadis actually participated in those non-ISRA issues, (*see supra* Part IV.A.1-5), increasing the risk of harm to

---

[8] Notably, other portions of the document limit Arcadis' primary role to ISRA compliance, further underscoring the factual disputes in the SJ record.

potential recipients of contaminated concrete, taking on the specific duty to ensure that the off-site distribution of concrete conformed with the applicable standards.

As to the opportunity and ability to exercise care, Arcadis' attendance at daily site meetings weighs in favor of finding a duty.  A reasonable jury could find that Arcadis representatives attended, at least, the daily meetings on December 8, 2004—during which sampling methodology, results, and off-site disposal were discussed, (Ex. 88 to Tallmadge Aff.)—and on January 13, 2005—in which disposal options and prospective concrete recipients were discussed, (Ex. 41 to Gaede Cert.).  At the meetings, and especially at meetings during which the participants discussed off-site disposal and reuse options, Arcadis had the opportunity (based on its presence) and the ability (based on its knowledge of and involvement with sampling and stockpiling) to exercise care, which extended to contaminated concrete off-site.

As to the public interest in the proposed solution, Arcadis argues that Ford hired a consultant other than Arcadis to oversee decommissioning, and therefore "plac[ing] a duty on Arcadis to ensure that all activities were conducted in accordance with all applicable laws would expose environmental consultants to a massive new set of liabilities, against which they could not possibly protect themselves."  (Arcadis Moving Br. at 25).  The Court agrees that placing a duty on an environmental consultant to ensure "all activities were conducted in accordance with all applicable laws" would be overly burdensome where the consultant was hired for a limited and particular purpose and participated only in the limited activities associated with that purpose. However, in this case, the record contains genuine disputes of fact demonstrating that Arcadis was hired for a limited and particular purpose but that Arcadis undertook responsibilities outside that scope, increasing the risk of harm to unsuspecting recipients of contaminated concrete to whom Arcadis owed a duty of care. To be clear, the scope of this duty extends only so far as

Arcadis' non-ISRA undertakings are properly demonstrated at trial. *See Grand St. Artists*, 19 F. Supp. 2d at 252 ("Additionally, there remains some question of fact as to what exactly [environmental consultant] Jenny was required to do to satisfy the contract and professional standards, but the court need not resolve that dispute at this time.").

Accordingly, the Court's review of the extensive summary judgment record in light of the relevant factors leads the Court to find that Arcadis owed a duty of care to Edgewood. Of course, Edgewood will also have to demonstrate that Arcadis breached its duty of care in overseeing concrete processing operations and unlawfully distributed contaminated concrete from the Edison site, both significant hurdles.

### 2.       Economic Loss Doctrine

Arcadis also argues that the economic loss doctrine bars Edgewood from recovering in negligence because Edgewood's loss is purely economic, that Edgewood has not demonstrated any actual physical harm, that Edgewood's true recovery is in contract, and that tort and contract recovery together would amount to the sort of double recovery prohibited by the economic loss doctrine. (Moving Br. at 26-28). In opposition, Edgewood argues that its contract claims are only against Ford and EQ—not Arcadis—and that the economic loss doctrine applies only where a plaintiff seeks tort and contract recovery from the same party. (Edgewood Opp. Br. at 39). Edgewood argues that it does not allege the failure to receive contractual benefits from Arcadis; instead, Edgewood alleges that "Arcadis breached its duty of care in overseeing concrete processing operations and unlawfully distributing contaminated concrete from the Edison Site." (*Id.* at 40). Finally, Edgewood argues that it has demonstrated proof of physical harm because it has presented evidence of environmental contamination resulting in property damage. (*Id.* at 41).

"The economic loss doctrine 'prohibits plaintiffs from recovering in tort economic losses to which their entitlement flows only from a contract.'"  *Werwinski v. Ford Motor Co.*, 286 F.3d 661, 671 (3d Cir. 2002) (citing *Duquesne Light Co. v. Westinghouse Elec. Corp.*, 66 F.3d 604, 618 (3d Cir. 1995)).  "Under New Jersey law, a tort remedy does not arise from a contractual relationship unless the breaching party owes an independent duty imposed by law."  *Saltiel v. GSI Consultants, Inc.*, 788 A.2d 268, 280 (2002) (citing *Int'l Minerals & Min. Corp. v. Citicorp N. Am., Inc.*, 736 F. Supp. 587, 596-97 (D.N.J. 1990), and *New Mea Const. Corp. v. Harper*, 497 A.2d 534, 538 (N.J. Super Ct. App. Div. 1985)).  Additionally, in the absence of "personal injury or consequential property damage arising from a traumatic event," a plaintiff's negligence claim fails under the economic loss doctrine.  *See id.*

Here, Edgewood alleges contract claims against Ford and EQ, but not against Arcadis. (*See* Edgewood Opp. Br. at 40; AC ¶¶ 261-72).  Accordingly it cannot be said that Edgewood's recovery from Arcadis "flows only from a contract."  *Werwinski*, 286 F.3d at 671.  Indeed, under the Court's analysis in Part IV.D.1 above, Edgewood's recovery would flow from the "independent duty" imposed by law that Arcadis owed to Edgewood.  *Saltiel*, 788 A.2d at 280. This finding is consistent with the cases on which Arcadis primarily relies.  *See id.* at 280 (applying economic loss doctrine, and limiting recovery because the court was "unable to discern any duty owed to the plaintiff that is independent of the duties that arose under the contract"); *New Mea*, 497 A.2d at 539 (applying the economic loss doctrine to claims where "the relationship between the parties is governed by a lengthy and comprehensive contractual arrangement"); *see also Capitalplus Equity, LLC v. Prismatic Dev. Corp.*, No. 07-321, 2008 WL 2783339, at *6 (D.N.J. July 16, 2008) ("Plaintiff's fraud, negligent misrepresentation, promissory estoppel and equitable estoppel claims are not barred by the economic loss doctrine

because they do not arise out of the same facts underlying the breach of contract claims."); *Bracco Diagnostics, Inc. v. Bergen Brunswig Drug Co.*, 226 F. Supp. 2d 557, 558, 565 (D.N.J. 2002) (applying economic loss doctrine, and barring plaintiff's common-law fraud claims where plaintiff and defendant entered "Wholesale Distribution Agreements" to sell health care products).

Finally, the Court finds that Edgewood has supported its allegations of physical harm with evidence of alleged environmental contamination resulting from the use of contaminated concrete as backfill. (Arcadis Reply SMF ¶¶ 136-37); *see*, *e.g.*, *Haw. Motorsports Inv., Inc. v. Clayton Grp. Servs., Inc.*, No. 09-00304, 2010 WL 3398553, at *5 (D. Haw. Aug. 27, 2010); *Green Hills (USA), L.L.C. v. Aaron Streit*, Inc., 361 F. Supp. 2d 81, 90-91 (E.D.N.Y. 2005). Accordingly, the Court finds that the economic loss doctrine does not bar Edgewood's negligence claim against Arcadis.

### E.      Count IV: Civil Conspiracy

Edgewood alleges that, beginning in December 2004, Arcadis and the other defendants conspired to commit a fraud on Edgewood by entering into a conspiratorial agreement to induce Edgewood to obtain contaminated concrete. (AC ¶ 415). Edgewood contends that the alleged conspirators "reached an agreement to handle, test and/or distribute contaminated concrete" with overt acts of concealing the extent of the contamination in the concrete and unlawfully distributing contaminated concrete to Edgewood. (*Id.* ¶ 417).

In New Jersey, the elements of civil conspiracy are: "(1) combination of two or more persons; (2) a real agreement or confederation with a common design; (3) the existence of an unlawful purpose to be achieved by unlawful means; and (4) special damages." *Eli Lilly & Co. v. Roussel Corp.*, 23 F. Supp. 2d 460, 496 (D.N.J. 1998); *Banco Popular N. Am. v. Gandi*, 876

A.2d 253, 263 (N.J. 2005).   "The plaintiff need not provide direct evidence of the agreement between the conspirators; it is enough that it could be circumstantially inferred from the facts that the conspirators had reached an understanding."   *Eli Lilly*, 23 F. Supp. 2d at 496.   "[A] plaintiff need not prove that the unlawful agreement was express or that each participant in the conspiracy knew the 'exact limits of the illegal plan or the identity of all participants,' as long as plaintiff alleges that each participant shared in 'the general conspiratorial objective.'"   *Id.* at 496 (citing *Morgan v. Union Cnty. Bd. of Chosen Freeholders*, 633 A.2d 985, 999 (N.J. Super. Ct. App. Div. 1993).   Similarly, "[n]ot every conspirator must commit an overt act in furtherance of the conspiracy, so long as at least one does."   *Morganroth & Morganroth v. Norris, McLaughlin & Marcus, P.C.*, 331 F.3d 406, 415 (3d Cir. 2003).   Importantly, the "[m]ere agreement to do a wrongful act can never alone amount to a tort, whether or not it may be a crime.   Some act that is itself a tort must be committed by one of the parties in pursuance of the agreement."   *Id.* at 414 (citations omitted).   Therefore, the "gist of the claim" is not the unlawful agreement, but the "underlying wrong which, absent the conspiracy, would give a right of action."   *Banco Popular*, 876 A.2d at 263 (citations and quotations omitted).

Arcadis argues that the summary judgment record contains no evidence that the underlying harm existed under Judge Ackerman's definition in his denial of Arcadis' motion to dismiss: that the parties conspired to defraud Edgewood by offering crushed concrete which "was unsuitable for residential use."   (Arcadis Moving Br. at 30 (citing *Edgewood Props., Inc. v. J&L Mgmt. Corp.*, No. 08-774 (consolidated with 06-1278), at *33 (D.N.J. Jan. 27, 2009))).   Additionally, Arcadis argues, "[t]here is no evidence to support Edgewood's claim that Arcadis reached an understanding of a 'general conspiratorial objective' to defraud Edgewood in accepting crushed concrete with levels above the residential standards," or that Arcadis "was

involved in any alleged conspiratorial objective concerning Edgewood and/or off-site distribution of concrete." (Arcadis Moving Br. at 31). Arcadis supports its position by referencing Edgewood's admission that it had no direct communications or dealings with Arcadis and that Arcadis' responsibilities on the Edison Site were limited to on-site ISRA issues, identifying regulatory requirements, preparing a draft request to the NJDEP for approval to use clean concrete on-site, and participation in an on-site discussion regarding sampling methods to determine if the material could be used on-site pursuant to the variance. (*Id.* at 32). As Arcadis argues for purposes of defeating other claims, "[t]he handling of the concrete generated from demolition of the buildings, including testing, segregation, and off-site disposition, was not within Arcadis' scope of work." (*Id.* at 31). As with other claims based on Arcadis' core argument, the Court denies summary judgment based on genuine disputes of material fact.

The Court finds that Edgewood has raised genuine issues of material fact, supporting an agreement or general conspiratorial objective, overt acts by Arcadis and others, and the underlying fraud, as Judge Ackerman articulated it in his decision denying Arcadis' motion to dismiss:

> Edgewood alleges that Arcadis and others (Ford, [MA], and Golder) agreed in December 2004 on a plan to distribute contaminated concrete to outside parties, including Edgewood, as an inexpensive means of disposing of the material. The Enterprise Parties schemed to defraud Edgewood by offering crushed concrete to Edgewood while knowingly misrepresenting its contamination levels. This conspiracy was furthered by several overt acts, such as Ford's entry into the First Contract with Edgewood, the April 27, 2005 memorandum sent from Golder to Edgewood reinforcing the conspiracy's fraudulent conduct, and Edgewood's receipt of concrete in excess of residential zone limits. Some of these overt acts were committed by parties other than Arcadis; others, like Arcadis'[] testing and segregation of contaminated concrete in preparation for Edgewood's removal, were committed by Arcadis. The underlying harm to Edgewood lied in its receipt of concrete unsuitable for residential use. This Court finds that Edgewood pleads this civil conspiracy claim with particularity, identifying the time period, purpose, and division of labor of the conspiracy, as well as the date and place of the misrepresentations, their promulgators, and their content.

- 41 -

*Edgewood Props.*, No. 08-774, at *9. The Court's task at this stage is to examine the record to determine whether support exists for those allegations.

The following facts satisfy Edgewood's burden on summary judgment to provide evidence of the general understanding, agreement, or conspiratorial objective among Arcadis, Ford, MA, Golder, and EQ to sample and distribute contaminated crushed concrete to parties like Edgewood:

- Golder's Michael Flanagan's deposition testimony discussing Arcadis' Gabriel Horn's presence at a November 29, 2004 meeting, during which Mr. Flanagan noted, "Writing zero dollar sales agreement, then not Ford's problem," (Ex. 59 to Gaede Cert. at 222:22-23, 223:3-4, 225:24-25);

- Arcadis' John Messinger's deposition testimony, answering that "Gabe [Horn] had mentioned to me that, you know, Ford had found somebody to take the material," in response to the question, "[a]t some point did you learn that some of the concrete was not going to a landfill and it was being given away to developers?," (Ex. 173 to Tallmadge Aff. at 166:3-22);

- Ford Land's Michael Powell's deposition testimony stating that when prospective concrete recipients came to the Edison Site they would speak with Michael Powell and whomever was "reviewing" samples of concrete from "either Golder & Associates, or ARCADIS," and that the receiving party would state "what kind of volume [the recipient wanted], where the material would be going," that the recipient "would answer those questions . . . [and] would leave with the sampling criteria, along with a blank copy of the zero sales agreement," and that the recipient would be "asked if they were a development sort of company," (Ex. 44 to Gaede Cert. at 349:14-353:16);

- Golder's Mike Flanagan's field notes from the January 13, 2005 meeting, noting, "11:30—discussion about the reuse [sic] concrete piles and where the material can be disposed of. EQ indicates they have a prospective buyer. All at the 11:00 meeting agree that piles below residential limit can go to the prospective buyer, so long as there is no selling involved," (Ex. 41 to Gaede Cert.);

- Arcadis' Bill Wittek's March 23, 2005 email to Arcadis' John Messinger regarding concrete use based on sampling results to be split into four separate classifications, including "On-site: no detections, Re-use: detected but below residential[,] Restricted: detected between residential and commercial levels[,] No use: if above restricted use limits," (Ex. 57 to Gaede Cert.);

- 42 -

- Bill Wittek's email to John Messinger copying Gabriel Horn indicating Wittek's attendance at an April 20, 2005 meeting noting under the heading "Concrete," that "Zero Sales agreement fell through.  Lining up another vendor—Edgewood has a property that needs fill.  Powell and Walton will work out," (Ex. 68 at 1 to Gaede Cert. ¶ 71).

Taken together, these portions of the summary judgment record demonstrate that a reasonable jury could find that Arcadis shared in a general conspiratorial objective to off-load contaminated concrete to parties like Edgewood who were looking to receive NJDEP-compliant concrete. *Kronfeld v. First Jersey Nat. Bank*, 638 F. Supp. 1454, 1469 (D.N.J. 1986) ("[A] conspiracy often is established by inferences from circumstantial evidence.").  These portions of the record also distinguish *Amgro, Inc. v. Lincoln General Insurance Co.*, 361 F. App'x 338, 347 (3d Cir. 2010), on which Arcadis relies.  (Arcadis Moving Br. at 32-33).  In that case, a panel of the Third Circuit found that defendant risk management consultant was an "unwitting party" to the fraudulent scheme based on "extremely limited interactions" with an alleged co-conspirator and "almost no knowledge of the day-to-day dealings" surrounding the alleged conspiracy.  *Id.* at 347.  Accordingly, the court granted summary judgment on plaintiff's conspiracy claim.  In the present case, the record indicates numerous examples of interactions at site meetings that occurred daily, during which off-site disposition was discussed, making it so that a reasonable jury could find that Arcadis was not "unwitting."

The following facts satisfy Edgewood's burden to provide evidence that Arcadis and other parties furthered the conspiracy with overt acts:

- Ford's entry into an agreement with Edgewood in February 2005, (Arcadis Moving SMF ¶ 134; Edgewood Opp. SMF ¶ 134);

- Edgewood's receipt of concrete in excess of residential zone limits, (Ex. 132 to Tallmadge Aff.);

- Arcadis' role in producing the variance request, (*see* the Court's analysis *supra* Part IV.A.1), and the sampling plan, (*supra* Part IV.B.1);

- 43 -

- Arcadis' recommendation to "change the method of sampling from composite sample of the pile to a grab sample," (Ex. 34 to Gaede Cert. at 354:22-355:6);

- Arcadis' supervisory role, along with Golder, as to deciding "(a) what level of contaminated concrete could/would be used as backfill on the Ford Plant, (b) how to sample the crushed concrete for the existence and levels of PCBs, and (c) how and when to label and consolidate the piles of crushed concrete," (Ex. 47 to Gaede Cert. ¶ 3, Baumann Decl.).

Similarly, Edgewood satisfies its summary judgment burden of demonstrating the underlying fraud by offering support for the fact that Edgewood agreed to receive crushed concrete below NJDEP restrictive use standards but received concrete exceeding those standards, (Ex. 91 to Gaede Cert. at EAP17497-98; Ex. 42 to Gaede Cert at 155:24-161:2), and that, for example, disposing of contaminated concrete off-site through zero dollar sales agreements would make it so the concrete was "not Ford's problem." (Ex. 59 to Gaede Cert. at 222:22-23, 223:3, 225:24-25).

Accordingly, the Court denies summary judgment on Edgewood's civil conspiracy claim.

### F.     Count V: NJ RICO

In Count V of its AC, Edgewood asserts a claim against Arcadis for violation of NJ RICO, N.J.S.A. 2C:41-1, *et seq.*  This Court set forth the standard in a previous opinion:

> NJRICO is broader in scope than the federal RICO statute.  *State v. Ball (Ball I)*, 632 A.2d 1222, 1239 (N.J. Super. App. Div. 1993).  The New Jersey courts take a liberal stance in permitting plaintiffs to plead NJRICO violations, rejecting the narrow construction of the federal statute that many circuits, including this one, have adopted.  *Id.* at 1238-40.  In addition, pursuant to N.J.S.A. 2C:41-2c, a plaintiff must prove the following five elements:
>
> "(1) the existence of an enterprise;
>
> (2) that the enterprise engaged in or its activities affected trade or commerce;
>
> (3) that defendant was employed by, or associated with the enterprise;

(4) that he or she participated in the conduct of the affairs of the enterprise; and

(5) that he or she participated through a pattern of racketeering activity."

Since the NJRICO statute is predicated upon its federal cousin, Title IX of the Federal Organized Crime Control Act of 1970, 18 U.S.C.A. §§ 1961-1968, courts should seek guidance from those decisions. *Ball I*, 632 A.2d at 1235-36. Finally, there must be an injury to plaintiffs as a result of the conspiracy. *Shan Indus., LLC v. Tyco Int'l (US), Inc.*, No. 04-1018, 2005 U.S. Dist. LEXIS 37983, at *47 (D.N.J. Sept. 9, 2005); *see also First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763, 769 (2d Cir.), *cert. denied*, 513 U.S. 1079 (1995) (quoting *Standardbred Owners Ass'n v. Roosevelt Raceway Assocs. L.P.*, 985 F.2d 102, 104 (2d Cir. 1993)) ("To show that an injury resulted 'by reason of' the defendant's action, and therefore to have standing under [civil] RICO, the plaintiff must allege 'that the defendant's violations were a proximate cause of the plaintiff's injury, *i.e.*, that there was a direct relationship between the plaintiff's injury and the defendant's injurious conduct."). "This language can, of course, be read to mean that a plaintiff is injured 'by reason of' a RICO violation, and therefore may recover, simply on showing that the defendant violated § 1962, the plaintiff was injured, and the defendant's violation was a 'but for' cause of plaintiff's injury." *Holmes v. Sec. Investor Prot. Corp.*, 503 U.S. 258, 265 (1992).

(D.E. 220 at 21-22). Arcadis challenges elements (1), (3), (4), and (5), and the Court analyzes

the elements in this order.[9]

### 1.      Substantive NJ RICO Claim

As to element (1)—the existence of an enterprise—Edgewood alleges that "Ford, [MA],

Golder, Arcadis and EQ formed an enterprise with the intent of distributing concrete that they

knew was contaminated in violation of environmental regulations." (AC ¶ 423). "New Jersey

RICO enterprise . . . is a group of people, however loosely associated, whose existence provides

the common purpose of committing two or more predicate acts." *Ball I*, 632 A.2d at 1240.

Under this standard, Arcadis argues that it lacked a shared purpose with the other alleged

members of the enterprise because all of the Edison Site consultants had clearly defined roles,

Arcadis' role was clearly limited to ISRA issues, and Arcadis "had no involvement in or

---

[9] The parties do not dispute element (2)—that the enterprise engaged in or its activities affected trade or commerce—so the Court will not address it here.

responsibility for the demolition of the buildings or the off-site disposition of the resulting concrete material." (Arcadis Moving Br. at 34-35). Specifically, Arcadis argues, as in other claims, that the summary judgment record demonstrates that Arcadis did not participate in pre-demolition concrete sampling; sampling piles of crushed concrete; receiving, reviewing, evaluating, or discussing crushed concrete pile sample results; marking piles of crushed concrete; deciding how piles would be staged, combined, or sent off-site; contacting third parties who would receive concrete; and that Arcadis "had no information or knowledge as to where the crushed concrete was being taken or its intended use." (*Id.* at 35). The Court rejects this characterization of the record, pointing to the numerous genuine issues of material fact that the Court found in Part IV.A.1-5 of its analysis, addressing each of the issues raised by Arcadis.

Accordingly, the record reveals numerous genuine issues of material fact demonstrating that Arcadis "participate[d], either directly or indirectly, in the conduct or the affairs of the enterprise." *Horowitz v. Marlton Oncology, P.C.*, 116 F. Supp. 2d 551, 554 (D.N.J. 1999). This finding is supported by, for example, evidence that Arcadis and Golder were in "supervisory roles" deciding "(a) what level of contaminated concrete could/would be used as backfill on the Ford Plant, (b) how to sample the crushed concrete for the existence and levels of PCBs, and (c) how and when to label and consolidate the piles of crushed concrete." (Ex. 47 to Gaede Cert. ¶ 3, Baumann Decl.). Arcadis' forceful dispute as to the validity and characterization of Kevin Baumann's declaration illustrates the genuine nature of the dispute. (Arcadis Reply SMF ¶ 119). Other genuine issues of material fact—for example, Arcadis' participation in daily site meetings with its alleged co-conspirators where zero dollar sales agreements were discussed, Arcadis' participation along with Golder in site visits with prospective recipients, and Arcadis' knowledge that prospective recipients were developers like Edgewood—demonstrate that a

reasonable jury could find that Arcadis acted "purposefully and knowingly in the affairs of the enterprise in the sense of engaging in activities to seek to further assist or help effectuate the goals of the enterprise." *State v. Ball (Ball II)*, 661 A.2d 251, 268 (N.J. 1995).

As to element (3)—that defendant was employed by, or associated with the enterprise— Arcadis argues, "[i]f . . . the alleged enterprise was formed with the intent to cause the distribution of the concrete material, such an enterprise did not include Arcadis."   (Arcadis Moving Br. at 34-35).   However, "the threshold showing of 'association' is not difficult to establish: it is satisfied by proof that the defendant was 'aware of at least the general existence of the enterprise named in the indictment.'"   *United States v. Parise*, 159 F.3d 790, 796 (3d Cir. 1998) (quoting *United States v. Eufrasio*, 935 F.2d 553, 577 n.29 (3d Cir. 1991)).   "[A] defendant must be aware of the general nature of the enterprise and know that the enterprise extends beyond his individual role."   *Id.*

In *Parise*, for example, "the necessary showing of 'association' was easily met," because evidence demonstrated that defendant attended "the initial meeting during which the bribery scheme was discussed."   *Id.* Attendance at this initial meeting "alone [wa]s sufficient to demonstrate that [defendant] was aware of the [National Maritime Union] Enterprise and knew that the activities of the NMU Enterprise extended beyond his role in bribing union employees" to steer union members with personal injury cases to defendant's law firm.  *Id.*  In the present case, evidence demonstrates Arcadis' attendance at meetings—including meetings on December 8, 2004, (*see*, *e.g.*, Ex. 88 to Tallmadge Aff.), and January 13, 2005, (*see*, *e.g.*, Exs. 41, 42 to Gaede Cert.))—during which Arcadis, Ford, MA, Golder, and EQ discussed the distribution of contaminated concrete to parties like Edgewood through zero dollar sales agreements, and to

which Arcadis did not object, despite the fact that the distribution would violate the concrete use variance, demolition permit conditions, and state waste disposal regulations.

As to element (4)—participation in the conduct of the affairs of the enterprise—Edgewood alleges the common purpose of off-site distribution of contaminated concrete. (AC ¶ 423). "Unlike the federal RICO statute, NJ RICO does not require 'operation or management,' and instead participation is defined as acting 'purposefully and knowingly in the affairs of the enterprise in the sense of engaging in activities that seek to further, assist or help effectuate the goals of the enterprise.'" *Szelc v. Stanger*, No. 08-4782, 2011 U.S. Dist. LEXIS 41827, at *28-29 (D.N.J. Apr. 15, 2011) (citing *Ball II*, 661 A.2d at 268). Accordingly, a common purpose requires, "a community of purpose among the members of the enterprise," and the party's alleged association must be "more than merely incidental," to "justif[y] prosecution under RICO." *Ball I*, 632 A.2d at 1244. Under these standards, Arcadis argues, that none of its activities at the Edison Site were directed at the off-site distribution of contaminated concrete, and that its activities were limited to "participation in a discussion regarding the use of the regulatory protocol for sampling soil to sample the crushed concrete for use on-site and its limited involvement in the preparation of the variance request letter evidence." (Arcadis Moving Br. at 36-37). This, Arcadis argues, "at most, [demonstrates] a merely incidental association with an alleged enterprise and no participation, directly or indirectly, in the alleged common purpose of causing the off-site distribution of contaminated concrete material." *Id.*

The Court finds that Edgewood has demonstrated its burden of showing that Arcadis' association was more than merely incidental. The following evidence, for example, demonstrates a genuine issue of fact material to Arcadis' employees' states of mind as to the off-site distribution of contaminated concrete to companies like Edgewood.

- Golder's Michael Flanagan's deposition testimony discussing Arcadis' Gabriel Horn's presence at a November 29, 2004 meeting, during which Mr. Flanagan noted, "Writing zero dollar sales agreement, then not Ford's problem," (Ex. 59 to Gaede Cert. at 222:22-23, 223:3, 225:24-25);

- Arcadis' John Messinger's deposition testimony, answering that "Gabe [Horn] had mentioned to me that, you know, Ford had found somebody to take the material," in response to the question, "[a]t some point did you learn that some of the concrete was not going to a landfill and it was being given away to developers?," (Ex. 173 to Tallmadge Aff. at 166:3-22);

- Ford Land's Michael Powell's deposition testimony stating that when prospective concrete recipients came to the Edison Site they would speak with Michael Powell and whomever was "reviewing" samples of concrete from "either Golder & Associates, or ARCADIS," and that the receiving party would state "what kind of volume [the recipient wanted], where the material would be going," that the recipient "would answer those questions . . . [and] would leave with the sampling criteria, along with a blank copy of the zero sales agreement," and that the recipient would be "asked if they were a development sort of company," (Ex. 44 to Gaede Cert. at 349:14-353:16);

- Golder's Mike Flanagan's field notes from the January 13, 2005 meeting, noting, "11:30—discussion about the reuse [sic] concrete piles and where the material can be disposed of. EQ indicates they have a prospective buyer. All at the 11:00 meeting agree that piles below residential limit can go to the prospective buyer, so long as there is no selling involved," (Ex. 42 to Gaede Cert.);

- Arcadis' Bill Wittek's March 23, 2005 email to Arcadis' John Messinger regarding concrete use based on sampling results to be split into four separate classifications, including "On-site: no detections, Re-use: detected but below residential[,] Restricted: detected between residential and commercial levels[,] No use: if above restricted use limits," (Ex. 57 to Gaede Cert.);

- Bill Wittek's email to John Messinger copying Gabriel Horn indicating Wittek's attendance at an April 20, 2005 meeting noting under the heading "Concrete," that "Zero Sales agreement fell through. Lining up another vendor—Edgewood has a property that needs fill. Powell and Walton will work out," (Ex. 68 at 1 to Gaede Cert. ¶ 71).

These facts place Arcadis employees' states of mind squarely into issue and, "[i]t is ordinarily improper to grant summary judgment when a party's state of mind is in issue." *Mayo, Lynch & Assocs., Inc. v. Pollack*, 799 A.2d 12, 20 (N.J. Super. App. Div. 2002). In *Mayo*, for example, the Appellate Division found that "[t]he trial judge mistakenly granted summary judgment when

Pollack's state of mind, his knowledge of the bid-rigging scheme and intent to participate in it, was in issue." *Id.* at 19-20 ("A jury could conclude that [defendant's] failure to conduct any investigation, in violation of his professional obligation to investigate, surpassed mere negligence or recklessness, and indicated an intentional participation in the scheme to award the contract to Horan."). Similarly, in this case, numerous genuine issues of fact are material to Arcadis' intent to help Ford distribute contaminated concrete off-site, making this an issue for trial.

As to element (5)—participating through a pattern of racketeering activity—N.J.S.A. 2C:41-1d requires, "engaging in at least two incidents of racketeering conduct." Edgewood alleges that Arcadis, along with the other members of the alleged enterprise, engaged in the following predicate acts of racketeering activity: (1) securing execution of documents by deception; (2) selling or offering for sale adulterated or mislabeled commodities; (3) federal mail fraud; and (4) federal wire fraud. (AC ¶ 464). Edgewood makes no substantial arguments under (1) or (2) and instead relies on its arguments as to (3) and (4) where the Court will focus its analysis. Arcadis argues that it had no involvement with mail or wire fraud because Edgewood has failed to prove Arcadis' involvement in any underlying scheme to defraud, the required predicate for demonstrating mail or wire fraud. (Arcadis Moving Br. at 38). The Court has previously set forth the relevant standard:

> Improper use of the federal mail and wires are predicate offenses under federal RICO, 18 U.S.C. § 1961(1), and NJRICO, N.J.S.A. 2C:41-1(a)(2) (incorporating by reference federal list of racketeering activities). To allege mail or wire fraud, a plaintiff must describe: (1) the existence of a scheme to defraud, (2) the use of the mails or wires in furtherance of the fraudulent scheme, and (3) culpable participation by the defendants. To be part of the execution of [mail] fraud . . . the use of the mails need not be an essential element of the scheme. It is sufficient for the mailing to be incident to an essential part of the scheme, or a step in [the] plot. Further, even completely innocent mailings (those that contain no false information) can satisfy the mailing element. Therefore, [a] scheme or

artifice to defraud need not be fraudulent on its face, but must involve some sort of fraudulent misrepresentations or omissions reasonably calculated to deceive persons of ordinary prudence and comprehension.

(D.E. 220 at 32-33) (citations and quotations omitted).[10]  The Court considers these concepts in connection with the appropriate standards for summary judgment.

The Court has set forth, in great detail, element (1), which it will not revisit here.  To support its summary judgment burden of demonstrating elements (2) and (3)—that Arcadis used mails or wires in furtherance of the scheme and Arcadis' culpable participation—Edgewood points to ten emails, (Exs. 40, 43, 44, 50 to Tallmadge Aff.; Exs. 57 at 1, 68 at 1, 83, 88, 89 to Gaede Cert.); the September 14, 2004 variance letter from MA to NJDEP, (Ex. 59 to Tallmadge Aff.); and the November 19, 2004 memorandum from Golder's Messinger and Hemingway to Ford's Pearson and Powell regarding NJDEP rules for on- vs. off-site use of crushed concrete, (Ex. 90 to Gaede Cert.).  The Court finds that these communications—in addition to others, (*see*, *e.g.*, Ex. 49 to Gaede Aff. (Arcadis' Thomas Connors' July 20, 2004 email to Ford Land Project Manager Eric Pearson that, [i]f there is a question about the concrete being clean then it should be sampled or disposed off-site")—satisfy Edgewood's burden of creating genuine issues of material fact for trial as to whether Arcadis participated in the underlying fraudulent scheme through a pattern of racketeering activity.  *See*, *e.g.*, *Swistock v. Jones*, 884 F.2d 755, 759 (3d Cir. 1989) (reversing dismissal where plaintiff alleged predicate acts of mail and wire fraud spanning fourteen months "for the purposes of inducing plaintiffs to enter into the leasing transaction and to induce plaintiffs to continue making monthly payments under the lease"); *Szelc*, 2011 U.S. Dist. LEXIS 41827, at *29 (finding power of attorney for closing of fraudulent

---

[10] The Court notes that, "[a]mong other things, the New Jersey RICO statute requires proof of a 'pattern of racketeering activity.'  The predicate acts must therefore (1) be related, and (2) pose a threat of continued criminal activity."  *Metz v. United Cntys. Bancorp*, 61 F. Supp. 2d 364, 372 (D.N.J. 1999).  Arcadis focuses its arguments on the lack of an underlying fraud, without making substantial arguments challenging the relatedness and continuousness of the fraud under the facts in the summary judgment record.  Accordingly, the Court does not analyze these concepts in detail here.  (*See* D.E. 220 at 29-33).

sale-leaseback raised a genuine issue of material fact "as to whether [defendant] knew of and intended to further the" enterprise, despite the alternative, innocent explanation that "may be consistent with [defendant] merely having served as a title agent," which would be explored at trial); *Mayo*, 799 A.2d at 19 ("[Defendant's] two opinion letters, if intentionally false, and failure to take any action after ascertaining that Fidelity & Deposit bonds were fraudulent, could have constituted violations of N.J.S.A. 2C:21, and thus qualified as racketeering under N.J.S.A. 2C:41-1(1)(o).").

Accordingly, trial, not summary judgment is the appropriate forum for deciding this claim.

### 2.      NJ RICO Conspiracy Claim

Edgewood alleges a separate violation—under N.J.S.A. 2C:41-2d—that Arcadis conspired to engage in racketeering activity.  (AC ¶ 483).  The Supreme Court of New Jersey has set forth the standard for a conspiracy to violate NJ RICO:

> [A] RICO conspiracy has two separate elements: [1] an agreement to violate RICO and [2] the existence of an enterprise.  The agreement to violate RICO itself has two aspects.  One involves the agreement proper, that is, [a] an agreement to conduct or participate in the conduct of the affairs of the enterprise. The other involves [b] an agreement to the commission of at least two predicate acts.  If either agreement is lacking, the defendant has not embraced the objective of the conspiracy—the substantive violation of the RICO Act—that is required for any conspiracy conviction under classic conspiracy law.
>
> Courts, in analyzing the elements of a RICO conspiracy, generally concur that the level of awareness of a defendant need not be extensive.  A defendant must have some minimal knowledge of the extent of enterprise, but need not know the identities of all the conspirators, nor need a defendant know all the details of the enterprise.  It is sufficient if a defendant knows the general nature of the enterprise and know[s] that the enterprise extends beyond his individual role.

*Ball II*, 661 A.2d at 268 (citations and quotations omitted).

Arcadis, relying substantially on its arguments under Count IV (Civil Conspiracy), argues that "[t]he extensive discovery in this matter has produced no evidence of Arcadis, implicitly or explicitly, making any of the agreements necessary to sustain a NJ RICO conspiracy claim." (Arcadis Moving Br. at 39).  In opposition, Edgewood argues that Arcadis' "attendance at and participation in Edison Site daily meetings where plans for unlawful off-site disposal of crushed concrete were discussed is evidence that it adopted the goal of furthering the scheme to illegally distribute such material," that "Arcadis aided the other conspirators in carrying out the scheme" by drafting the variance request, watched as the NJDEP approved the variance, and then "maintain[ed] its silence when, contrary to that written variance, demolition permit conditions and New Jersey solid waste regulations, Ford began shipping the contaminated concrete off-site."  (Edgewood Opp. Br. at 22-23 (citing *Mayo*, 799 A.2d at 22 ("Pollack aided the other conspirators in the commission of their crime; by approving the bonds, he ensured that the scheme would remain undetected."))).

As to the agreement to conduct or participate in affairs of the enterprise, the Court relies on its analysis in Part IV.E above, addressing genuine disputes of material fact in the record as to Arcadis' discussion of splitting samples of concrete into four use categories, including off-site re-use; Arcadis' presence at meetings in which discussions took place regarding the off-site disposition of contaminated concrete to prospective recipients; Arcadis' disputed involvement in walking prospective recipients around the Edison Site and discussing where the concrete would be taken; that the recipients would leave with a zero dollar sales agreement; and discussing that when one agreement fell through, Edgewood was lined up as another potential recipient because its property needed fill.  As to the agreement to the commission of at least two predicate acts, the Court again incorporates its analysis in Part IV.E above, discussing Ford's entry into an

agreement with Edgewood in February 2005; Arcadis' role in producing the variance request; Arcadis' recommendation to change the method of sampling from composite sample of the pile to a grab sample; Arcadis' disputed supervisory role in the disposition of concrete; the fact that zero dollar sales agreements would make it so the contaminated concrete was not Ford's problem; and that, although Edgewood wanted compliant concrete, it received contaminated concrete in excess of residential zone limits.

Accordingly, Edgewood has raised genuine issues of material fact as to whether Arcadis "ha[d] some minimal knowledge of the extent of enterprise," without "know[ing] all of the details of the enterprise," and whether Arcadis "kn[ew] the general nature of the enterprise." *Ball II*, 661 A.2d at 268.

## V.     Conclusion

For the foregoing reasons, the Court denies Arcadis' motion for summary judgment.  An accompanying Order will follow.

*s/Esther Salas*
**Esther Salas, U.S.D.J.**

- 54 -